# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 200UNITED, and SERVICE EMPLOYEES INTERNATIONAL UNION, | Case No. 19-CV-01073-WMS |
| Plaintiffs, | |
| v. | Hon. Judge William M. Skretny (USDJ) |
| DONALD J. TRUMP, President of the United States of America; MARGARET WEICHERT, Acting Director of the Office of Personnel Management; and UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF

## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

I.   The Federal Civil Service System Established by Congress ................................................2

II.  The Challenged Executive Orders and Their Effects on the Statutory Scheme .................5

     A.   Employee Discipline and Discharge..........................................................................6

     B.   Time and Resources Needed to Perform Statutory Duties  ...................................8

     C.   Good-Faith Collective Bargaining...........................................................................9

          1.   Removal of Subjects from Bargaining......................................................10

          2.   Unlawful Bargaining Parameters ............................................................11

          3.   Mandating Predetermined Outcomes of Bargaining................................11

III. Federal Employees Impacted By These Orders....................................................................11

IV.  OPM Will Imminently Implement These Executive Orders ...............................................12

ARGUMENT ...............................................................................................................13

I.   Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims ...............................13

     A.   Plaintiffs Are Likely to Succeed on the Merits of Their Procedural APA
          Claim..........................................................................................................................15

     B.   Plaintiffs Are Also Likely to Succeed with Their Claims that Agency Actions
          Required by the Executive Orders Are Contrary to Law.......................................18

          1.   Provisions Regarding Employee Discipline and Discharge .....................18

          2.   Provisions Regarding Employees' Resources to Perform Statutory
               Duties .......................................................................................................19

          3.   New Collective Bargaining Rules.............................................................20

     C.   This Court Has Jurisdiction to Hear These Claims................................................21

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

II.     Implementation of the Three Executive Orders Will Irreparably Harm Federal
        Employees, Their Labor Representatives, and the Public Interest ................................... 22

CONCLUSION ........................................................................................................................... 24

APPENDIX .................................................................................................................................. 26

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

# TABLE OF AUTHORITIES

**Cases**

*AFGE v. Trump*,
318 F. Supp. 3d 370 (D.D.C. 2018) .................................................................... 2

*AFGE v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ......................................................... 2, 13, 18, 21

*Am. Fed'n of Labor v. Watson*,
327 U.S. 582 (1946) .............................................................................................. 23

*APA, NTEU v. Helfer*,
53 F.3d 1289 (D.C. Cir. 1995) ..................................................................... 15, 16

*BATF v. FLRA*,
464 U.S. 89 (1983) ................................................................................. 3, 4, 8, 9

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986) .............................................................................................. 22

*Califano v. Sanders*,
430 U.S. 99 (1977) ................................................................................................ 22

*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......................................................................... 14

*Clarke v. Ofc. of Fed. Housing Enterp. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004) .................................................................... 24

*Danielson v. Local 275, Laborers Int'l Union of N. Am., AFL-CIO*,
479 F.2d 1033 (2d Cir. 1973) ............................................................................. 13

*Donovan v. Red Star Marine Servs., Inc.*,
739 F.2d 774 (2d Cir. 1984) ............................................................................... 14

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .............................................................................. 13

*Elgin v. Dept. of Treasury*,
567 U.S. 1 (2012) .................................................................................................. 21

*EPIC v. U.S. Dep't of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011) ............................................................................... 14

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ............................................................................... 13

iii

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
 561 U.S. 477 (2010) ............................................................................................ 22

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*,
 589 F.2d 658 (D.C. Cir. 1978) ........................................................................... 15

*International Union of Elec. Workers v. NLRB*,
 426 F.2d 1243 (D.C. Cir. 1970) ......................................................................... 24

*Lincoln v. Vigil*,
 508 U.S. 182 (1993) ............................................................................................ 14

*Lindahl v. Office of Pers. Mgmt.*,
 470 U.S. 768 (1985) .............................................................................................. 3

*Nat. Treas. Emp. Union v. Chertoff*,
 452 F.3d 839 (D.C. Cir. 2006) .......................................................... 15, 17, 22, 24

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
 979 F.2d 227 (D.C. Cir. 1992) ........................................................................... 15

*NTEU v. Devine*,
 577 F. Supp. 738 (D.D.C. 1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984) ............... 22

*NTEU v. Horner*,
 854 F.2d 490 (D.C. Cir. 1988) ........................................................................... 22

*NTEU v. Newman*,
 768 F. Supp. 8 (D.D.C. 1991) ............................................................................ 22

*NTEU v. U.S. Dept. of Treasury*,
 838 F. Supp. 631 (D.D.C. 1993) ........................................................................ 24

*NTEU v. Whipple*,
 636 F. Supp. 2d 63 (D.D.C. 2009) ..................................................................... 22

*Pennsylvania v. President United States*,
 930 F.3d 543 (3d Cir. 2019) ............................................................................... 13

*Scenic America, Inc. v. U.S. Dept. of Transp.*,
 836 F.3d 42 (D.C. Cir. 2016) ............................................................................. 14

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ...................................................................................... 21, 22

*Tilton v. SEC*,
 824 F.3d 276 (2d Cir. 2016) ............................................................................... 21

*Time Warner Cable Inc. v. F.C.C.*,
  729 F.3d 137 (2d Cir. 2013)................................................................. 14, 15

*U.S. v. Fausto*,
  484 U.S. 439 (1988) .......................................................................... 3

*United States v. Yuzary*,
  55 F.3d 47 (2d Cir. 1995)................................................................. 15, 17, 21

*White v. Shalala*,
  7 F.3d 296 (2d Cir. 1993)................................................................. 14

**Statutory Authorities**

5 U.S.C. §500.................................................................................... 1

5 U.S.C. §551.................................................................................... 14

5 U.S.C. §553.................................................................................14, 16, 17

5 U.S.C. §702.................................................................................14, 22

5 U.S.C. §706................................................................................. *passim*

5 U.S.C. §1101..................................................................................1

5 U.S.C. §1103..................................................................................3

5 U.S.C. §1105..................................................................................15

5 U.S.C. §4302.................................................................................7, 18

5 U.S.C. §7101..................................................................................3

5 U.S.C. §7102................................................................................. *passim*

5 U.S.C. §7103................................................................................. *passim*

5 U.S.C. §7104..................................................................................4

5 U.S.C. §7106.................................................................................10, 18, 20

5 U.S.C. §7111..................................................................................11

5 U.S.C. §7114................................................................................. *passim*

5 U.S.C. §7116..................................................................................22

5 U.S.C. §7117..................................................................................10

5 U.S.C. §7121................................................................................. *passim*

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

5 U.S.C. §7131 ............................................................................................................. *passim*

5 U.S.C. §7134 ...........................................................................................................21

5 U.S.C. §7512 .............................................................................................................7


**Legislative Materials**

124 Cong. Rec. 29188 (1978) ............................................................................. 3, 9, 11

S. Rep. No. 95-969 (1978) ............................................................................... 3, 4, 9, 18

The Pendleton Act of 1883 (22, 27 Stat. 403) ............................................................2

Intergovernmental Personnel Act of 1970 (Pub. L. 91-648) ................................3, 5, 24

House Committee on Post Office and Civil Service, *History of Civil Service Merit Systems of the United States and Selected Foreign Countries,* Cmte. Print No. (1976) ........... 2, 5

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

# INTRODUCTION

Members in the plaintiff unions are employees of the United States Department of Veterans Affairs (the "VA") whose employment has been governed for many years by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §1101 *et seq*. Many of plaintiffs' members are veterans themselves, and their work caring for their fellow veterans is a continuation of their service to this country.

Pursuant to three Executive Orders aimed at federal employees like these, the Trump Administration now seeks to undermine statutory protections for federal civil service employees that have kept the civil service merit-based and largely politics-free for decades. *See* Appendix ("App.") 1-3 (attaching Executive Order Nos. 13,836, 13,837, and 13,839, collectively the "Executive Orders"). The Executive Orders are an effort to make statutory changes without congressional authorization. They are also in many ways a re-packaging of attacks on the independent civil service that have surfaced repeatedly in our history but have consistently been rebuffed.

As explained in greater detail below, implementation of the Orders should be enjoined to preserve the long-settled status quo while this Court considers the merits of Plaintiffs' lawsuit. Plaintiffs are likely to succeed on the merits of their claims because the Executive Orders direct federal agencies to take action that is both contrary to law and that requires but has not gone through notice-and-comment rulemaking. *Contra* Administrative Procedure Act ("APA"), 5 U.S.C. §500 *et seq*. Implementation of the Orders while this suit is pending will also cause irreparable harm to federal workers as the Orders will, among other things, nullify the statutory right to union representation in discipline and discharge proceedings, which could have life-altering implications for the employees plaintiffs represent, and illegally impact current collective bargaining negotiations, eliminating opportunities that once lost cannot later be regained. For many of these same reasons, the balance of hardships and public interest strongly favor a preliminary injunction as well.

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

Plaintiffs seek an order preserving the status quo now because the Executive Branch is poised imminently to implement its unlawful Orders through agency action. Until recently, implementation of the three Executive Orders had been halted in large part by an order of the federal district court in the District of Columbia, *see AFGE v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), but that court's injunction was overturned recently by the D.C. Circuit on jurisdictional grounds that do not apply here, *see AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). Absent an injunction from this Court, defendants will implement the illegal Orders as soon as the D.C. Circuit's mandate issues and before their lack of authority to do so can be adjudicated.

## BACKGROUND

### I. The Federal Civil Service System Established by Congress

The modern civil service was born of a desire to eliminate the political patronage or "spoils" system, which had allowed new administrations to fire experienced federal workers and replace them with unqualified political supporters. After an initial period of competence-based appointments by the early presidents, the patronage system developed in the 19th Century. The lack of protections for civil servants that characterized the spoils system led to poor government because experienced, non-partisan staff were too easily and too often replaced, and the resulting inefficiencies and partisan administration led to a corresponding "decline in prestige of public service." House Committee on Post Office and Civil Service, *History of Civil Service Merit Systems of the United States and Selected Foreign Countries*, Cmte. Print No. 94-29 (1976), at 81 (*see* Leonard Decl. ¶14).

Congress first stepped in to enact reform in the 1880s. The Pendleton Act of 1883 (22, 27 Stat. 403) introduced a merit system but, at least initially, covered only 10% of the federal workforce. *History of Civil Service Merit Systems,* at 170. Between that Act and the 1978 Civil Service Reform Act ("CSRA"), civil service reform continued in fits and starts—administrations would add or remove jobs from the scope of the merit-based civil service system and would strengthen or weaken protections as they preferred. *Id.* at 184-85; *see also, e.g.*, *id.* at 8-9, 254

(describing how Franklin Roosevelt, for example, presided over a necessary increase in the size of government but, in filling the new jobs created, exempted many from protections of the civil service system).  By 1977, the rules that governed federal employment were a hodgepodge that both lacked uniformity and changed with the politics of each administration.  *BATF v. FLRA*, 464 U.S. 89 (1983).

Congress recommitted to and rearticulated the principles of a merit system in the Intergovernmental Personnel Act of 1970 (Pub. L. 91-648),[1] and then in 1978, "comprehensively overhauled" the federal civil service system by enacting the CSRA.  *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).  The CSRA replaced an "'outdated patchwork of statutes and rules,'" *U.S. v. Fausto*, 484 U.S. 439, 444 (1988) (quoting S. Rep. No. 95-969, p. 3 (1978)), and created a "statutory Federal labor-management program" protected from "alter[ation] *by any president*," 124 Cong. Rec. 29,186 (1978) (remarks of co-sponsor Rep. Clay) (emphasis added).[2]

Central to this overhaul, Title VII of the CSRA, which is known as the Federal Service Labor-Management Relations Statute ("FSLMRS"), was "the first statutory scheme governing labor relations between federal agencies and their employees."  *BATF*, 464 U.S. at 91; *see* 5 U.S.C. §7101 *et seq.*  In enacting the FSLMRS, Congress recognized that labor unions and collective bargaining "safeguard the public interest" because they are key tools for protecting the meritocratic system.  *See, e.g.*, §7101(a)(1), (b) (congressional findings that "labor organizations and collective bargaining in the civil service are in the public interest" and protecting the right to union representation "safeguards the public interest").  For example, faced with a long history of

---

[1] In enacting this statute, Congress identified several principles essential to a successful merit system, including recruitment and retention on the basis of skills and experience, adequate compensation and training, fair treatment of employees, and protection from political pressure. 84 Stat. 1909.

[2] The CSRA also created OPM and gave it authority for "executing, administering, and enforcing" Presidential rules regarding the federal workforce.  5 U.S.C. §1103(a)(5); *see also id.* §1103(a)(7).  All further statutory citations are to Title 5 of the U.S. Code unless otherwise noted.

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

(not uncommon) administration efforts to replace long-term employees with political inexperienced loyalists, Congress intended that union stewards would be the on-the-ground defenders of fair treatment for qualified career staff. *See* S. Rep. No. 95-969 at 2-4; 13. Accordingly, the Act guarantees federal employees the right to choose to be represented by a labor organization and to be protected in the exercise of that right, §7102, and was "intended to strengthen the position of federal unions," *BATF*, 464 U.S. at 107.

At the same time, the CSRA imposes significant responsibilities on unions to ensure that collective bargaining is, in fact, an "effective instrument of the public interest . . . ." *Id.* at 107. In particular, Congress assigned unions the duty to represent all members of a bargaining unit regardless of union membership. §7114(a)(1). Unions chosen to be exclusive representatives therefore have a statutory obligation to: represent employees at various stages of discipline and discharge proceedings, as well as in other employer investigations; enforce the applicable collective bargaining agreement; engage in "formal discussions" regarding "any personnel policy or practices or other general condition of employment"; and, of course, engage in collective bargaining. §7114(a)(2); *see also* §7121(b)(1)(C) (requiring that collective bargaining agreements authorize union representation in grievances); §§7104-05, 7116, 7118-19, 7121-22, 7132.

These responsibilities naturally consume significant time and resources. *See, e.g.*, Declarations of Scott Phillipson at ¶¶20-37 and Don Woodworth at ¶¶10-21. In addition to duties representing employees in formal grievances, bargaining, and unfair labor practice proceedings, union representatives are often their co-workers' principal resource for all kinds of human-relations matters. As federal police officer and union representative Don Woodworth explains, "[e]mployees in the unit rely on me to represent them to management about their performance evaluations, leave solicitations, bidding issues, contract interpretation, and a host of employment issues. I am often the first point of contact when individual employees face discipline or other work-related issues." Woodworth Decl. ¶4. Unions elected by federal workers cannot fulfill their statutory duties unless the employees who serve as union

representatives are able to devote time to the tasks they are obligated to perform on behalf of their fellow bargaining unit members. *See, infra,* at II(B).

Because these various mechanisms for protecting our merit-based civil service system have now been in place for many years, they are "more and more taken for granted." *History of Civil Service Merit Systems,* at 287. But enactment of the CSRA did not end attacks on the independent civil service, which re-emerge periodically in different forms although usually with the same goal – namely, the goal of reducing protections for career staff so that new administrations have more freedom to hire their "own" people and implement policy changes that might otherwise face resistance from long-term, apolitical employees. *See, e.g.*, Leonard Decl. ¶15 (article citing an increase in violations of the Hatch Act, which is intended, *inter alia*, to protect career civil servants from political pressure by superiors, and a perception of an increased "willingness to tap political appointees with no government experience"); *see also id.* ¶16 (article citing recent violations in administrations of both parties and describing concern that "[t]hings are becoming more politicized" in government work); Leonard Decl. ¶17 (U.S. Dep't of Justice, Office of Inspector Gen., "An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division" (July 2, 2008)). The challenged Executive Orders are of a piece with many past challenges to the civil service in that they attempt, as a number of administrations have before, to make it easier to discharge career federal workers who may be seen as hostile to a new president's policies. In this case, the Orders also systematically attempt to weaken the labor unions who are federal employees' elected representatives.

## II.    The Challenged Executive Orders and Their Effects on the Statutory Scheme

President Trump issued three Executive Orders on May 25, 2018, that purport to make sweeping changes to the federal civil service and labor-management relations systems in violation of the CSRA. App. 1-3. The overall impact of the Orders is purportedly to eliminate important employee protections guaranteed by statute, to prevent federal employees from exercising their right to act as union representatives on behalf of their co-workers, and to

undermine collective bargaining in violation of the statute by directing agencies to refuse to bargain over some issues and to insist on pre-determined outcomes as to other issues. The Orders also purport to require implementation immediately, within 45 days, or during ongoing or upcoming bargaining (depending on the particular provision), with formal notice-and-comment rules possibly to follow *after* the fact. App. 1-3; *see also* Leonard Decl. Exs. A-F (OPM Guidances). The existing statutory provisions and specific, conflicting sections of the Executive Orders are discussed in detail below.[3]

A. Employee Discipline and Discharge

The history of the federal civil service highlights the need to ensure that individual workers are protected from unwarranted discipline and discharge. Under the FSLMRS, union representation does much of that protective work. Employees are guaranteed the right to have union representation at key moments and to stand up for their co-workers as union representatives themselves. *See* §7102 (employees have right "to act for a labor organization in the capacity of a representative"); *see also* §7101 (right to "participate through labor unions"); §7114(a)(2) (right to union representation at grievances, meetings with management and in investigations); §7121 (right to union representation in grievance and binding arbitration). In addition, all federal bargaining agreements must contain a procedure for the resolution of employee or union-filed grievances over any workplace dispute, and the procedure must culminate in binding arbitration. §7121(a), (b). The "grievance[s]" that must be subject to this procedure are defined very broadly to include any dispute "concerning any matter related to the employment" of an employee, in addition to disputes related to violations of collective bargaining agreements and any asserted violations of law or regulation affecting employment. §7103(a)(9).[4] Congress excluded only a few specific matters from the mandatory grievance

---

[3] Plaintiffs do not attempt to summarize here all of the provisions of the Orders or the statutory provisions they implicate. For purposes of this motion, Plaintiffs focus on provisions that render the Orders unlawful under the APA.

[4] This statutory definition gives federal grievance procedures a far broader scope than the typical grievance procedure in a private collective bargaining agreement under the NLRA.

procedure, §7121(c), and the only other authorized mechanism for excluding additional topics from the grievance procedure is by negotiated agreement, §7121(a)(2).

In addition to providing for union representation as a protection against improper discipline or discharge, the CSRA includes substantive standards for resolving "adverse actions" against employees (such as reassignments, reductions in grade, or removals for unacceptable performance). §7512. The statute specifies that adverse actions for performance are permitted "only after an opportunity to demonstrate acceptable performance," known as a "performance improvement period" or "PIP." §4302(c)(6).

The Removal Procedures Order contradicts many of these statutory provisions. The Order purports to prohibit any grievance or arbitration of disputes regarding certain identified topics, including performance evaluations and incentive pay awards, which are matters that under the statute must be subject to grievance procedures. *Compare* §§7103(a)(9) (defining "grievance" as "concerning any matter related to the employment") *with* App. 3 §4(a) (prohibiting agencies from processing grievances related to performance evaluations; incentive pay; step increases; other types of payments). The Order also purports to prohibit agencies from ever agreeing to grieve or arbitrate removals for performance reasons, another subject that falls within the statutory definition of "grievance" and that can only be excluded from the grievance procedure by negotiated agreement, §7121(a)(2). App. 3 §§3, 4(b). Finally, the Removal Procedures Order purports to prohibit any agency from allowing a PIP longer than 30 days, effectively contravening Congress's decision to leave that matter for resolution in good-faith bargaining. *Id*. §4(c). These mandates were effective within 45 days of the Order, and OPM was directed to propose formal rules only later. App. 3 §7(a), (b).[5]

---

[5] When the Orders were issued, OPM directed agencies to implement them in bargaining as soon as possible and within 45 days if not covered by a collective bargaining agreement. Leonard Decl. Ex. E (July 5, 2018 OPM Removal Procedures Guidance). OPM also explained that it might issue formal rules under the Orders in the future. But neither the Executive Orders nor OPM's Guidances state when OPM intends to propose any rules or identify what areas those rules might cover, leaving agencies in the default position of having to implement all substantive requirements immediately as written and revise their procedures later if OPM issues rules.

B. <u>Time and Resources Needed to Perform Statutory Duties</u>

As explained above, the FSLMRS imposes on unions the obligation to represent all employees in their bargaining units. §7114(a)(2). To fulfill that obligation, unions must, *inter alia*, engage in collective bargaining and represent employees in grievance, arbitration, and FLRA proceedings, as well as in other employer investigations. §7114(a)(2), (a)(4). Federal-employee unions have never had the right to collect "fair share fees" from non-members who use and benefit from the union's services, leaving federal unions with fewer resources than most other unions to hire any staff to do their statutorily-mandated work. Healy Decl. ¶10. Thus, the FSLMRS provides employees the right to represent each other (to "act for a labor organization in the capacity of a representative," §7102(1)) and the "right, in that capacity, to present the views of the labor organization" to the employer. *Id*.

The FSLMRS also authorizes what is known as "official time," *i.e.*, time at work that employees who are union representatives can use to perform their statutory representative duties. §7131. Congress specifically mandated that "official time" include time for collective bargaining, §7131(a), and for participation in FLRA proceedings at agency discretion, §7131(c). Congress also made clear that official time is not statutorily authorized for internal union business. §7131(b). For everything else required of employees acting as union representatives, Congress directed employers and unions to negotiate over the amount of official time appropriate for each bargaining unit. §7131(d). The legislative history of these provisions demonstrates that Congress was concerned with allowing employee representatives necessary time to perform the work that is statutorily required of them and recognized that such work can be done only if employees are permitted time to do it. *BATF*, 464 U.S. at 101-2. Representative William Clay of Missouri, who co-sponsored the CSRA, explained that employees performing this work "'should be allowed official time to carry out their statutory representational activities just as

management uses official time to carry out its responsibilities.'" *Id.* (quoting 124 Cong. Rec. 29188 (1978)).[6]

The Official Time Order directs agencies to violate these statutory provisions. For example, the Order requires OPM to ban employees from using work time to participate in any grievances involving co-workers, App. 2 §4(a)(iv), notwithstanding that the FSLMRS *guarantees* employees the right to 1) act as a union representative, §7102, and 2) have a union representative during grievance proceedings and employer investigations, §§7114(a)(2), §7121(b). The Order also purports to ban employees from using official time for union-related "First Amendment" activity. *Compare* App. 2 §4(a)(ii) *with* §7102 (guaranteeing employees' right "to present the views of the labor organization" to the employer). And the Order imposes caps on official time even though Congress required that the amount of such time be negotiated, such that any limits be imposed by *agreement between the parties*. *Compare* App. 2 §4(a)(i) *with* §7131(d).

In addition, the Official Time Order deters employees from engaging in representational and grievance work by requiring advance written authorization from their agency, App. 2 §4(b), and by authorizing serious discipline for violations of these new rules, *id*. at §5(a). The Order even prohibits any employee "acting on behalf of a Federal labor organization" from "the free or discounted use of government property or any agency resources," defined as "office or meeting space, reserved parking spaces, phones, computers, and computer systems." *Id*. at §4(a)(iii). Query how an individual federal employee who has a statutory duty to represent his or her co-workers, *supra at* II(A)*,* can perform that function without either time or space in which to do so.

C. Good-Faith Collective Bargaining

The FSLMRS provides that employees "shall have the right" to engage in "collective bargaining with respect to conditions of employment." §7102. "Conditions of employment" is

---

[6] The Senate originally included a narrower official time provision consistent with then-operative Executive Orders; the House bill included the broad provision that became law and reflected parity between employees and management. *See BATF*, 464 U.S. at 101-2; S. Rep. No. 95-969 at 112 (1978); H.R. Conf. Rep. No. 95-1717 at 139 (1978).

defined broadly to include: "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions," §7103(a)(14). The FSLMRS also requires both agencies and their employees to negotiate over these terms and conditions "in good faith." §7114(a)(4), (b); §7103(a)(12). As defined by Congress in detail, the duty to bargain in good-faith includes an obligation to approach bargaining with an open mind and a "sincere resolve" to reach agreement. §7114(b)(1).

The FSLMRS designates three specific categories of bargaining subjects. First, Congress identified the matters over which agencies and unions *must* bargain (mandatory subjects), which include the "conditions of employment" defined above, §7103(a)(14), to which Congress specifically added "procedures for the settlement of grievances," §7121(a), and the "amount" of "official time" for representational work beyond bargaining, §7131(d). Second, Congress identified a short list of subjects over which unions and agencies may *not* bargain (prohibited subjects), which includes, *inter alia*, "policies, practices, and matters" relating to political activities, §7103(a)(14), and "[g]overnment-wide rule[s] or regulation[s]." §7117(a)(1); *see also* §7106(a). Finally, there are subjects over which unions and employing agencies are permitted to bargain (permissive subjects), including procedures for protecting employees from adverse actions within the scope of defined "management rights." §7106(b).

The three Executive Orders contain numerous sections that contravene these statutory requirements:

1. *Removal of Subjects from Bargaining*. Notwithstanding that Congress granted agencies the authority to bargain over permissive subjects, §7106(b), the Collective Bargaining Order purports to eliminate all permissive subjects of bargaining by unilateral decree. App. 1 §6 (prohibiting "negotiat[ing] over the substance of the subjects set forth in section 7106(b)(1) of title 5"). The Order does not set forth any implementation timeframe for this prohibition and thus will apply to ongoing and upcoming collective bargaining negotiations. The Official Time Order also prohibits agencies from bargaining over the use of official time by a union representative to pursue a grievance on behalf of co-workers, App. 2 §4(v), notwithstanding the

direction to bargain set forth in §7131(d).  And the Official Time Order creates a new (and low) cap on the use of official time per employee, and bars agencies from negotiating anything different.  *Compare* App. 2 §4(ii) with §7131(d).  These provisions are effective immediately in any ongoing or upcoming bargaining.  App. 2 §8.

2. *Unlawful Bargaining Parameters*.  The Collective Bargaining Order imposes arbitrary bargaining parameters that limit the duration of bargaining and confine bargaining to the mechanical exchange of written proposals rather than a good-faith exchange as contemplated by the statute.  App. 1 §5.  Because this Order sets no timeframe, these restrictions on bargaining also appear to be effective immediately.

3. *Mandating Predetermined Outcomes of Bargaining*.  The Removal Procedures Order mandates predetermined outcomes in bargaining, contrary to the defined duty to bargain in good faith, §7114(a)(4), (b); §7103(a)(12), by prohibiting agencies from entering into any bargaining agreement that, *inter alia*, constrains the agency's ability to terminate an employee without progressive discipline or to impose certain other performance-related rules.  App. 3 §4(b)(i)-(iii). The Order does not set a time frame for implementation of these provisions so they will apply immediately to any ongoing or upcoming bargaining.  *Id*. at §7(b)(ii).  The Official Time Order also attempts to predetermine the outcome of bargaining by requiring agreements to contain new arbitrary bargaining unit-wide caps on official time, in the form of a ratio between number of unit employees and total hours of official time.  App. 2 §3.

## III.    Federal Employees Impacted By These Orders

Federal workers represented by SEIU Local 200U and SEIU are employees whose employment is governed by the CSRA and FSMLRS, and the plaintiff unions are each "labor organizations," §7103(a)(4), which have been chosen as the exclusive bargaining representative for units of federal employees, §7111.  Phillipson Decl. ¶¶3-17; Healy Decl. ¶¶5-6.

SEIU Local 200U represents federal employees who work at VA medical facilities in Buffalo, Canandaigua, Syracuse, and Albany, New York, and Erie, Pennsylvania.  Phillipson Decl. ¶¶4-15.  These bargaining units include employees who provide pharmacy, rehabilitation,

and prosthetic services; who provide specialized treatment such as psychological or speech/language therapy; and who serve as police officers and firefighters on VA campuses. *Id.* ¶10.

As explained further in the Declarations of SEIU Local 200U President Scott Phillipson, and Canandaigua VA unit chair Don Woodworth, SEIU Local 200U cannot function unless its employee representatives have time to perform the duties assigned to them by statute. Phillipson Decl. ¶¶20-37; Woodworth Decl. ¶¶11-21. SEIU Local 200U has only two paid employees of its own to help represent over 6,000 federal employees. Phillipson Decl. ¶24. For this reason, and because of the practical reality that representative functions can often only be performed by workers at the job site, the union cannot fulfill its obligations without employee representatives. *Id.* at ¶20-37.

Plaintiff SEIU is the certified representative for a nationwide unit of VA employees whose facility-based contracts are negotiated by SEIU locals such as SEIU Local 200U. Healy Decl. ¶¶5-6. In addition to the VA employees represented by SEIU Local 200U, SEIU represents federal employees in Illinois, Mississippi, Indiana, and Wisconsin. *Id.*

## IV. OPM Will Imminently Implement These Executive Orders

The Executive Orders cannot be implemented without agency action, and they delegate responsibility to OPM for implementation and for the provision of direction to employing agencies, consistent with OPM's statutory authority to execute and administer the "President's rules" for the civil service workforce. *See* §§1101, 1103, 1104. Accordingly, OPM issued three Guidances in July 2018 that incorporate the rules and requirements set forth in the Orders and state that most provisions are either immediately effective, effective within 45 days of the Orders, or effective as soon as a collective bargaining agreement comes up for negotiation (which could be immediately). App. 1-3; Leonard Decl. Exs. A, C, and E.

On August 25, 2018, OPM and the President's subordinates were enjoined from "implementing or giving effect to" the Executive Orders by the D.C. District Court because the

Orders conflict with the CSRA and FSLMRS. *AFGE*, 318 F. Supp. 3d at 440.[7] OPM had no choice but to rescind its July Guidances but has been very clear—including in a recent motion to expedite the mandate for the D.C. Circuit decision that overturned the District Court's injunction on jurisdictional grounds, *AFGE*, 929 F.3d at 761—that it intends to return immediately to implementation after the mandate issues and the District Court's injunction is lifted. Leonard Decl. ¶11. The D.C. Circuit's mandate has not yet issued because a petition for en banc rehearing was filed but that petition could be denied and the mandate issue any day. *Id*. ¶¶10,13.

## ARGUMENT

In moving for a preliminary injunction, Plaintiffs seek to "maintain the status quo" under the CSRA until this Court can rule on the substance of their claims. *Danielson v. Local 275, Laborers Int'l Union of N. Am., AFL-CIO*, 479 F.2d 1033, 1037 (2d Cir. 1973). Interim injunctive relief is appropriate when a party demonstrates: "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (internal quotations omitted). Plaintiffs meet both these requirements.

## I.      Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

Plaintiffs move for a preliminary injunction on the basis of their claims under the APA. Although the APA does not apply directly to actions by the President, it does apply to agencies when they take any action to implement Executive Orders, and Executive Orders cannot be used to achieve an end-run around the APA. *See, e.g.*, *Pennsylvania v. President United States*, 930 F.3d 543, 568 (3d Cir. 2019) (affirming preliminary injunction enjoining agency action implementing an Executive Order without required notice-and-comment rulemaking); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754-55 (9th Cir. 2018) (APA review of

---

[7] The provisions enjoined were the Official Time §§3(a), 4(a), 4(b); Removal Procedures §§3, 4(a), 4(c); and Collective Bargaining §§5(a), 5(e), 6. *AFGE*, 318 F. Supp. 3d at 440.

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

agency action taken pursuant to Presidential directive); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question").

The APA imposes both procedural requirements for agency action and mandates that agency action comply with the law. §706(2)(A)-(D). As is relevant here with respect to procedure, the APA requires federal agencies to go through a formal notice-and-comment process before imposing "rules," which are defined as "the whole or a part of an agency statement of general or particular applicability and future effect …." §551(4); §553; *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 167 (2d Cir. 2013). To the extent an agency's action constitutes such a "rule," the agency must publish notice of its proposed rule in the Federal Register, collect and consider public comments, and issue a concise statement of purpose upon finalizing the new rule. §553(b)-(c). When an agency attempts to issue and implement rules without notice and comment, the APA authorizes federal courts to "hold unlawful" and "set aside" that action as "without observance of procedure required by law." §706(2)(D).[8]

The APA's formal rule-making requirements apply to "legislative" rules but not to lesser agency action such as "interpretive rules." §553(b)(A); *see Lincoln v. Vigil*, 508 U.S. 182, 196 (1993); *Time Warner Cable*, 729 F.3d at 168. The Second Circuit has defined legislative rules as agency action that "create[s] new law, rights, or duties," *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993), or "change[s] existing rights and obligations," *Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 783 (2d Cir. 1984). *See also Time Warner Cable*, 729 F.3d at 168; *EPIC v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (the question is whether "the new rule effects a substantive regulatory change to the statutory … regime"). Accordingly, agency action that seeks to eliminate discretion delegated by Congress is a legislative rule. *Scenic*

---

[8] The APA provides a cause of action to challenge "agency action," and "agency action includes the whole or a part of an agency rule…." §551(13); *see also* §702 ("[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof").

*America, Inc. v. U.S. Dept. of Transp.*, 836 F.3d 42 (D.C. Cir. 2016); *see also Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C. Cir. 1978). Interpretive rules, by contrast, are those that attempt merely "to clarify an existing rule" but not "change existing law, policy, or practice." *United States v. Yuzary*, 55 F.3d 47, 52 (2d Cir. 1995); *Time Warner Cable*, 729 F.3d at 168 (interpretive or procedural rules do not "impose new substantive burdens") (quotation omitted); *see also Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236–37 (D.C. Cir. 1992) (interpretative rules "merely track[]" preexisting requirements and explain something the statute *already* required).

With respect to rules' content, the APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise contrary to law. §706(2)(A), (C). Thus, the APA authorizes federal courts to hold unlawful and set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. For example, the Third Circuit recently enjoined agencies from implementing the requirements of an Executive Order because the implementing rules would exceed the agency's statutory authority. *Pennsylvania*, 930 F.3d at 569 (affirming preliminary injunction because interim rules implementing Executive Order were in excess of statutory authority and contrary to law); *see also Nat. Treas. Emp. Union v Chertoff,* 452 F.3d 839, 861 (D.C. Cir. 2006) (affirming district court order under APA setting aside rules limiting scope of collective bargaining as exceeding statutory authority and contrary to law).

A. Plaintiffs Are Likely to Succeed on the Merits of Their Procedural APA Claim

OPM is charged with executing and administering any Presidential rulemaking for federal employees, *supra* at 13; §1103, and OPM is an "agency" subject to the requirements of the APA, *NTEU v. Helfer*, 53 F.3d 1289, 1292-93 (D.C. Cir. 1995). Notably, Congress, when it created OPM, specifically incorporated the APA's requirements for any rules promulgated by OPM that apply to federal employees beyond "the Office or its employees." §1103(b); *see also* §1105.

As discussed above, OPM took action in July 2018 to implement the challenged Executive Orders and has made clear its intent to take such action again immediately after the D.C. District Court's injunction is lifted. Leonard Decl. ¶11. Although OPM has indicated that it might engage in some formal rulemaking related to the Orders at some unspecified *future* date, OPM cannot hold off on implementation in the meantime (and has indicated no intention to do so) given the plain language of the Orders themselves. App. 1-3. OPM's July 2018 Guidances thus told agencies to comply with the Orders immediately (e.g., in active bargaining), as soon as possible (for collective bargaining agreements not yet open for negotiation), or within 45 days of the Orders' signing (a date now long since passed). Leonard Decl. Exs. A-F. OPM has also emphasized to the D.C. Circuit that it believes immediate implementation is important, *id.* ¶11, and such implementation will necessarily precede any formal rulemaking. Thus, it is clear that OPM will implement the challenged Orders immediately when the D.C. Circuit's mandate issues.

But as the Executive Orders themselves and OPM's Guidances make clear, implementation in this case will necessarily involve the imposition of new rules that "change existing policy or practice"—rules that require notice-and-comment rulemaking under the APA. §§553, 706(2)(D). For example, to implement the Orders, OPM must (as it did its July 2018 Guidances) do all of the following:

- Impose new requirements that effectuate a wholesale revision of the mandatory grievance procedures and the statutory treatment of progressive discipline. Leonard Decl. Ex. E (OPM Removal Procedures Guidance, particularly sections titled "Standard for Negotiating Grievance Procedures" and "Managing the Federal Workforce"), implementing Removal Procedures Order (App. 3) §§2-6. *See also supra*, at 7-8 (explaining conflict between Removal Procedures Order and §7121 and other provisions of the CSRA).

- Direct that going forward no employee can use on-duty time to act in a representative capacity in specific contexts permitted by existing law (participating in grievances, lobbying); no employee can exceed certain caps on use of official time; employees must seek pre-authorization; and employees must be subject to serious discipline for using time in violation of these rules. Leonard Decl. Ex. C (OPM Official Time Guidance),

implementing Official Time Order (App. 2) §§3-5.  *See supra* at 9-10 (explaining conflict between Official Time Order and §7131 and other FSLMRS provisions).

- Eliminate all agency discretion to bargain over permissive subjects and predetermine the outcome of collective bargaining with respect to mandatory subjects of bargaining (like official time and grievance procedures), and impose other bargaining constraints inconsistent with the duty to bargain in good faith.  Leonard Decl. Ex. A (OPM Collective Bargaining Guidance), implementing Collective Bargaining Order (App. 1) §6; *see also* Leonard Decl. Ex. C (OPM Official Time Guidance), implementing App. 2 §§3, 4; Leonard Decl. Ex. E. (OPM Removal Procedures Guidance), implementing App. 3 §4(b).  *See supra* at 10-12 (explaining conflict between collective bargaining provisions and §7106 and other CSRA duty to bargain provisions).[9]

    These drastically changed policies cannot with a straight face be described as merely "clarify[ing] . . . existing rule[s]."  *Yuzary*, 55 F.3d at 52.  By their plain terms, the Orders and Guidances alter long-standing requirements under the statutory scheme and change rights and responsibilities.  Indeed, the Orders themselves tellingly refer to their requirements as new "rules," *e.g.*, App. 2 §4(c),[10] and, while mandating immediate implementation, acknowledge that formal regulatory action may be needed in the future.  App. 2 §4(c); App. 3 at §7.  If plaintiffs are correct that OPM's directives implementing the Executive Orders impose legislative rules for purposes of the APA (which they do), OPM's procedure – implement now and engage in notice-and-comment rulemaking later – is prohibited.  Rules must be subject to meaningful notice-and-comment *before* implementation.  §553; *Pennsylvania*, 930 F.3d at 568.[11]

---

[9] Plaintiffs do not contend that every part of these Executive Orders will be implemented via legislative rule.  For example, the Collective Bargaining Order provisions establishing the Labor Relations Group likely do not rise to the level of a legislative rule.  App. 1 §3.  But these Orders substantially comprise directives to impose new rules that alter rights and requirements.

[10] In defending against the challenges brought in the D.C. courts to these Executive Orders, the federal government defendants repeatedly argued that the orders impose binding government-wide "rules."  *AFGE*, D.D.C. Case No. 18-cv-1261-KBJ, ECF Dkt. 40 at p.28 (arguing that Sections 4 of the Official Time, section 4 of the Removal Procedures, and Section 6 of the Collective Bargaining "easily" impose government-wide rules).  The government will be hard-pressed to argue now to the contrary now, that these orders do not create binding rules.

[11] In *Chertoff*, an earlier administration sought to revise labor-management rules to remove much of the duty to bargain as to employees of the Department of Homeland Security. 452 F.3d at 851.  The attempted revisions were ultimately invalidated as contrary to law, but the

B. Plaintiffs Are Also Likely to Succeed with Their Claims that Agency Actions Required by the Executive Orders Are Contrary to Law

Plaintiffs are also likely to succeed on the merits of their claims that the Executive Orders require agencies to take action that is "not in accordance with law" and in excess of "statutory authority" in violation of the APA. §706(2)(A), (C); *Pennsylvania*, 930 F.3d at 572.

1. *Provisions Regarding Employee Discipline and Discharge.* As discussed in detail above, the FSLMRS requires that all collective bargaining agreements contain a procedure for resolving grievances and defines "grievance" broadly to include any dispute "concerning any matter related to the employment" of an employee, alleged violations of the agreement itself, and any other claimed violation of law regarding employment. §§7103(a)(9), 7121. The CSRA also specifies that adverse actions are permitted "only after an opportunity to demonstrate acceptable performance" or PIP. §4302(c)(6). The statute appropriately leaves the exact length of any PIP to negotiation between the specific employer and union. *See* §7114(b) (duty to bargain over conditions of employment); §7106 (not excluding PIPs from list).

The Removal Procedures Order requires agency action that conflicts with these statutory mandates. Section 4 of the Order purports to prohibit agencies from participating in grievances or arbitrations about certain "matter[s] related to the employment," such as removals for performance reasons, performance evaluations, incentive pay, etc., App. 3 §4(a), notwithstanding that the CSRA requires grievance procedures to include such matters, §§7103(a)(9). The Order also requires agencies to impose a 30-day limit on PIPs without regard to whether that length of time is reasonable or is what would result from actual good-faith bargaining, in violation of the CSRA. *AFGE,* 318 F. Supp. 3d at 391.[12]

---

administration at least went through notice-and-comment before implementing them. *Id*. at 843. Here even that step has been ignored.

[12] Although the D.C. Circuit reversed the District Court's injunction on jurisdictional grounds, it did not address or disagree with that court's analysis of the merits of the claims that the Executive Orders violate the FSLMRS. That analysis supports plaintiffs' APA claims here. 929 F.3d at 756.

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

2. *Provisions Regarding Employees' Resources to Perform Statutory Duties.*  The FSLMRS requires unions to represent all employees in their bargaining units, §7114(a)(2), and gives individual employees the "right" to act as union representatives and to present labor's view to their employer, §7131.  Congress also authorized "official time" so that employees working as labor representatives can fulfill the union's statutory obligations, and Congress left the "amount" of such time (for representative duties other than bargaining) to good-faith negotiation. §7131(d).

The Executive Orders require agency action that will violate these statutory provisions. For example, the Official Time Order directs agencies to prohibit employees from using any official time to participate in any grievances involving co-workers, App. 2 at §4(a)(v), notwithstanding that the CSRA guarantees employees the right to act as labor representatives and guarantees employees the right to have a union representative present during grievances and employer investigations, §§7114(a)(2); 7121(b).  The Order additionally requires agencies to ban employees from using official time for union-related "First Amendment" activity.  *Contra* §7102 (guaranteeing employees' "right to present the views of the labor organization" to the employer). The Order also directs agencies to prevent labor representatives from using any office space, computers, or even phones, App. 2 §4(a)(iii), notwithstanding representatives' statutory duty (and right) to represent their fellow employees, §§7102, 7121.  And the Order imposes caps on official time even though Congress provided for the amount of such time to be negotiated. *Compare* App. 2 §4(a)(i) *with* §7131(d).

In sum, the FSLMRS requires labor unions to represent bargaining-unit employees, provides for certain official time and for the negotiation of other time to fulfill those duties, and guarantees employees the right to serve as labor representatives and to have their representatives present at key moments.  Yet the Official Time Order requires agencies to ban union employee-representatives from using any of their work time to represent co-workers in grievances; to ban them from using work space, computers, or phones; to impose an artificially low limit on official

available time regardless whether that time is sufficient to do the representation work the statute requires; and to refuse to negotiate over any additional official time.

3. *New Collective Bargaining Rules*.  As discussed in detail above, the FSLMRS provides that employees "shall have the right," §7201, to bargain over the broadly defined category of "conditions of employment," §§7103(a)(14), 7114.  The FSLMRS also requires good-faith bargaining and identifies mandatory, permissive, and prohibited subjects for negotiation.  *Supra*, at 10-12.

All three Executive Orders impose new rules that violate these statutory sections.  For example, notwithstanding that Congress made clear agencies' ability to bargain over permissive subjects, §7106(b), and required agencies to negotiate in good faith, §7114, the Collective Bargaining Order directs agencies to refuse to bargain over any permissive subjects at all.  App. 1 §6 (prohibiting "negotiat[ing] over the substance of the subjects set forth in section 7106(b)(1) of title 5").  The Official Time Order prohibits agencies from negotiating over the use of official time by a union representative to pursue a grievance on behalf of co-workers, App. 2 §4(v), notwithstanding that such time is a condition of employment about which employees have a statutorily protected right to bargain, §§7103(a)(14), 7131(d).  And that same Order sets a low limit on official time overall and bars agencies from negotiating any different amount.  *Compare* App. 2 §4(ii) *with* §7131(d) (providing that official time "shall" be afforded in the "amount" negotiated by the agency and exclusive representative).

The Removal Procedures Order similarly sets predetermined outcomes for topics that are supposed to be subject to "good faith" bargaining by prohibiting agencies from agreeing to progressive discipline, and procedures that protect employees.  App. 3 §4(b).  And the Collective Bargaining Order also imposes arbitrary limits on the duration of bargaining and confines bargaining to a mechanical exchange of written proposals without regard to whether such procedures comply with the duty to negotiate in good faith.  App. 1 §5.

In sum, many provisions of these Executive Orders and OPM's implementing directives contravene the applicable statute and should be set aside as unlawful.

C.  This Court Has Jurisdiction to Hear These Claims

Congress specifically authorized federal courts by way of APA sections 702 and 706 to review claims that agency action is unlawful, and this Court accordingly has jurisdiction to hear plaintiffs' APA claims.  In opposition, the government may point to the D.C. Circuit's decision in *AFGE* to argue that this Court lacks jurisdiction, but *AFGE* is inapposite.

As an initial matter, *AFGE* did not involve any claims brought under the judicial review provisions of the APA, and none of the D.C. Circuit's analysis considers such claims.  929 F.3d at 756.  The D.C. Circuit did determine that the different, non-APA claims at issue in *AFGE* should proceed through an agency dispute-resolution system rather than in court.  *Id.* at 754.  But the same test that the D.C. Circuit applied to make that jurisdictional determination – the two-part test articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994) – leads to exactly the opposite conclusion with respect to plaintiffs' APA claims.

The first step of the *Thunder Basin* test asks whether it is "fairly discernible" that Congress intended to establish exclusive administrative review and whether the claims at issue "are of the type Congress intended to be reviewed within this statutory structure."  *Thunder Basin*, 510 U.S. at 207, 212; *see also Elgin v. Dept. of Treasury*, 567 U.S. 1, 22 (2012); *Tilton v. SEC*, 824 F.3d 276, 287 (2d Cir. 2016).  As to plaintiffs' APA claims, the answer to both questions clearly is "no."  It is not "fairly discernable" that Congress intended for review of APA challenges to be removed from the courts, and APA claims are certainly not of the type that Congress intended to send to administrative review.  On the contrary, the APA includes a general grant of authority to *courts* to review the legality of agency action, §706, and Congress has expressly stated that: 1) OPM's regulations implementing the President's rules for the federal workforce are subject to the APA, §§1103(b), 1105; *and* that 2) regulations implementing the FSLMRS are subject to the APA, §7134.  These are very strong indications (not considered by the D.C. Circuit for the non-APA claims at issue there) that Congress intended the APA to apply in circumstances like these and that it intended APA claims to be reviewable in court.

There is also no real question that OPM is subject to the APA, including the APA's provisions for judicial review. *See, e.g.*, *NTEU v. Horner*, 854 F.2d 490, 492, 496-98, 501 (D.C. Cir. 1988); *NTEU v. Newman*, 768 F. Supp. 8 (D.D.C. 1991). And courts have repeatedly held that the CSRA and FSLMRS do not foreclose APA review of binding rules. *See, e.g.*, *Chertoff*, 452 F.3d at 849; *NTEU v. Whipple*, 636 F. Supp. 2d 63, 69 (D.D.C. 2009); *NTEU v. Devine*, 577 F. Supp. 738, 745 (D.D.C. 1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984).

Put simply, APA challenges are not at all like the type of adjudicative claims that Congress intended to send to the agencies created by the CSRA and FSLMRS, namely the unfair labor practice charges, negotiability disputes, arbitration appeals, or employee adverse action appeals that Congress sent to the FLRA or Merits Systems Protection Board ("MSPB"). §§7116-18, 7122, 7513. And there is certainly no basis for concluding that Congress intended *APA challenges* to be sent to these agencies. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (there is a "strong presumption that Congress intends judicial review of administrative action."); *Califano v. Sanders*, 430 U.S. 99, 104 (1977) ("the statute [APA] undoubtedly evinces Congress' intention and understanding that judicial review should be widely available to challenge the actions of federal administrative officials").[13]

## II. Implementation of the Three Executive Orders Will Irreparably Harm Federal Employees, Their Labor Representatives, and the Public Interest

Federal employees and their labor representatives face imminent irreparable injury from the implementation of these Executive Orders. Once the D.C. Circuit's mandate issues, the

---

[13] Even if the Court were to reach the second step of the *Thunder Basin* test, which it should not, that analysis would likewise confirm that Congress never intended to channel APA claims to the FLRA or MSPB. *E.g.*, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (applying *Thunder Basin* step two, asking whether "a finding of preclusion could foreclose all meaningful judicial review; if the suit is wholly collateral to a statute's review provisions; and if the claims are outside the agency's expertise"). There is no mechanism at all to bring an APA challenge before the FLRA or MSPB because neither agency has been granted the power (exclusive to the federal courts) to "hold unlawful" and "set aside" agency action. §706(2). Nor do these specialized agencies have any particular expertise in resolving APA claims, which has long been, as Congress intended it to be, the exclusive realm of the federal courts. §§702, 706; *Califano,* 430 U.S. at 104.

Plaintiffs' Mem. in Supp. of Mot. for Preliminary Injunction

Administration will move to implement the Orders as already directed by the President. The government has not been shy about its desire to implement these Orders immediately, representing to the D.C. Circuit that it should issue its mandate right away because "agency officials and unions are presently engaged in collective bargaining throughout the federal government, and agency officials' conduct of those negotiations (and the President's supervision of that conduct) is presently constrained by the erroneously issued injunction." D.C. Circuit Case No. 18-5289 Doc. #1800975 at *1. Once the mandate issues, the unlawful agency action described above is therefore imminent.

The provisions OPM will direct agencies to implement *prior to* notice-and-comment rule-making will result in: an illegal system of employee discipline and refusal to process legitimate grievances authorized by law; employees being required to spend unpaid time (including vacation or unpaid leave) to perform the important day-to-day and statutorily required work of representing their co-workers; and agencies beginning, at OPM's direction, to insist on and implement unilateral bargaining positions, altering the balance and result of bargaining across the country.

All of these actions will injure federal employees. *See generally* Phillipson Decl. The implementation of these Orders will harm federal employees like Don Woodworth, who explains why it is important that federal workers be able to perform the duty of representing their fellow workers in grievance proceedings without being forced to use vacation time or unpaid leave. Woodworth Decl. ¶¶15-21; Phillipson Decl. ¶¶26-29, 36. Unions will be immediately hamstrung in presenting contract grievances and forced to decide whether to let employees go it alone. Phillipson Decl. ¶¶21-37; Woodworth Decl. ¶¶15-21. Congress never intended this.

Likewise, once the mandate issues, OPM will direct agencies to remove a host of subjects from bargaining or to revise bargaining proposals immediately to reflect the pre-determined positions mandated by the Executive Orders. Phillipson Decl. ¶¶38-39, 49-52; Healy Decl. ¶11. Courts have repeatedly recognized that once bargaining begins under imbalanced and unfair (indeed, illegal) conditions, it is very difficult to unwind the clock. *Am. Fed'n of Labor v.*

*Watson*, 327 U.S. 582, 594 (1946) ("The loss in bargaining position by the unions, the disruption of harmonious relationships between the unions and the employers, the almost certain decrease in union membership – these are matters involving intangible values"); *Chertoff*, 452 F.3d at 853 (recognizing harm to union caused by unlawful rule prohibiting bargaining over permissive subjects, where "their bargaining position in all negotiations is fundamentally diminished").[14]

Weighed against the harm to federal employees, neither OPM nor any of the employing federal agencies will be harmed by continuing to adhere to the system for labor-management relations that has been in place for over 40 years since Congress enacted the CSRA. *See, e.g.*, *NTEU v. U.S. Dept. of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("threat of harm to the government is negligible" where "Customs service continues to function" despite injunction). And when the government acts contrary to law, the public interest weighs *strongly* in favor of maintaining the status quo and preventing the implementation of the illegal act. *See, e.g.*, *id.* ("The preservation of . . . the legality of the process by which government agencies function certainly weighs heavily in the public interest."); *see also Clarke v. Ofc. of Fed. Housing Enterp. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) ("there is a substantial public interest in ensuring that [the agency] acts within the limits of its authority").

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction prohibiting OPM and the President's subordinate agencies from implementing Executive Order Nos. 13,836, 13,837, and 13,839 in order to maintain the status quo until such time as this Court has resolved the legal challenges to these Orders.

---

[14] Federal employees are not required to become members of the unions that represent them or pay them any money for that representation. Unions like SEIU Local 200U earn and retain the support of their members by performing services perceived by the members to be valuable. These Orders aim straight at the heart of this support. *See Int'l Union of Elec. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

Respectfully submitted,

Dated: September 12, 2019

By: _/s/ Danielle Leonard_

DANIELLE LEONARD (*pro hac vice*)
BARBARA J. CHISHOLM (*pro hac vice*)
MEGAN WACHSPRESS (*pro hac vice*)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415)421-7151 (office)
dleonard@altber.com
bchisholm@altber.com
mwachspress@altber.com

NICOLE G. BERNER, General Counsel
(*pro hac vice*)
CLAIRE PRESTEL, Associate General
Counsel (*pro hac vice*)
Service Employees International Union
1800 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 730-7468
nicole.berner@seiu.org
claire.prestel@seiu.org

CATHERINE CREIGHTON
CREIGHTON, JOHNSEN & GIROUX
1103 Delaware Avenue
Buffalo, NY 14209
Tel: 716-854-0007
ccreighton@cpjglaborlaw.com

MAIREAD E. CONNOR
LAW OFFICES OF MAIREAD E.
CONNOR, PLLC
White Memorial Building, Suite 204
100 E. Washington St.
Syracuse, New York 13202
Tel: (315) 422-6225
mec@connorlaborlaw.com

*Attorneys for Plaintiffs SEIU LOCAL 200U
and SEIU*

# APPENDIX

**Appendix Tab 1**     **Collective Bargaining Order**
Executive Order No. 13,836 ("Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining")

**Appendix Tab 2**     **Official Time Order**
Executive Order No. 13,837 ("Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use")

**Appendix Tab 3**     **Removal Procedures Order**
Executive Order No. 13,839 ("Promoting Accountability and Streamlining Removal Procedures Consistent With Merit System Principles")

# APPENDIX 1



# Presidential Documents

Executive Order 13836 of May 25, 2018

## Developing Efficient, Effective, and Cost-Reducing Approaches To Federal Sector Collective Bargaining

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to assist executive departments and agencies (agencies) in developing efficient, effective, and cost-reducing collective bargaining agreements (CBAs), as described in chapter 71 of title 5, United States Code, it is hereby ordered as follows:

**Section 1**. *Policy*. (a) Section 7101(b) of title 5, United States Code, requires the Federal Service Labor-Management Relations Statute (the Statute) to be interpreted in a manner consistent with the requirement of an effective and efficient Government. Unfortunately, implementation of the Statute has fallen short of these goals. CBAs, and other agency agreements with collective bargaining representatives, often make it harder for agencies to reward high performers, hold low-performers accountable, or flexibly respond to operational needs. Many agencies and collective bargaining representatives spend years renegotiating CBAs, with taxpayers paying for both sides' negotiators. Agencies must also engage in prolonged negotiations before making even minor operational changes, like relocating office space.

(b) The Federal Government must do more to apply the Statute in a manner consistent with effective and efficient Government. To fulfill this obligation, agencies should secure CBAs that: promote an effective and efficient means of accomplishing agency missions; encourage the highest levels of employee performance and ethical conduct; ensure employees are accountable for their conduct and performance on the job; expand agency flexibility to address operational needs; reduce the cost of agency operations, including with respect to the use of taxpayer-funded union time; are consistent with applicable laws, rules, and regulations; do not cover matters that are not, by law, subject to bargaining; and preserve management rights under section 7106(a) of title 5, United States Code (management rights). Further, agencies that form part of an effective and efficient Government should not take more than a year to renegotiate CBAs.

**Sec. 2**. *Definitions*. For purposes of this order:

(a) The phrase "term CBA" means a CBA of a fixed or indefinite duration reached through substantive bargaining, as opposed to (i) agreements reached through impact and implementation bargaining pursuant to sections 7106(b)(2) and 7106(b)(3) of title 5, United States Code, or (ii) mid-term agreements, negotiated while the basic comprehensive labor contract is in effect, about subjects not included in such contract.

(b) The phrase "taxpayer-funded union time" means time granted to a Federal employee to perform non-agency business during duty hours pursuant to section 7131 of title 5, United States Code.

**Sec. 3**. *Interagency Labor Relations Working Group*. (a) There is hereby established an Interagency Labor Relations Working Group (Labor Relations Group).

(b) *Organization*. The Labor Relations Group shall consist of the Director of the Office of Personnel Management (OPM Director), representatives of participating agencies determined by their agency head in consultation with the OPM Director, and OPM staff assigned by the OPM Director. The OPM Director shall chair the Labor Relations Group and, subject to the availability

of appropriations and to the extent permitted by law, provide administrative support for the Labor Relations Group.

(c) *Agencies.* Agencies with at least 1,000 employees represented by a collective bargaining representative pursuant to chapter 71 of title 5, United States Code, shall participate in the Labor Relations Group. Agencies with a smaller number of employees represented by a collective bargaining representative may, at the election of their agency head and with the concurrence of the OPM Director, participate in the Labor Relations Group. Agencies participating in the Labor Relations Group shall provide assistance helpful in carrying out the responsibilities outlined in subsection (d) of this section. Such assistance shall include designating an agency employee to serve as a point of contact with OPM responsible for providing the Labor Relations Group with sample language for proposals and counter-proposals on significant matters proposed for inclusion in term CBAs, as well as for analyzing and discussing with OPM and the Labor Relations Group the effects of significant CBA provisions on agency effectiveness and efficiency. Participating agencies should provide other assistance as necessary to support the Labor Relations Group in its mission.

(d) *Responsibilities and Functions.* The Labor Relations Group shall assist the OPM Director on matters involving labor-management relations in the executive branch. To the extent permitted by law, its responsibilities shall include the following:

(i) Gathering information to support agency negotiating efforts, including the submissions required under section 8 of this order, and creating an inventory of language on significant subjects of bargaining that have relevance to more than one agency and that have been proposed for inclusion in at least one term CBA;

(ii) Developing model ground rules for negotiations that, if implemented, would minimize delay, set reasonable limits for good-faith negotiations, call for Federal Mediation and Conciliation Service (FMCS) to mediate disputed issues not resolved within a reasonable time, and, as appropriate, promptly bring remaining unresolved issues to the Federal Service Impasses Panel (the Panel) for resolution;

(iii) Analyzing provisions of term CBAs on subjects of bargaining that have relevance to more than one agency, particularly those that may infringe on, or otherwise affect, reserved management rights. Such analysis should include an assessment of term CBA provisions that cover comparable subjects, without infringing, or otherwise affecting, reserved management rights. The analysis should also assess the consequences of such CBA provisions on Federal effectiveness, efficiency, cost of operations, and employee accountability and performance. The analysis should take particular note of how certain provisions may impede the policies set forth in section 1 of this order or the orderly implementation of laws, rules, or regulations. The Labor Relations Group may examine general trends and commonalities across term CBAs, and their effects on bargaining-unit operations, but need not separately analyze every provision of each CBA in every Federal bargaining unit;

(iv) Sharing information and analysis, as appropriate and permitted by law, including significant proposals and counter-proposals offered in bargaining, in order to reduce duplication of efforts and encourage common approaches across agencies, as appropriate;

(v) Establishing ongoing communications among agencies engaging with the same labor organizations in order to facilitate common solutions to common bargaining initiatives; and

(vi) Assisting the OPM Director in developing, where appropriate, Government-wide approaches to bargaining issues that advance the policies set forth in section 1 of this order.

(e) Within 18 months of the first meeting of the Labor Relations Group, the OPM Director, as the Chair of the group, shall submit to the President,

through the Office of Management and Budget (OMB), a report proposing recommendations for meeting the goals set forth in section 1 of this order and for improving the organization, structure, and functioning of labor relations programs across agencies.

**Sec. 4**. *Collective Bargaining Objectives*. (a) The head of each agency that engages in collective bargaining under chapter 71 of title 5, United States Code, shall direct appropriate officials within each agency to prepare a report on all operative term CBAs at least 1 year before their expiration or renewal date. The report shall recommend new or revised CBA language the agency could seek to include in a renegotiated agreement that would better support the objectives of section 1 of this order. The officials preparing the report shall consider the analysis and advice of the Labor Relations Group in making recommendations for revisions. To the extent permitted by law, these reports shall be deemed guidance and advice for agency management related to collective bargaining under section 7114(b)(4)(C) of title 5, United States Code, and thus not subject to disclosure to the exclusive representative or its authorized representative.

(b) Consistent with the requirements and provisions of chapter 71 of title 5, United States Code, and other applicable laws and regulations, an agency, when negotiating with a collective bargaining representative, shall:

(i) establish collective bargaining objectives that advance the policies of section 1 of this order, with such objectives informed, as appropriate, by the reports required by subsection (a) of this section;

(ii) consider the analysis and advice of the Labor Relations Group in establishing these collective bargaining objectives and when evaluating collective bargaining representative proposals;

(iii) make every effort to secure a CBA that meets these objectives; and

(iv) ensure management and supervisor participation in the negotiating team representing the agency.

**Sec. 5**. *Collective Bargaining Procedures*. (a) To achieve the purposes of this order, agencies shall begin collective bargaining negotiations by making their best effort to negotiate ground rules that minimize delay, set reasonable time limits for good-faith negotiations, call for FMCS mediation of disputed issues not resolved within those time limits, and, as appropriate, promptly bring remaining unresolved issues to the Panel for resolution. For collective bargaining negotiations, a negotiating period of 6 weeks or less to achieve ground rules, and a negotiating period of between 4 and 6 months for a term CBA under those ground rules, should ordinarily be considered reasonable and to satisfy the ''effective and efficient'' goal set forth in section 1 of this order. Agencies shall commit the time and resources necessary to satisfy these temporal objectives and to fulfill their obligation to bargain in good faith. Any negotiations to establish ground rules that do not conclude after a reasonable period should, to the extent permitted by law, be expeditiously advanced to mediation and, as necessary, to the Panel.

(b) During any collective bargaining negotiations under chapter 71 of title 5, United States Code, and consistent with section 7114(b) of that chapter, the agency shall negotiate in good faith to reach agreement on a term CBA, memorandum of understanding (MOU), or any other type of binding agreement that promotes the policies outlined in section 1 of this order. If such negotiations last longer than the period established by the CBA ground rules -- or, absent a pre-set deadline, a reasonable time -- the agency shall consider whether requesting assistance from the FMCS and, as appropriate, the Panel, would better promote effective and efficient Government than would continuing negotiations. Such consideration should evaluate the likelihood that continuing negotiations without FMCS assistance or referral to the Panel would produce an agreement consistent with the goals of section 1 of this order, as well as the cost to the public of continuing to pay for both agency and collective bargaining representative negotiating teams. Upon the conclusion of the sixth month of any negotiation, the agency head shall receive notice from appropriate agency staff and shall

receive monthly notifications thereafter regarding the status of negotiations until they are complete. The agency head shall notify the President through OPM of any negotiations that have lasted longer than 9 months, in which the assistance of the FMCS either has not been requested or, if requested, has not resulted in agreement or advancement to the Panel.

(c) If the commencement or any other stage of bargaining is delayed or impeded because of a collective bargaining representative's failure to comply with the duty to negotiate in good faith pursuant to section 7114(b) of title 5, United States Code, the agency shall, consistent with applicable law consider whether to:

(i) file an unfair labor practice (ULP) complaint under section 7118 of title 5, United States Code, after considering evidence of bad-faith negotiating, including refusal to meet to bargain, refusal to meet as frequently as necessary, refusal to submit proposals or counterproposals, undue delays in bargaining, undue delays in submission of proposals or counterproposals, inadequate preparation for bargaining, and other conduct that constitutes bad-faith negotiating; or

(ii) propose a new contract, memorandum, or other change in agency policy and implement that proposal if the collective bargaining representative does not offer counter-proposals in a timely manner.

(d) An agency's filing of a ULP complaint against a collective bargaining representative shall not further delay negotiations. Agencies shall negotiate in good faith or request assistance from the FMCS and, as appropriate, the Panel, while a ULP complaint is pending.

(e) In developing proposed ground rules, and during any negotiations, agency negotiators shall request the exchange of written proposals, so as to facilitate resolution of negotiability issues and assess the likely effect of specific proposals on agency operations and management rights. To the extent that an agency's CBAs, ground rules, or other agreements contain requirements for a bargaining approach other than the exchange of written proposals addressing specific issues, the agency should, at the soonest opportunity, take steps to eliminate them. If such requirements are based on now-revoked Executive Orders, including Executive Order 12871 of October 1, 1993 (Labor-Management Partnerships) and Executive Order 13522 of December 9, 2009 (Creating Labor-Management Forums to Improve Delivery of Government Services), agencies shall take action, consistent with applicable law, to rescind these requirements.

(f) Pursuant to section 7114(c)(2) of title 5, United States Code, the agency head shall review all binding agreements with collective bargaining representatives to ensure that all their provisions are consistent with all applicable laws, rules, and regulations. When conducting this review, the agency head shall ascertain whether the agreement contains any provisions concerning subjects that are non-negotiable, including provisions that violate Government-wide requirements set forth in any applicable Executive Order or any other applicable Presidential directive. If an agreement contains any such provisions, the agency head shall disapprove such provisions, consistent with applicable law. The agency head shall take all practicable steps to render the determinations required by this subsection within 30 days of the date the agreement is executed, in accordance with section 7114(c) of title 5, United States Code, so as not to permit any part of an agreement to become effective that is contrary to applicable law, rule, or regulation.

**Sec. 6.** *Permissive Bargaining.* The heads of agencies subject to the provisions of chapter 71 of title 5, United States Code, may not negotiate over the substance of the subjects set forth in section 7106(b)(1) of title 5, United States Code, and shall instruct subordinate officials that they may not negotiate over those same subjects.

**Sec. 7.** *Efficient Bargaining over Procedures and Appropriate Arrangements.* (a) Before beginning negotiations during a term CBA over matters addressed by sections 7106(b)(2) or 7106(b)(3) of title 5, United States Code, agencies shall evaluate whether or not such matters are already covered by the

term CBA and therefore are not subject to the duty to bargain. If such matters are already covered by a term CBA, the agency shall not bargain over such matters.

(b) Consistent with section 1 of this order, agencies that engage in bargaining over procedures pursuant to section 7106(b)(2) of title 5, United States Code, shall, consistent with their obligation to negotiate in good faith, bargain over only those items that constitute procedures associated with the exercise of management rights, which do not include measures that excessively interfere with the exercise of such rights. Likewise, consistent with section 1 of this order, agencies that engage in bargaining over appropriate arrangements pursuant to section 7106(b)(3) of title 5, United States Code, shall, consistent with their obligation to negotiate in good faith, bargain over only those items that constitute appropriate arrangements for employees adversely affected by the exercise of management rights. In such negotiations, agencies shall ensure that a resulting appropriate arrangement does not excessively interfere with the exercise of management rights.

**Sec. 8**. *Public Accessibility.* (a) Each agency subject to chapter 71 of title 5, United States Code, that engages in any negotiation with a collective bargaining representative, as defined therein, shall submit to the OPM Director each term CBA currently in effect and its expiration date. Such agency shall also submit any new term CBA and its expiration date to the OPM Director within 30 days of its effective date, and submit new arbitral awards to the OPM Director within 10 business days of receipt. The OPM Director shall make each term CBA publicly accessible on the Internet as soon as practicable.

(b) Within 90 days of the date of this order, the OPM Director shall prescribe a reporting format for submissions required by subsection (a) of this section. Within 30 days of the OPM Director's having prescribed the reporting format, agencies shall use this reporting format and make the submissions required under subsection (a) of this section.

**Sec. 9**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the OMB Director relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) Nothing in this order shall abrogate any CBA in effect on the date of this order.

(d) The failure to produce a report for the agency head prior to the termination or renewal of a CBA under section 4(a) of this order shall not prevent an agency from opening a CBA for renegotiation.

(e) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 25, 2018.*

[FR Doc. 2018–11913
Filed 5–31–18; 8:45 am]
Billing code 3295–F8–P

# APPENDIX 2


# Presidential Documents

Executive Order 13837 of May 25, 2018

## Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and section 7301 of title 5, United States Code, and to ensure the effective functioning of the executive branch, it is hereby ordered as follows:

**Section 1.** *Purpose.* An effective and efficient government keeps careful track of how it spends the taxpayers' money and eliminates unnecessary, inefficient, or unreasonable expenditures. To advance this policy, executive branch employees should spend their duty hours performing the work of the Federal Government and serving the public.

Federal law allows Federal employees to represent labor organizations and perform other non-agency business while being paid by American taxpayers (taxpayer-funded union time). The Congress, however, has also instructed the executive branch to interpret the law in a manner consistent with the requirements of an effective and efficient government.

To that end, agencies should ensure that taxpayer-funded union time is used efficiently and authorized in amounts that are reasonable, necessary, and in the public interest. Federal employees should spend the clear majority of their duty hours working for the public. No agency should pay for Federal labor organizations' expenses, except where required by law. Agencies should eliminate unrestricted grants of taxpayer-funded union time and instead require employees to obtain specific authorization before using such time. Agencies should also monitor use of taxpayer-funded union time, ensure it is used only for authorized purposes, and make information regarding its use readily available to the public.

**Sec. 2.** *Definitions.* For purposes of this order, the following definitions shall apply:

(a) Except for purposes of section 4 of this order, "agency" has the meaning given the term in section 7103(a)(3) of title 5, United States Code, but includes only executive agencies. For purposes of section 4 of this order, "agency" has the meaning given to "Executive agency" in section 105 of title 5, United States Code, but excludes the Government Accountability Office.

(b) "Agency business" shall mean work performed by Federal employees, including detailees or assignees, on behalf of an agency, but does not include work performed on taxpayer-funded union time.

(c) "Bargaining unit" shall mean a group of employees represented by an exclusive representative in an appropriate unit for collective bargaining under subchapter II of chapter 71 of title 5, United States Code.

(d) "Discounted use of government property" means charging less to use government property than the value of the use of such property, as determined by the General Services Administration, where applicable, or otherwise by the generally prevailing commercial cost of using such property.

(e) "Employee" has the meaning given the term in section 7103(a)(2) of title 5, United States Code, except for purposes of section 4 of this order, in which case it means an individual employed in an "Executive

agency,'' according to the meaning given that term in section 105 of title 5, United States Code, but excluding the Government Accountability Office.

(f) ''Grievance'' has the meaning given the term in section 7103(a)(9) of title 5, United States Code.

(g) ''Labor organization'' has the meaning given the term in section 7103(a)(4) of title 5, United States Code.

(h) ''Paid time'' shall mean time for which an employee is paid by the Federal Government, including both duty time, in which the employee performs agency business, and taxpayer-funded union time. It does not include time spent on paid or unpaid leave, or an employee's off-duty hours.

(i) ''Taxpayer-funded union time'' shall mean official time granted to an employee pursuant to section 7131 of title 5, United States Code.

(j) ''Union time rate'' shall mean the total number of duty hours in the fiscal year that employees in a bargaining unit used for taxpayer-funded union time, divided by the number of employees in such bargaining unit.

**Sec. 3.** *Standards for Reasonable and Efficient Taxpayer-Funded Union Time Usage.* (a) No agency shall agree to authorize any amount of taxpayer-funded union time under section 7131(d) of title 5, United States Code, unless such time is reasonable, necessary, and in the public interest. Agreements authorizing taxpayer-funded union time under section 7131(d) of title 5, United States Code, that would cause the union time rate in a bargaining unit to exceed 1 hour should, taking into account the size of the bargaining unit, and the amount of taxpayer-funded union time anticipated to be granted under sections 7131(a) and 7131(c) of title 5, United States Code, ordinarily not be considered reasonable, necessary, and in the public interest, or to satisfy the ''effective and efficient'' goal set forth in section 1 of this order and section 7101(b) of title 5, United States Code. Agencies shall commit the time and resources necessary to strive for a negotiated union time rate of 1 hour or less, and to fulfill their obligation to bargain in good faith.

(b) (i) If an agency agrees to authorize amounts of taxpayer-funded union time under section 7131(d) of title 5, United States Code, that would cause the union time rate in a bargaining unit to exceed 1 hour (or proposes to the Federal Service Impasses Panel or an arbitrator engaging in interest arbitration an amount that would cause the union time rate in a bargaining unit to exceed 1 hour), the agency head shall report this agreement or proposal to the President through the Director of the Office of Personnel Management (OPM Director) within 15 days of such an agreement or proposal. Such report shall explain why such expenditures are reasonable, necessary, and in the public interest, describe the benefit (if any) the public will receive from the activities conducted by employees on such taxpayer-funded union time, and identify the total cost of such time to the agency. This reporting duty cannot be delegated.

(ii) Each agency head shall require relevant subordinate agency officials to inform the agency head 5 business days in advance of presenting or accepting a proposal that would result in a union time rate of greater than 1 hour for any bargaining unit, if the subordinate agency officials anticipate they will present or agree to such a provision.

(iii) The requirements of this subsection shall not apply to a union time rate established pursuant to an order of the Federal Service Impasses Panel or an arbitrator engaging in interest arbitration, provided that the agency had proposed that the Impasses Panel or arbitrator establish a union time rate of 1 hour or less.

(c) Nothing in this section shall be construed to prohibit any agency from authorizing taxpayer-funded union time as required under sections 7131(a) and 7131(c) of title 5, United States Code, or to direct an agency to negotiate to include in a collective bargaining agreement a term that precludes an agency from granting taxpayer-funded union time pursuant to those provisions.

**Sec. 4**. *Employee Conduct with Regard to Agency Time and Resources.* (a) To ensure that Federal resources are used effectively and efficiently and in a manner consistent with both the public interest and section 8 of this order, all employees shall adhere to the following requirements:

(i) Employees may not engage in lobbying activities during paid time, except in their official capacities as an employee.

(ii) (1) Except as provided in subparagraph (2) of this subsection, employees shall spend at least three-quarters of their paid time, measured each fiscal year, performing agency business or attending necessary training (as required by their agency), in order to ensure that they develop and maintain the skills necessary to perform their agency duties efficiently and effectively.

(2) Employees who have spent one-quarter of their paid time in any fiscal year on non-agency business may continue to use taxpayer-funded union time in that fiscal year for purposes covered by sections 7131(a) or 7131(c) of title 5, United States Code.

(3) Any time in excess of one-quarter of an employee's paid time used to perform non-agency business in a fiscal year shall count toward the limitation set forth in subparagraph (1) of this subsection in subsequent fiscal years.

(iii) No employee, when acting on behalf of a Federal labor organization, may be permitted the free or discounted use of government property or any other agency resources if such free or discounted use is not generally available for non-agency business by employees when acting on behalf of non-Federal organizations. Such property and resources include office or meeting space, reserved parking spaces, phones, computers, and computer systems.

(iv) Employees may not be permitted reimbursement for expenses incurred performing non-agency business, unless required by law or regulation.

(v) (1) Employees may not use taxpayer-funded union time to prepare or pursue grievances (including arbitration of grievances) brought against an agency under procedures negotiated pursuant to section 7121 of title 5, United States Code, except where such use is otherwise authorized by law or regulation.

(2) The prohibition in subparagraph (1) of this subsection does not apply to:

(A) an employee using taxpayer-funded union time to prepare for, confer with an exclusive representative regarding, or present a grievance brought on the employee's own behalf; or to appear as a witness in any grievance proceeding; or

(B) an employee using taxpayer-funded union time to challenge an adverse personnel action taken against the employee in retaliation for engaging in federally protected whistleblower activity, including for engaging in activity protected under section 2302(b)(8) of title 5, United States Code, under section 78u–6(h)(1) of title 15, United States Code, under section 3730(h) of title 31, United States Code, or under any other similar whistleblower law.

(b) Employees may not use taxpayer-funded union time without advance written authorization from their agency, except where obtaining prior approval is deemed impracticable under regulations or guidance adopted pursuant to subsection (c) of this section.

(c) (i) The requirements of this section shall become effective 45 days from the date of this order. The Office of Personnel Management (OPM) shall be responsible for administering the requirements of this section. Within 45 days of the date of this order, the OPM Director shall examine whether existing regulations are consistent with the rules set forth in this section. If the regulations are not, the OPM Director shall propose for notice and public comment, as soon as practicable, appropriate regulations to clarify

and assist agencies in implementing these rules, consistent with applicable law.

(ii) The head of each agency is responsible for ensuring compliance by employees within such agency with the requirements of this section, to the extent consistent with applicable law and existing collective bargaining agreements. Each agency head shall examine whether existing regulations, policies, and practices are consistent with the rules set forth in this section. If they are not, the agency head shall take all appropriate steps consistent with applicable law to bring them into compliance with this section as soon as practicable.

(e) Nothing in this order shall be construed to prohibit agencies from permitting employees to take unpaid leave to perform representational activities under chapter 71 of title 5, United States Code, including for purposes covered by section 7121(b)(1)(C) of title 5, United States Code.

**Sec. 5.** *Preventing Unlawful or Unauthorized Expenditures.* (a) Any employee who uses taxpayer-funded union time without advance written agency authorization required by section 4(b) of this order, or for purposes not specifically authorized by the agency, shall be considered absent without leave and subject to appropriate disciplinary action. Repeated misuse of taxpayer-funded union time may constitute serious misconduct that impairs the efficiency of the Federal service. In such instances, agencies shall take appropriate disciplinary action to address such misconduct.

(b) As soon as practicable, but not later than 180 days from the date of this order, to the extent permitted by law, each agency shall develop and implement a procedure governing the authorization of taxpayer-funded union time under section 4(b) of this order. Such procedure shall, at a minimum, require a requesting employee to specify the number of taxpayer-funded union time hours to be used and the specific purposes for which such time will be used, providing sufficient detail to identify the tasks the employee will undertake. That procedure shall also allow the authorizing official to assess whether it is reasonable and necessary to grant such amount of time to accomplish such tasks. For continuing or ongoing requests, each agency shall require requests for authorization renewals to be submitted not less than once per pay period. Each agency shall further require separate advance authorization for any use of taxpayer-funded union time in excess of previously authorized hours or for purposes for which such time was not previously authorized.

(c) As soon as practicable, but not later than 180 days from the date of this order, each agency shall develop and implement a system to monitor the use of taxpayer-funded union time to ensure that it is used only for authorized purposes, and that it is not used contrary to law or regulation. In developing these systems, each agency shall give special attention to ensuring taxpayer-funded union time is not used for:

(i) internal union business in violation of section 7131(b) of title 5, United States Code;

(ii) lobbying activities in violation of section 1913 of title 18, United States Code, or in violation of section 4(a)(i) of this order; or

(iii) political activities in violation of subchapter III of chapter 73 of title 5, United States Code.

**Sec. 6.** *Agency Reporting Requirements.* (a) To the extent permitted by law, each agency shall submit an annual report to OPM on the following:

(i) The purposes for which the agency has authorized the use of taxpayer-funded union time, and the amounts of time used for each such purpose;

(ii) The job title and total compensation of each employee who has used taxpayer-funded union time in the fiscal year, as well as the total number of hours each employee spent on these activities and the proportion of each employee's total paid hours that number represents;

(iii) If the agency has allowed labor organizations or individuals on tax-payer-funded union time the free or discounted use of government property, the total value of such free or discounted use;

(iv) Any expenses the agency paid for activities conducted on taxpayer-funded union time; and

(v) The amount of any reimbursement paid by the labor organizations for the use of government property.

(b) Agencies shall notify the OPM Labor Relations Group established pursuant to the Executive Order entitled ''Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining'' of May 25, 2018, if a bargaining unit's union time rate exceeds 1 hour.

(c) If an agency's aggregate union time rate (i.e., the average of the union time rates in each agency bargaining unit, weighted by the number of employees in each unit) has increased overall from the last fiscal year, the agency shall explain this increase in the report required under subsection (a) of this section.

(d) The OPM Director shall set a date by which agency submissions under this section are due.

**Sec. 7.** *Public Disclosure and Transparency.* (a) Within 180 days of the date of this order, the OPM Director shall publish a standardized form that each agency shall use in preparing the reports required by section 6 of this order.

(b) OPM shall analyze the agency submissions under section 6 of this order and produce an annual report detailing:

(i) for each agency and for agencies in the aggregate, the number of employees using taxpayer-funded union time, the number of employees using taxpayer-funded union time separately listed by intervals of the proportion of paid time spent on such activities, the number of hours spent on taxpayer-funded union time, the cost of taxpayer-funded union time (measured by the compensation of the employees involved), the aggregate union time rate, the number of bargaining unit employees, and the percentage change in each of these values from the previous fiscal year;

(ii) for each agency and in the aggregate, the value of the free or discounted use of any government property the agency has provided to labor organizations, and any expenses, such as travel or per diems, the agency paid for activities conducted on taxpayer-funded union time, as well as the amount of any reimbursement paid for such use of government property, and the percentage change in each of these values from the previous fiscal year;

(iii) the purposes for which taxpayer-funded union time was granted; and

(iv) the information required by section 6(a)(ii) of this order for employees using taxpayer-funded union time, sufficiently aggregated that such disclosure would not unduly risk disclosing information protected by law, including personally identifiable information.

(c) The OPM Director shall publish the annual report required by this section by June 30 of each year. The first report shall cover fiscal year 2019 and shall be published by June 30, 2020.

(d) The OPM Director shall, after consulting with the Chief Human Capital Officers designated under chapter 14 of title 5, United States Code, promulgate any additional guidance that may be necessary or appropriate to assist the heads of agencies in complying with the requirements of this order.

**Sec. 8.** *Implementation and Renegotiation of Collective Bargaining Agreements.* (a) Each agency shall implement the requirements of this order within 45 days of the date of this order, except for subsection 4(b) of this order, which shall be effective for employees at an agency when such agency implements the procedure required by section 5(b) of this order, to the

extent permitted by law and consistent with their obligations under collective bargaining agreements in force on the date of this order. The head of each agency shall designate an official within the agency tasked with ensuring implementation of this order, and shall report the identity of such official to OPM within 30 days of the date of this order.

(b) Each agency shall consult with employee labor representatives about the implementation of this order. On the earliest date permitted by law, and to effectuate the terms of this order, any agency that is party to a collective bargaining agreement that has at least one provision that is inconsistent with any part of this order shall give any contractually required notice of its intent to alter the terms of such agreement and either reopen negotiations and negotiate to obtain provisions consistent with this order, or subsequently terminate such provision and implement the requirements of this order, as applicable under law.

**Sec. 9**. *General Provisions.* (a) Nothing in this order shall abrogate any collective bargaining agreement in effect on the date of this order.

(b) Nothing in this order shall be construed to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under chapter 71 of title 5, United States Code, or encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment.

(c) Nothing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency, or the head thereof.

(d) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(e) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(f) If any provision of this order, including any of its applications, is held to be invalid, the remainder of this order and all of its other applications shall not be affected thereby.

THE WHITE HOUSE,
*May 25, 2018.*

[FR Doc. 2018–11916
Filed 5–31–18; 8:45 am]
Billing code 3295–F8–P

# APPENDIX 3


# Presidential Documents

Executive Order 13839 of May 25, 2018

## Promoting Accountability and Streamlining Removal Procedures Consistent With Merit System Principles

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 1104(a)(1), 3301, and 7301 of title 5, United States Code, and section 301 of title 3, United States Code, and to ensure the effective functioning of the executive branch, it is hereby ordered as follows:

**Section 1.** *Purpose.* Merit system principles call for holding Federal employees accountable for performance and conduct. They state that employees should maintain high standards of integrity, conduct, and concern for the public interest, and that the Federal workforce should be used efficiently and effectively. They further state that employees should be retained based on the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards. Unfortunately, implementation of America's civil service laws has fallen far short of these ideals. The Federal Employee Viewpoint Survey has consistently found that less than one-third of Federal employees believe that the Government deals with poor performers effectively. Failure to address unacceptable performance and misconduct undermines morale, burdens good performers with subpar colleagues, and inhibits the ability of executive agencies (as defined in section 105 of title 5, United States Code, but excluding the Government Accountability Office) (agencies) to accomplish their missions. This order advances the ability of supervisors in agencies to promote civil servant accountability consistent with merit system principles while simultaneously recognizing employees' procedural rights and protections.

**Sec. 2.** *Principles for Accountability in the Federal Workforce.* (a) Removing unacceptable performers should be a straightforward process that minimizes the burden on supervisors. Agencies should limit opportunity periods to demonstrate acceptable performance under section 4302(c)(6) of title 5, United States Code, to the amount of time that provides sufficient opportunity to demonstrate acceptable performance.

(b) Supervisors and deciding officials should not be required to use progressive discipline. The penalty for an instance of misconduct should be tailored to the facts and circumstances.

(c) Each employee's work performance and disciplinary history is unique, and disciplinary action should be calibrated to the specific facts and circumstances of each individual employee's situation. Conduct that justifies discipline of one employee at one time does not necessarily justify similar discipline of a different employee at a different time -- particularly where the employees are in different work units or chains of supervision -- and agencies are not prohibited from removing an employee simply because they did not remove a different employee for comparable conduct. Nonetheless, employees should be treated equitably, so agencies should consider appropriate comparators as they evaluate potential disciplinary actions.

(d) Suspension should not be a substitute for removal in circumstances in which removal would be appropriate. Agencies should not require suspension of an employee before proposing to remove that employee, except as may be appropriate under applicable facts.

(e) When taking disciplinary action, agencies should have discretion to take into account an employee's disciplinary record and past work record, including all past misconduct -- not only similar past misconduct. Agencies should provide an employee with appropriate notice when taking a disciplinary action.

(f) To the extent practicable, agencies should issue decisions on proposed removals taken under chapter 75 of title 5, United States Code, within 15 business days of the end of the employee reply period following a notice of proposed removal.

(g) To the extent practicable, agencies should limit the written notice of adverse action to the 30 days prescribed in section 7513(b)(1) of title 5, United States Code.

(h) The removal procedures set forth in chapter 75 of title 5, United States Code (Chapter 75 procedures), should be used in appropriate cases to address instances of unacceptable performance.

(i) A probationary period should be used as the final step in the hiring process of a new employee. Supervisors should use that period to assess how well an employee can perform the duties of a job. A probationary period can be a highly effective tool to evaluate a candidate's potential to be an asset to an agency before the candidate's appointment becomes final.

(j) Following issuance of regulations under section 7 of this order, agencies should prioritize performance over length of service when determining which employees will be retained following a reduction in force.

**Sec. 3**. *Standard for Negotiating Grievance Procedures.* Whenever reasonable in view of the particular circumstances, agency heads shall endeavor to exclude from the application of any grievance procedures negotiated under section 7121 of title 5, United States Code, any dispute concerning decisions to remove any employee from Federal service for misconduct or unacceptable performance. Each agency shall commit the time and resources necessary to achieve this goal and to fulfill its obligation to bargain in good faith. If an agreement cannot be reached, the agency shall, to the extent permitted by law, promptly request the assistance of the Federal Mediation and Conciliation Service and, as necessary, the Federal Service Impasses Panel in the resolution of the disagreement. Within 30 days after the adoption of any collective bargaining agreement that fails to achieve this goal, the agency head shall provide an explanation to the President, through the Director of the Office of Personnel Management (OPM Director).

**Sec. 4**. *Managing the Federal Workforce.* To promote good morale in the Federal workforce, employee accountability, and high performance, and to ensure the effective and efficient accomplishment of agency missions and the efficiency of the Federal service, to the extent consistent with law, no agency shall:

(a) subject to grievance procedures or binding arbitration disputes concerning:

(i) the assignment of ratings of record; or

(ii) the award of any form of incentive pay, including cash awards; quality step increases; or recruitment, retention, or relocation payments;

(b) make any agreement, including a collective bargaining agreement:

(i) that limits the agency's discretion to employ Chapter 75 procedures to address unacceptable performance of an employee;

(ii) that requires the use of procedures under chapter 43 of title 5, United States Code (including any performance assistance period or similar informal period to demonstrate improved performance prior to the initiation of an opportunity period under section 4302(c)(6) of title 5, United States Code), before removing an employee for unacceptable performance; or

(iii) that limits the agency's discretion to remove an employee from Federal service without first engaging in progressive discipline; or

(c) generally afford an employee more than a 30-day period to demonstrate acceptable performance under section 4302(c)(6) of title 5, United States Code, except when the agency determines in its sole and exclusive discretion that a longer period is necessary to provide sufficient time to evaluate an employee's performance.

**Sec. 5.** *Ensuring Integrity of Personnel Files.* Agencies shall not agree to erase, remove, alter, or withhold from another agency any information about a civilian employee's performance or conduct in that employee's official personnel records, including an employee's Official Personnel Folder and Employee Performance File, as part of, or as a condition to, resolving a formal or informal complaint by the employee or settling an administrative challenge to an adverse personnel action.

**Sec. 6.** *Data Collection of Adverse Actions.* (a) For fiscal year 2018, and for each fiscal year thereafter, each agency shall provide a report to the OPM Director containing the following information:

(i) the number of civilian employees in a probationary period or otherwise employed for a specific term who were removed by the agency;

(ii) the number of civilian employees reprimanded in writing by the agency;

(iii) the number of civilian employees afforded an opportunity period by the agency under section 4302(c)(6) of title 5, United States Code, breaking out the number of such employees receiving an opportunity period longer than 30 days;

(iv) the number of adverse personnel actions taken against civilian employees by the agency, broken down by type of adverse personnel action, including reduction in grade or pay (or equivalent), suspension, and removal;

(v) the number of decisions on proposed removals by the agency taken under chapter 75 of title 5, United States Code, not issued within 15 business days of the end of the employee reply period;

(vi) the number of adverse personnel actions by the agency for which employees received written notice in excess of the 30 days prescribed in section 7513(b)(1) of title 5, United States Code;

(vii) the number and key terms of settlements reached by the agency with civilian employees in cases arising out of adverse personnel actions; and

(viii) the resolutions of litigation about adverse personnel actions involving civilian employees reached by the agency.

(b) Compilation and submission of the data required by subsection (a) of this section shall be conducted in accordance with all applicable laws, including those governing privacy and data security.

(c) To enhance public accountability of agencies for their management of the Federal workforce, the OPM Director shall, consistent with applicable law, publish the information received under subsection (a) of this section, at the minimum level of aggregation necessary to protect personal privacy. The OPM Director may withhold particular information if publication would unduly risk disclosing information protected by law, including personally identifiable information.

(d) Within 60 days of the date of this order, the OPM Director shall issue guidance regarding the implementation of this section, including with respect to any exemptions necessary for compliance with applicable law and the reporting format for submissions required by subsection (a) of this section.

**Sec. 7.** *Implementation.* (a) Within 45 days of the date of this order, the OPM Director shall examine whether existing regulations effectuate the principles set forth in section 2 of this order and the requirements of sections 3, 4, 5, and 6 of this order. To the extent necessary or appropriate, the OPM Director shall, as soon as practicable, propose for notice and public

comment appropriate regulations to effectuate the principles set forth in section 2 of this order and the requirements of sections 3, 4, 5, and 6 of this order.

(b) The head of each agency shall take steps to conform internal agency discipline and unacceptable performance policies to the principles and requirements of this order. To the extent consistent with law, each agency head shall:

(i) within 45 days of this order, revise its discipline and unacceptable performance policies to conform to the principles and requirements of this order, in areas where new final Office of Personnel Management (OPM) regulations are not required, and shall further revise such policies as necessary to conform to any new final OPM regulations, within 45 days of the issuance of such regulations; and

(ii) renegotiate, as applicable, any collective bargaining agreement provisions that are inconsistent with any part of this order or any final OPM regulations promulgated pursuant to this order. Each agency shall give any contractually required notice of its intent to alter the terms of such agreement and reopen negotiations. Each agency shall, to the extent consistent with law, subsequently conform such terms to the requirements of this order, and to any final OPM regulations issued pursuant to this order, on the earliest practicable date permitted by law.

(c) Within 15 months of the adoption of any final rules issued pursuant to subsection (a) of this section, the OPM Director shall submit to the President a report, through the Director of the Office of Management and Budget, evaluating the effect of those rules, including their effect on the ability of Federal supervisors to hold employees accountable for their performance.

(d) Within a reasonable amount of time following the adoption of any final rules issued pursuant to subsection (a) of this section, the OPM Director and the Chief Human Capital Officers Council shall undertake a Government-wide initiative to educate Federal supervisors about holding employees accountable for unacceptable performance or misconduct under those rules.

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) Agencies shall consult with employee labor representatives about the implementation of this order. Nothing in this order shall abrogate any collective bargaining agreement in effect on the date of this order.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(e) If any provision of this order, including any of its applications, is held to be invalid, the remainder of this order and all of its other applications shall not be affected thereby.

[Signature]

THE WHITE HOUSE,
*May 25, 2018.*

[FR Doc. 2018–11939
Filed 5–31–18; 8:45 am]
Billing code 3295–F8–P