**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 200UNITED; AND
SERVICE EMPLOYEES INTERNATIONAL
UNION,

SEIU,

v.

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES OF AMERICA;
MARGARET WEICHERT, ACTING
DIRECTOR OF THE OFFICE OF
PERSONNEL MANAGEMENT; AND
UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT,

Defendants.

Case No. 1:19-cv-01073-EAW

**DEFENDANTS' RESPONSE TO SERVICE EMPLOYEES INTERNATIONAL UNION'S**
**MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

BACKGROUND ..........................................................................................................................4

    I.     Congress enacts the Federal Service Labor-Management Relations Statute, which incorporates a comprehensive, jurisdiction-channeling review scheme .................................4

    II.    In May 2018, the President issues the Executive Orders at issue .............................................6

    III.   Numerous federal unions immediately challenge the orders in district court. SEIU, by contrast, waited almost fifteen months to bring suit ..............................................................8

STANDARD OF REVIEW ..........................................................................................................9

ARGUMENT ...............................................................................................................................10

    I.     SEIU asserts claims substantively identical to those asserted in *AFGE*. The D.C. Circuit's decision demonstrates why the statute's comprehensive review scheme precludes district court jurisdiction over SEIU's claims ............................................................................................10

    II.    SEIU cannot demonstrate likelihood of success on the merits ...........................................17

        A.   The Orders are consistent with the Statute ..........................................................................17

        B.   The Orders do not violate the APA's notice-and-comment requirement.........................21

    III.   SEIU has not established irreparable harm. It delayed seeking relief for over a year, and its alleged harms are neither actual and imminent, nor irreparable.......................................23

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*American Federation of Government Employees v. Secretary of Air Force*......................................................... 16, 18

*American Federation of Government Employees v. Trump*, 929 F.3d 748 (D.C. Cir. July 16, 2019)........passim

*Association for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977) ............................................24

*BATF v. FLRA*, 464 U.S. 89, 104 (1983) ...........................................................................................................23

*Carducci v. Regan*................................................................................................................................................17

*Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)..........................................................................25

*Clarry v. U.S.*, 85 F.3d 1041, 1048 (2d Cir. 1996).............................................................................................24

*Elgin v. Department of Treasury*..............................................................................................................4, 15, 16

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) .........................................26

*Fornaro v. James*, 416 F.3d 63, 68-69 (D.C. Cir. 2005)..............................................................................16, 17

*Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992)........................................................................................24

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ....................................11, 26

*Heckler v. Ringer*, 466 U.S. 602 (1984) .......................................................................................................16, 17

*Jalbert v. Sec. & Exch. Comm'n*, 327 F. Supp. 3d 287, 299 (D. Mass. 2018) ...............................................17

*Local 1814 v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992)......................................11

*NAGE v. FLRA*, 179 F.3d 946, 951 (D.C. Cir. 1999) ......................................................................................23

*Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 273 n.5 (1974) ...................................................6, 24

Order Denying En Banc Review, U.S. Court of Appeals for the D.C. Circuit, No. 18-5289 (Sept. 25, 2019), Doc. No. 1807961 .........................................................................................................................3

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).........................................................................24

*Thunder Basin v. Reich* .........................................................................................................................................4

*Tilton v. S.E.C.*, 824 F.3d 276, 281 (2d Cir. 2016)......................................................................................12, 13

*Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) ........................................................... 25

*Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 763 (2d Cir. 1999) ............................................................. 11

**Statutes**

5 U.S.C . § 553 ........................................................................................................................... 24

5 U.S.C. § 7101 ............................................................................................................................. 3

5 U.S.C. § 7102 ..................................................................................................................... 7, 22

5 U.S.C. § 7104 ............................................................................................................................. 8

5 U.S.C. § 7105 ..................................................................................................................... 8, 26

5 U.S.C. § 7106 ..................................................................................................................... 7, 23

5 U.S.C. § 7114 ..................................................................................................................... 6, 22

5 U.S.C. § 7116 ..................................................................................................................... 8, 14

5 U.S.C. § 7117 ...........................................................................................................7, 8, 14, 21

5 U.S.C. § 7118 ............................................................................................................. 8, 14, 26

5 U.S.C. § 7121 ............................................................................................................................. 7

5 U.S.C. § 7123 ............................................................................................................................. 8

5 U.S.C. § 7131 ...........................................................................................................7, 20, 22

5 U.S.C. § 7301 ..................................................................................................................... 8, 24

**Rules**

83 Fed. Reg. 25329 ..............................................................................................................8, 9, 20

83 Fed. Reg. 25335 ..................................................................................................................passim

83 Fed. Reg. 25343 ..................................................................................................................passim

**INTRODUCTION**

On May 25, 2018, the President issued three Executive Orders that aim to make collective bargaining more efficient, to ensure that employees serve the public while on paid time, and to promote employee accountability. These Orders complement the Federal Service Labor-Management Relations Statute ("Statute") and facilitate its stated goals of "effective and efficient Government" and maintenance of "the highest standards of employee performance." 5 U.S.C. § 7101(a)(2), (b). Almost immediately, seventeen federal labor unions challenged the Orders in the U.S. District Court for the District of Columbia, seeking to preliminarily and permanently enjoin their enforcement. Following consolidation of those actions and an agreed-upon accelerated dispositive-motion briefing schedule— where the unions withdrew their preliminary injunction motions—the district court entered a final judgment enjoining several provisions of the Orders. The Government appealed, and on July 16, 2019, the U.S. Court of Appeals for the District of Columbia Circuit unanimously vacated the decision, holding that the Statute's comprehensive review scheme precluded district court subject-matter jurisdiction over the unions' claims. *American Federation of Government Employees v. Trump*, 929 F.3d 748 (D.C. Cir. July 16, 2019). The unions petitioned for *en banc* review, which the D.C. Circuit denied on September 25, 2019, with no member of the Court even calling for a vote. *See* Order Denying En Banc Review, U.S. Court of Appeals for the D.C. Circuit, No. 18-5289 (Sept. 25, 2019), Doc. No. 1807961.

Now, almost fifteen months after the Orders issued, the plaintiffs here—Service Employees International Union and Service Employees International Union Local 200United (collectively, "SEIU")—have essentially carbon-copied the *AFGE* complaint, selected this Court as a new forum, and sought to preliminarily enjoin the Orders. The Court should deny SEIU's eleventh hour motions for preliminary relief for several reasons: SEIU cannot evade *AFGE*'s holding and establish subject-matter jurisdiction outside the Statute's comprehensive review scheme; it cannot otherwise establish

a likelihood of success on the merits; and it has not demonstrated a risk of irreparable harm warranting either a temporary restraining order or a preliminary injunction.

First, the Court lacks subject-matter jurisdiction over SEIU's claims, which are materially identical to those resolved by the D.C. Circuit in *AFGE*. Like the unions in *AFGE*, SEIU presents scaled-up, conjectural versions of labor disputes that Congress intended to be resolved through the mechanisms set forth in the Statute, with judicial review reserved for federal courts of appeals after completion of the administrative process. *AFGE*, 929 F.3d at 754. The Statute formed the Federal Labor Relations Authority ("FLRA"), vesting in it the exclusive authority to adjudicate labor disputes between federal-employee unions and agencies, including claims that an agency has violated the Statute. In *AFGE*, the D.C. Circuit held that under the test set forth in *Thunder Basin v. Reich*,[1] and clarified in *Elgin v. Department of Treasury*,[2] unions must challenge the Orders on a case-by-case basis under this scheme, making the arguments (if factually warranted) that they sought to make sweepingly and prospectively in district court. To be sure, unions may prefer to challenge the Orders prospectively and collectively rather than pursue FLRA adjudication case-by-case. But Congress foreclosed that option. *See AFGE*, 292 F.3d at 755–57. Federal unions cannot manufacture jurisdiction where Congress has specifically channeled it away from district courts. Unions such as AFGE and SEIU will ultimately receive their day in federal court, before a court of appeals, after they have completed the FLRA adjudication process. Then, and only then, can SEIU challenge the provisions of the Orders with which they take issue.

Tellingly, SEIU declines to argue that the D.C. Circuit erred in *AFGE*. Instead, it simply argues (in less than two pages) that *AFGE* is inapposite because it now brings claims against the Office of Personnel Management (OPM) under the Administrative Procedure Act, in purported contrast to the

---

[1]      510 U.S. 200 (1994).

[2]      567 U.S. 1 (2012).

claims asserted by its fellow unions in *AFGE* under the Constitution and the Statute itself. But SEIU simply swaps out one label for another: it brings the exact substantive claims asserted in *AFGE*—that the Orders conflict with the Statute—and styling them now as APA claims does not change the fact that Congress has precluded their adjudication in district court. The Statute vests the authority to adjudicate these claims first in the FLRA, followed by judicial review in a court of appeals. Like the unions in *AFGE*, SEIU must wait until disputes between its members and their agencies have developed on a specific factual record and then proceed as set forth in the Statute.

Jurisdiction aside, SEIU cannot establish a likelihood of success on the merits of its claims. The Orders do not contravene the Statute. In large part, the Orders simply prescribe flexible goals for agencies to pursue through collective bargaining, while reiterating that agencies must comply with all statutory duties, including the duty to bargain in good faith. SEIU's principal challenge to these provisions is based on the untenable premise that the Orders have prescribed goals that agencies cannot pursue while fulfilling their duty to bargain in good faith—even though the Orders *require* agencies to fulfill this duty. The remaining provisions SEIU challenges remove a handful of subjects from the collective bargaining process under express statutory language that SEIU neither discusses nor cites.

Finally, SEIU cannot show irreparable harm. The Second Circuit generally denies preliminary relief where plaintiffs are dilatory in bringing suit. A plaintiff's unnecessary delay in enforcing its rights undermines any suggestion of urgent, irreparable harm warranting preliminary relief. Just so here: while its fellow unions rushed to court immediately after the Orders were issued in May 2018, SEIU waited almost fifteen months before it finally tagged in. And SEIU had as much reason to join that litigation as it claims to have for suing now: its own declarant testifies that an SEIU unit was in active

3

collective bargaining negotiations when the Orders first issued.[3] SEIU cannot now reasonably ask this Court to find immediate, irreparable harm from the Orders while it sat on the sidelines for well over a year, letting its fellow unions challenge the Orders all the way to the D.C. Circuit.

Even overlooking SEIU's lengthy delay in seeking relief, SEIU has not established any irreparable harm that the Court might forestall by preliminarily enjoining the Orders. To satisfy its evidentiary burden of showing irreparable harm, SEIU must come forward with concrete evidence of harm to itself or its members. SEIU has not done so. It generally alleges that the Orders will swiftly go into effect, but not that it will inflict imminent irreversible harm on SEIU in particular. SEIU fails to identify a single negotiating position that an agency is currently adopting in an active CBA negotiation which could be altered by the Orders. And even if it had, SEIU must show why such alleged harm is *irreparable*, rather than the type of harm that can be otherwise prevented or reversed later by the FLRA. SEIU has done none of that.

For these reasons, the Court should deny SEIU's motion.

## **BACKGROUND**

I.   **Congress enacts the Federal Service Labor-Management Relations Statute, which incorporates a comprehensive, jurisdiction-channeling review scheme.**

In 1978, Congress enacted the Statute as part of the broader Civil Service Reform Act ("CSRA"), to govern collective bargaining between federal agencies and qualifying unions, a field formerly administered under a series of executive orders. *See Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 273 n.5 (1974). Three components of that scheme are relevant here. First, the Statute requires that an agency and its employees' designated union "meet and negotiate in good faith" to arrive "at a collective bargaining agreement" ("CBA"). 5 U.S.C. § 7114(a)(4).[4] These negotiations may

---

[3] *See* Phillips Decl. ¶ 56.
[4] All citations throughout omit internal quotation marks unless otherwise stated.

cover "conditions of employment," 5 U.S.C. § 7102(2), and any resulting CBA generally must "provide procedures for the settlement of grievances." 5 U.S.C. § 7121(a)(1). Although the parties may negotiate over a range of workplace conditions, the Statute makes clear that agencies need not negotiate over certain subjects. For example, agencies may not negotiate over "matters which are the subject" of a "Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1). Further, the Statute indicates that it shall not "affect the authority of any management official of any agency" over certain subjects, including hiring, work assignments, or disciplinary action against any employee, 5 U.S.C. § 7106(a), although "at the election of the agency," the parties may still negotiate over particular management issues, 5 U.S.C. § 7106(b)(1). These include the number of employees that may be assigned to a subdivision, or the technology they will use in carrying out a task (the "permissive subjects" of negotiation). *See id.*

Second, the Statute provides for "official time" (paid time for certain union-related activities). In particular, the Statute states that union representatives involved "in the negotiation of" a CBA "shall be authorized official time for such purposes . . . during the time the employee otherwise would be in a duty status." 5 U.S.C. § 7131(a). The Statute does not guarantee official time for any other union-related activity, and expressly proscribes the use of official time for "internal business of" a union, including union elections and recruitment. 5 U.S.C. § 7131(b). For any other uses of official time (the "negotiated official time"), the parties may agree to an amount that is "reasonable, necessary, and in the public interest."[5] 5 U.S.C. § 7131(d).

Third, the Statute establishes an elaborate remedial scheme. It charges the FLRA with resolving disputes involving the Statute, including "issues relating to the duty to bargain in good faith," through "complaints of unfair labor practices" which may be asserted in response to an agency's failure

---

[5] Although not relevant to this litigation, the Statute also states that the FLRA generally may, at its discretion, award official time to union representatives for their participation in FLRA proceedings. *See* 5 U.S.C. § 7131(c).

to "comply with *any* provision" of the Statute. 5 U.S.C. §§ 7104, 7105(2), 7116(a) (emphasis added).

The Statute also creates an expedited review procedure for disputes concerning whether "the duty to

bargain in good faith" extends to a particular matter (a "negotiability claim"). 5 U.S.C. § 7117(c). The

FLRA's powers are extensive: it can hold hearings, take testimony, and issue subpoenas. *See* 5 U.S.C.

§ 7105(g)(1), (2). If the FLRA finds that an agency has violated the Statute, it can require an agency to

"cease and desist from" the violation, "renegotiate a [CBA] in accordance with" its decision, and

generally "take any remedial action [the FLRA] considers appropriate." 5 U.S.C. §§ 7105(g)(3),

7118(a)(7)(B). Final decisions of the FLRA may generally be appealed by either party to a federal court

of appeals, ensuring judicial review following the completion of the administrative process. 5 U.S.C. §

7123(a).

Importantly, the foregoing provisions do not constrain the President's broad authority to

regulate federal employee conduct. The President had long exercised such authority under his Article

II powers to supervise the executive branch, and Congress further acknowledged the President's

authority to "prescribe regulations for the conduct of employees in the executive branch," 5 U.S.C. §

7301. The CSRA notes that none of its components, including the Statute, shall be construed to "limit,

curtail, abolish, or terminate any" pre-existing "function of, or authority available to, the President"

unless otherwise expressly provided. Pub. L. No. 95-454, § 904, 92 Stat. at 1224.

## II.     In May 2018, the President issues the Executive Orders at issue.

On May 25, 2018, President Trump issued the Orders at issue here. *See* 83 Fed. Reg. 25329

(Collective Bargaining Order, or "CB Order"); 83 Fed. Reg. 25335 (Official Time Order, or "OT

Order"); 83 Fed. Reg. 25343 ("Merit Order"). The Orders generally set forth reasonable goals for

agencies to pursue during CBA negotiations, and remove certain issues from negotiation as authorized

by the Statute. The Orders make clear, however, that they do not unsettle the terms of any CBAs

currently in effect. *See, e.g.,* CB Order § 9(c); OT Order § 9(a); Merit Order § 8(b). All Orders, by their

terms, also require agencies to fulfill their duty to bargain in good faith, and clarify that they are to be "implemented consistent with applicable law." *See, e.g.*, CB Order §§ 5, 9(b); OT Order §§ 3(a), 9(d); Merit Order §§ 3, 8(c).

First, the CB Order sets forth procedural goals for CBA negotiations. It states that agencies should endeavor to negotiate "reasonable time limits for good-faith negotiations," and notes that a "negotiating period of between 4 and 6 months . . . should ordinarily be considered reasonable." CB Order § 5(a). An agency must notify the President if negotiations exceed 9 months, *see id.* § 5(b), but the Order imposes no firm cap on the length of negotiations. The Order also calls on agencies to "request the exchange of written proposals" during negotiations, but does not require that agencies seek to exclude oral discussions altogether. *Id.* § 5(e). Further, the CB Order states that agencies shall decline their option to negotiate over "permissive subjects." *Id.* § 7; *see also supra* at 5 (describing permissive subjects).

Next, the OT Order prescribes certain parameters for the use of official time, consistent with the Statute's requirements. For example, the Order instructs agencies to pursue a limit on negotiated official time that is "reasonable, necessary, and in the public interest." OT Order § 3(a). The Order indicates that an annual limit allowing more than one hour of official time per employee "ordinarily" will not meet this standard. *See id.* But it clarifies that an agency must still "bargain in good faith," and can agree to a greater amount. *Id.* § 3(a), (b). The OT Order also states that, with certain exceptions, an employee may not receive official time to "prepare or pursue" a grievance for another employee, but does not prevent an employee from preparing or pursuing such a grievance on his or her own time. *Id.* § 4(a)(v). The OT Order also states that no employees (not just union members) may receive paid time for lobbying activities, unless in their official capacity, or receive special discounts on use of government resources for union activities unless those discounts are "generally available for non-agency business." *Id.* § 4(a)(i), (iii).

Finally, the Merit Order addresses a discrete set of employee-performance issues. It states that, when negotiating over the required grievance procedure, agencies should "endeavor to exclude from its application" disputes concerning the removal of an employee "for misconduct or unacceptable performance." Merit Order § 3. The Order, however, reminds agencies of their duty to negotiate in good faith, and cautions that they should only pursue this goal "[w]henever reasonable in view of the particular circumstances." *See id.* The Order requires agencies to exclude certain topics, such as incentive pay awards and relocation payments, from the grievance procedure "to the extent consistent with law," *id.* § 4. Also, no agency may reach an agreement that requires the use of "progressive discipline" before removing an employee, *id.* § 4(b)(iii). For employees whose performance has been deemed unacceptable, agencies "generally" should not provide more than "a 30-day period to demonstrate acceptable performance." *Id.* § 4(c). Of course, an agency may provide more time if necessary. *See id.*

III.   **Numerous federal unions immediately challenge the orders in district court. SEIU, by contrast, waited almost fifteen months to bring suit.**

Seventeen federal unions immediately challenged the Orders in the U.S. District Court for the District of Columbia, eventually consolidating their suits under a single caption, with AFGE as the lead plaintiff. *See AFGE*, 929 F.3d at 753. The unions asserted a mix of constitutional and statutory claims, including the claim that the Orders "and their various provisions violate particular requirements of the" Statute. *Id.* at 753–54. Although the D.C. District Court enjoined certain provisions of the Orders, the D.C. Circuit vacated the decision on appeal, holding that the Statute's comprehensive remedial scheme precluded district court jurisdiction over plaintiffs' claims. *See id.* The Court held that the unions must instead seek relief from the FLRA for any alleged conflict between the Orders and the Statute. *See id.*

Meanwhile, almost fifteen months elapsed before SEIU brought this suit on August 13, 2019. It now seeks a temporary restraining order and preliminary injunction preventing OPM from

implementing certain provisions within the Orders. SEIU largely replicates the *AFGE* unions' claims, styling them now as APA claims. In seeking to establish that the Orders are "contrary to law," and thus invalid under the APA, SEIU claims that various provisions violate the Statute—the precise claim made in *AFGE*. *See, e.g.*, PI Mot., 6–11, 15, 18–20. SEIU, in fact, professes that the D.C. District Court's decision in *AFGE* supports their claims here, effectively conceding the substantive overlap between the two cases. PI Mot. at 18 n. 12 (the District Court's "analysis," in *AFGE* "that the [Orders] violate the [Statute] . . . supports SEIU's APA claims here.").

## STANDARD OF REVIEW

"Where the party seeking the [preliminary] injunction attempts to enjoin application of a governmental regulation, it must demonstrate irreparable harm should the injunction not be granted and a likelihood of success on the merits." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). "Such relief, however, is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.*

SEIU states that it need not establish a "likelihood of success on the merits," but may instead demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [their] favor." PI Mot., 13. "But where a preliminary injunction is sought against the enforcement of governmental rules, the movant may not invoke the 'fair ground for litigation standard' but must show 'likelihood of success.'" *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 763 (2d Cir. 1999). The same standard applies to a motion for a temporary restraining order. *See Local 1814 v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) ("the traditional standards which govern . . . an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction").

**ARGUMENT**

**I.   SEIU asserts claims substantively identical to those asserted in *AFGE*. The D.C. Circuit's decision demonstrates why the statute's comprehensive review scheme precludes district court jurisdiction over SEIU's claims.**

The D.C. Circuit's jurisdictional holding in *AFGE* resolves this case. SEIU makes no effort to dispute the merits of the D.C. Circuit's decision, instead seeking to evade the decision's reach by asserting that it has cured any jurisdictional defect simply by using the APA as a vehicle to assert the same legal theories. But that assertion misconstrues the relevant jurisdictional law, which looks not to the general cause of action invoked, but rather to the substance of a plaintiff's specific claims. SEIU, like the unions in *AFGE*, argues at bottom that various Order provisions conflict with the Statute.[6] These are the precise legal questions the statutory scheme is designed to channel through the FLRA, and from there to a federal court of appeals. The Court thus lacks jurisdiction over SEIU's attempted end run around the Statute.

In *Thunder Basin*, the Supreme Court set forth the relevant two-part test for determining when a statutory review scheme precludes district court jurisdiction over a plaintiff's action. First, the Court must look to the statute to "determine whether it is fairly discernible" that Congress intended its "scheme of administrative" review "to preclude district court jurisdiction," with the presumption that "when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Tilton v. S.E.C.*, 824 F.3d 276, 281 (2d Cir. 2016). Second, the Court must look to SEIU's claims to determine whether they are "of the type

---

[6] Plaintiffs' Brief makes clear that this case is about alleged conflicts between the Statute and certain Order provisions. *See, e.g.*, PI Mot., 7 (alleged conflict between section 7103(a)(9) of the Statute and Merit Order § 4(a), (b)); *Id.*, 9 (alleged conflict between sections 7114(a)(2) and 7121(b) of the Statute, and OT Order § 4(a)(iv)); *Id.* (alleged conflict between section 7102 of the Statute and OT Order § 4(a)(ii)); *Id.* (alleged conflict between section 7131(d) of the Statute and OT Order § 4(a)(i)); *Id.*, 10 (alleged conflict between section 7106(b) of the Statute and CB Order § 6); *Id.*, 11 (alleged conflict between sections 7114(a)(4) and 7103(a)(12) of the Statute, and Merit Order § 4(b)(i)-(iii) and OT Order § 3).

Congress intended to be reviewed within th[e] statutory structure." *Id.* Generally, courts must "presume that a claim is not confined to administrative channels [1] if a finding of preclusion could foreclose all meaningful judicial review; [2] if the suit is wholly collateral to a statute's review provisions; and [3] if the claims are outside the agency's expertise." *Id.*

The Statute plainly meets the first part of the *Thunder Basin* test. As the D.C. Circuit noted, the Statute created "an enormously complicated and subtle scheme to govern employee relations in the federal sector," and thus "we can fairly discern that Congress intended the statutory scheme to be exclusive with respect to claims within its scope." *AFGE*, 929 F.3d at 755. SEIU points to nothing in the Statute's text, history, or purpose that suggests otherwise, much less rebuts the "presumption" that its review "procedures are to be exclusive."

Turning next to SEIU's claims, they likewise plainly satisfy the second part of the *Thunder Basin* test. They revolve around alleged violations of the Statute, and are thus precisely the type of claims intended for the FLRA. SEIU fails to show otherwise. In fact, SEIU meets none of the three elements that courts consider when analyzing that question.

First, the Statute provides for meaningful judicial review. SEIU may pursue claims before the FLRA, which has the authority to compile a thorough factual record through subpoenas, depositions, and live hearings. *See supra* at 6. If SEIU is unsuccessful before the FLRA, it may appeal the decision to a federal court of appeals. *See id.* Whether the FLRA may "hold unlawful and set aside agency action[,]" PI Mot., 22 n.13, is immaterial. SEIU can "ultimately obtain review of and relief from the executive orders by litigating [its] claims through the statutory scheme in the context of concrete bargaining disputes." *AFGE*, 929 F.3d at 757. SEIU can argue before the FLRA that an agency abiding by the Orders has unlawfully refused to bargain in good faith, or to bargain at all, over certain subjects in violation of the Statute. The FLRA may then issue "rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining

disputes." *Id.* at 760; *see also supra* at 6. This would provide SEIU complete relief from the Orders'

enforcement. Additionally, a court of appeals may then review any such FLRA ruling, and could even

review claims that the FLRA was unable to entertain in the first instance. *See AFGE*, 929 F.3d at 758–

59.

Second, SEIU's claims are not "wholly collateral" to the statutory scheme. The crux of SEIU's

APA claims is that implementation of certain provisions of the Orders would contravene the Statute.

*See supra* at 9, 10 & n. 6. Its "challenge" is thus "of the type that is regularly adjudicated through [the

Statute's] scheme: disputes over whether the Statute has been violated." *AFGE*, 929 F.3d at 760.

Indeed, the specific claims SEIU asserts here may be brought before the FLRA when a concrete

dispute arises. For example:

- If an agency adheres to the OT Order and refuses to negotiate over whether union representatives will receive official time for participating in grievance proceedings involving co-workers, SEIU may bring an unfair labor practice claim, or an expedited negotiability claim alleging that the agency improperly concluded that "the duty to bargain in good faith does not extend to" this issue. 5 U.S.C. §§ 7116, 7117(c), 7118.

- If an agency pursues the CB Order's goal concerning negotiation time-limits—that CBA negotiations "ordinarily" conclude within 4 to 6 months—SEIU can raise an unfair labor practice claim alleging that the agency's "adherence to [this provision] amounted to bad-faith bargaining in violation of the [Statute]." *AFGE*, 929 F.3d at 757; *see also* 5 U.S.C. § 7116(a)(5) (it is an "unfair labor practice" for an agency "to refuse to . . . negotiate in good faith"). The same is true if SEIU believes that an agency is negotiating in bad faith when pursuing the OT Order's goal with respect to a limit on negotiated official time.

- If an agency refuses to negotiate over permissive subjects, as the CB Order instructs, SEIU can raise an unfair labor practice claim, and the FLRA can interpret whether section 7106(b)(1)—the permissive subject provision—gives SEIU any say over whether these topics must be negotiated.

Third, SEIU's claims are not "beyond the expertise" of the FLRA. "Many of [its] claims allege

that the [Orders] direct agencies to violate the [Statute] by refusing to bargain over mandatory subjects

or taking actions that are inconsistent with the duty to bargain in good faith," matters that "lie at the

core of the FLRA's specialized expertise." *AFGE*, 929 F.3d at 760. Even if the FLRA boasts no special

expertise over the APA, *see* PI Mot., 22 n.13, SEIU's specific APA claims require no such "special expertise;" they revolve around the Statute, which assuredly falls within the FLRA's domain. And in any event, the FLRA "could offer an interpretation of the [Statute]" that may "shed light on" the APA claim. *AFGE*, 929 F.3d at 761. Thus, because the FLRA's "expertise can otherwise be brought to bear" on SEIU's claims, there is "no reason to conclude that Congress intended to exempt such claims from exclusive review before the" FLRA. *Elgin*, 567 U.S. at 23.

SEIU's argument in support of bypassing the Statute's review scheme revolves around its choice to bring its claims under the APA. SEIU argues that APA claims are unlike the "adjudicative claims" intended for administrative review. PI Mot., 22. The Supreme Court rejected the same argument in *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), holding that the District Court lacked jurisdiction over a facial constitutional challenge to the Military Selective Service Act under the CSRA. The plaintiffs—federal employees terminated for failing to register for the Selective Service in violation of the Act, *see id.* at 6–7—sued in district court. *See id.* at 7–8. They argued that their constitutional claims were "wholly collateral" to the administrative scheme since they had "nothing to do with the types of day-to-day personnel actions adjudicated by the" administrative reviewer. *Id.* at 21–22. The Court disagreed, noting that the plaintiffs' constitutional claims were a "vehicle by which they [sought]" to challenge the agency's termination criteria, which was "precisely the type of" action "regularly adjudicated" by the administrative reviewer. *Id.* at 21–22. Just so here: the APA is the "vehicle" by which SEIU seeks to litigate the Statute's requirements concerning the contours and scope of collective bargaining—"precisely the type of" issues the FLRA "regularly adjudicate[s]." *See AFGE*, 929 F.3d at 756–57 (SEIU cannot challenge a regulation "on a nationwide basis in an APA suit before [a] district court" to avoid bringing a "concrete" claim before "the FLRA").

SEIU makes a smattering of other, related arguments. None finds nearly enough purchase to distinguish SEIU's claims from those *AFGE* held to be precluded on virtually identical facts.

First, SEIU argues that the APA expressly "authorize[s] federal courts" to hear APA claims. PI Mot., 21. But it is immaterial that SEIU invokes a cause of action that *typically* permits suit in federal court. The question is whether SEIU's *specific claim* may be brought in federal court. *See Elgin*, 567 U.S. at 10 ("appropriate inquiry" went to whether the SEIU's challenge against the particular agency actions at issue had to "proceed exclusively though the statutory review scheme," even if they were raising broad "constitutional challenges to federal statutes"). Of course, the whole point of the *Thunder Basin* test is to determine when district courts lack jurisdiction over claims that otherwise fall within their broad section 1331 authority. *See AFGE*, 929 F.3d at 754 ("District courts have jurisdiction over civil actions arising under" federal law, "but Congress may preclude district court jurisdiction by establishing an alternative statutory scheme" for review). Courts have thus repeatedly found that district courts lack jurisdiction under *Thunder Basin* to hear claims that otherwise are typically brought in federal court. *See, e.g., Elgin*, 567 U.S. at 8–9 (district court lacked jurisdiction over SEIU's Equal Protection claim, even though "general grant of federal-question jurisdiction . . . gives district courts authority over constitutional claims"); *Fornaro v. James*, 416 F.3d 63, 68–69 (D.C. Cir. 2005) (Roberts, J.) (district court jurisdiction over APA challenge to OPM action precluded under CSRA).

Indeed, the D.C. Circuit reached that very conclusion in measuring an APA claim against the preclusive effect of the Statute. In *AFGE v. Secretary of Air Force*, AFGE brought claims under the APA challenging certain rules issued by the Air Force. 716 F.3d 633, 635 (D.C. Cir. 2013). The Court held that AFGE must "rely on the variety of causes of action and remedies" in the Statute, and could not "circumvent [its] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Id.* at 636. It made no difference that AFGE was dissatisfied with the remedies available in the administrative scheme. *See id.* at 639.

More broadly, the Supreme Court rejected a similar APA argument in *Heckler v. Ringer*, 466 U.S. 602 (1984). There, the Secretary of Health and Human Services promulgated a rule stating that

Medicare would no longer cover a unique respiratory-distress medical procedure. *See id.* at 607. A group of plaintiffs sued in district court, asserting, *inter alia*, procedural and substantive APA claims. *See id.* at 610 n.7, 614. The Court found that the plaintiffs could not side-step the Medicare Act's comprehensive review process and go straight to federal court. Rather, it held, the plaintiffs' APA claims were "inextricably intertwined" with Medicare benefit claims, and thus had to be "channeled first into the administrative process." *Id.* at 614. The Court rejected the argument that the plaintiffs could immediately sue in federal court simply because their claims "ar[ose] under the [APA]." *Id.* at 622. This held true even though the administrative scheme would not allow them to file APA claims per se, but rather "concrete claim[s] for reimbursement" under the Medicare Act (once ripe). *Id.* at 621–22.

Other courts have likewise found that a plaintiff may not "repackage[]" its claim "under the heading of an APA claim" to "exempt it from the exclusive channeling regime Congress prescribed." *Jalbert v. Sec. & Exch. Comm'n*, 327 F. Supp. 3d 287, 299 (D. Mass. 2018). In particular, the D.C. Circuit in *Fornaro* found that a district court lacked jurisdiction over an APA claim due to the CSRA. 416 F.3d at 66–69. Writing for a unanimous court, then-D.C. Circuit Judge Roberts held that the plaintiffs could not bring an APA claim in district court, but rather could raise only the challenges permitted under the CSRA's remedial scheme. *Id.* at 68-69. To hold otherwise would have defeated the very purpose of jurisdiction-channeling statutes such as the CSRA. *See id.* And even where the CSRA "provided no relief" at all for a particular employment claim, the D.C. Circuit held in *Carducci v. Regan* that "no remedy was available under the APA[,]" 714 F.2d 171, 174–75 (D.C. Cir. 1983) (Scalia, J.)— such is the preclusive force of jurisdictional channeling schemes such as the CSRA and the Statute.

Ignoring all of those decisions, SEIU relies on three cases more to its liking. PI Mot., 22. None supports SEIU's assertion that the Court has jurisdiction over its claim simply because it arises under the APA. The first of those decisions, *NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), does not even

mention the jurisdictional question at issue here. Regardless, *Chertoff* focused on an entirely different statutory scheme—one unique to the then-newly constituted Department of Homeland Security, the Homeland Security Act ("HSA"). *See id.* at 845–46, 849. It thus has no bearing here.

SEIU's other cited cases—district court decisions in *NTEU v. Devine*, 577 F. Supp. 738 (D.D.C. 1983) and *NTEU v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009)—likewise cannot overcome the case law discussed above. To be sure, both decisions found district court jurisdiction over APA claims challenging OPM *regulations*, rather than discrete agency actions. But their validity is questionable following the D.C. Circuit's decision in *AFGE v. Air Force*, which held precisely the opposite. *See supra* at 14. *Devine* was decided nearly thirty years before *Air Force* (and nearly ten years before *Thunder Basin*, for that matter). *Whipple* was also decided before *AFGE v. Air Force*, and was then rendered moot by an executive order, resulting in its dismissal before the D.C. Circuit had an opportunity to review it. *See* Status Report, *NTEU v. Whipple*, No. 07-168 (D.D.C. Jan. 26, 2011), ECF No. 47; Final Order, *NTEU v. Whipple*, No. 07-168 (D.D.C. Jan. 31, 2011), ECF No. 48. Further, *Air Force* expressly rejected arguments specifically relied upon in both cases.[7] Thus, these cases are of limited persuasive value at best, and do not sanction SEIU's strategic attempt to repackage the same claims asserted in *AFGE* to circumvent the Statute's remedial scheme. Indeed, it is unfathomable that the D.C. Circuit would find jurisdiction lacking in *AFGE*, but conclude that the unions could return to federal court simply by re-branding the same claims as APA challenges.

---

[7] *Compare Whipple*, 636 F.Supp.2d at 70 (claiming that the CSRA may not "preclude pre-enforcement judicial review of a regulation under the APA") *with Air Force*, 716 F.3d at 639 (plaintiffs must wait for the agency to "fail[] to live up to its" duties and then "pursue the matter" through the prescribed scheme, it is immaterial that the statutory remedy is "inconvenient" and lacks the "immediacy of an APA suit"); *compare Devine*, 577 F.Supp at 745 (CSRA generally precludes jurisdiction over concrete "labor altercation[s] between a federal employee and his federal employer") *with Air Force*, 716 F.3d at 639 ("a plaintiff's inability to use the APA to circumvent the CSRA's requirements applies to a 'systemwide challenge' . . . just as it does to the implementation of such a policy in a particular case").

Last, SEIU argues that Congress did not intend "APA challenges to be sent to" the FLRA. *See* PI Mot., 22. But again, SEIU myopically (and incorrectly) focuses only on the statute under which it brought suit. The question is whether SEIU's *specific* claim must be channeled through the statutory scheme, much as the question in *Elgin* was whether SEIU's facial Equal Protection challenge to the Military Selective Service Act had to be brought before the Merit Systems Protection Board. The framers of the Fourteenth Amendment may not have foreseen that Equal Protection claims would proceed through an administrative reviewer, but the *Elgin* Court nonetheless held that the plaintiffs had to pursue their claim through the statutory scheme. Similarly, regardless of whether Congress generally foresaw that APA challenges would be heard through the Medicare Act review scheme, the Supreme Court in *Heckler* concluded that SEIU could not sidestep the administrative process and bring its specific APA claim to federal district court.[8] *See supra* at 14–15.

In short, no matter how SEIU styles its claims, it ultimately argues that certain provisions in the Orders violate the Statute. These legal challenges fall squarely within the FLRA's province. Accordingly, the Court lacks jurisdiction, and so SEIU is unlikely to succeed on the merits of its claims.

## II.     SEIU cannot demonstrate likelihood of success on the merits.

### A.  The Orders are consistent with the Statute.

SEIU argues that a number of provisions within the Order conflict with the Statute. The challenged provisions fall into three categories: those that (i) set reasonable negotiation goals for agencies; (ii) establish Government-wide rules for employee and agency conduct, which may remove certain topics from CBA negotiations; and (iii) direct agencies to decline their option to bargain over "permissive subjects."

---

[8] SEIU also argues that the APA applies to OPM. PI Mot., 21–22. The Government, however, does not deny that OPM is generally subject to the APA. The question is whether SEIU may sidestep the Statute's remedial scheme, and immediately assert their specific APA claims concerning the Orders in District Court rather than wait for the appeal of an FLRA decision to a Circuit Court.

1.  *CBA goals for agencies.*

SEIU challenges certain provisions that set flexible goals for agencies in CBA negotiations. *See* CB Order § 5(a), (e); OT Order § 3; Merit Order § 4(c). None is rigid, and all *require*, by their terms, that agencies fulfill their duty to bargain in good faith. *See id.* SEIU does not contend that any of these goals is necessarily unreasonable, or that agencies will be inflexible in their pursuit. SEIU instead disputes these provisions by suggesting, incorrectly, that they set firm bargaining positions from which agencies may not depart.

First, SEIU claims that the CB Order "imposes arbitrary limits on the duration of bargaining and confines bargaining to a mechanical exchange of written proposals." PI Mot., 20. Neither is true. The CB Order states that agencies should make "their best effort to negotiate . . . reasonable time limits," and clarifies that "between 4 and 6 months" should "ordinarily be considered reasonable." CB Order § 5(a). There is no firm cap, and again, agencies are instructed to "bargain in good faith." *Id.* Likewise, with respect to the exchange of written proposals, the Order states only that agencies should "request" this practice. And it does not require that agencies request a process limited to written exchanges to the exclusion of concurrent oral discussions. *See id.* § 5(e).

Second, SEIU claims that the OT Order impermissibly "imposes caps on official time." PI Mot., 19; *see also id.*, 20 (same). This too is false. The Order instructs that agencies should agree to an amount of negotiated official time that is "reasonable, necessary, and in the public interest," OT Order § 3(a), as required by the Statute, *see* 5 U.S.C. § 7131(d). Although the Order prescribes a formula for calculating a presumptively reasonable limit, agencies can deviate from it based on the circumstances, including "the size of the bargaining unit."[9] OT Order § 3(a). Additionally, the OT Order makes clear

---

[9] SEIU cites to OT Order section 4(a)(ii) as well, but includes no substantive discussion of this provision. This section states that "employees shall spend at least three-quarters of their paid time . . . performing agency business or attending necessary training" to "ensure that they develop and maintain the skills necessary to perform their agency duties efficiently and effectively." OT Order §

that this negotiated limit shall not prevent an agency from awarding official time required under the Statute; *e.g.*, for participation in CBA negotiations. *See id.* § 3(c).

    2.   *Government-wide rules for employee and agency conduct.*

SEIU challenges provisions establishing government-wide rules, arguing generally that they unlawfully remove topics from the collective bargaining process. *See* OT Order § 4(a)(i), (iii), (v) (restrictions on official time); Merit Order § 4(a), (b)(iii), (c) (restrictions on grievance procedures, agreements that require progressive discipline before employee removal, and the length of performance demonstration periods). But section 7117(a)(1) of the Statute explicitly notes that "the duty to bargain in good faith shall" not extend to matters "inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1). Congress understood that, under section 7117(a)(1), "the issuance of government[-]wide rules . . . may restrict the scope of collective bargaining which might otherwise be permissible under the provisions of" the Statute. H.R. Rep. No. 95-1717, at 155 (1978) (conf. report). As applied here, this section has the effect of displacing the duty to bargain over any matter inconsistent with the government-wide rules promulgated in the Orders under the President's broad section 7301 authority. SEIU's brief does not even reference section 7117(a)(1).

SEIU also makes a handful of other arguments specific to certain of these provisions, none of which has merit. First, SEIU argues that the OT Order prohibits union representatives from receiving official time for "participat[ing] in any grievances involving co-workers," even though union representatives have a right to be present at these proceedings pursuant to 5 U.S.C. § 7114(a)(2). PI

---

4(a)(ii)(1). But it clarifies that "employees who have spent one-quarter of their paid time in any fiscal year on non-agency business may continue to use" official time for CBA negotiations and FLRA proceedings, as specified in the Statute. *Id.* § 4(a)(ii)(2). This time shall count towards the limitation on negotiated official time allotted to relevant employees in future years. *Id.* § 4(a)(ii)(3). This provision, therefore, ensures that official time awards—whatever their aggregate quantity—are spread out among union members to ensure that all federal employees retain the skills necessary to perform their agency duties.

Mot., 19. Union representatives, however, are not prevented from exercising this right simply because they will not be compensated by the government for it. Additionally, if Congress believed that official time was necessary to give effect to this right, it knew how to expressly require it. Congress chose to require official time when union representatives participate in formal CBA negotiations, *see* 5 U.S.C. 7114(a)(1), but included no such mandate for other union-related activity. In fact, Congress made clear that employees are *not* entitled to official time any time they exercise a right under the Statute. For example, the Statute gives each employee the right to "form, join or assist a union," yet it expressly prohibits official time for any "internal [union] business," including union recruitment, elections, and fundraising. 5 U.S.C. §§ 7102, 7131(b).

Second, SEIU argues that the OT Order "ban[s] employees from using official time for union-related 'First Amendment' activity," even though union representatives have a "right to present the views of the labor organization" to the employer. PI Mot., 19 (citing 5 U.S.C. § 7102(1)). The OT Order, of course, does not *ban* official time for "First Amendment" activity. It states only that employees—whether on official time or not—"may not engage in lobbying activities . . . except in their official capacities as an employee." OT Order § 4(i). Union representatives may continue to receive official time when they "present the views of the" union during CBA negotiations under 5 U.S.C. § 7131(a). In any event, this argument relies on the same faulty premise as the last one: that employees are entitled to official time whenever they exercise any statutory right. Again, the Statute does not guarantee official time for this purpose, and union representatives may still exercise their right to present their views to an employer while off duty.

Finally, SEIU argues that the OT Order "prevent[s]" unions "from using any office space, computers, or even phones" even though they must represent covered employees. PI Mot., 19. The Order, however, states only that employees acting on behalf of a union may not receive "*free or discounted use*" of government property unless these terms are generally offered for "non-agency

business." OT Order § 4(a)(iii). The Statute does not require agencies to provide unions with a resource subsidy, and SEIU does not suggest otherwise. *Cf. BATF v. FLRA*, 464 U.S. 89, 104 (1983) ("Congress might well have concluded that, although union representatives should not be penalized by a loss in salary while engaged in collective bargaining, they need not be further subsidized . . . [t]he provisions of the Act intended to facilitate the collection of union dues . . . certainly suggest that Congress contemplated that unions would ordinarily pay their own expenses.").

    3.  *Permissive subjects.*

    SEIU argues that the CB Order prevents agencies from negotiating over permissive subjects, even though agencies have the "ability" to do so. But as SEIU does not and cannot deny, unions have no right to insist on negotiations over these issues. The Statute makes clear that these subjects may be negotiated "*at the election of the agency*."[10] 5 U.S.C. § 7106(b)(1). The Statute thus exempts these topics from the range of issues that agencies are obligated to negotiate.

## B.  The Orders do not violate the APA's notice-and-comment requirement.

    SEIU claims that OPM must undertake a notice-and-comment process when issuing any guidance concerning the Orders. But this claim fails and, in any event, must be pressed through the administrative review scheme established by the Statute.

    As an initial matter, SEIU's claim mischaracterizes any ensuing OPM guidance as an independent regulation creating new legal duties. The guidance would serve as an interpretive device that simply offers further details regarding the Orders' plain terms. "The APA establishes the procedures federal administrative agencies use for rule making." *Perez v. Mortg. Bankers Ass'n*, 135 S.

---

[10] The D.C. Circuit took no issue with a prior Executive Order that mandated agencies to negotiate over the subjects set forth in § 7106(b)(1). *See NAGE v. FLRA*, 179 F.3d 946, 951 (D.C. Cir. 1999) (concluding that EO No. 12,871 "reaffirm[s] the President's authority to insure his control and supervision over the Executive Branch" by issuing an order to his subordinates). If the President can order agencies to exercise their discretion in one direction, surely he can order them to do so in the other as well.

Ct. 1199, 1203 (2015). The APA prescribes an extensive notice-and-comment procedure for "legislative rules," *id.*, which are "those that create new law, rights, or duties, in what amounts to a legislative act." *Clarry v. U.S.*, 85 F.3d 1041, 1048 (2d Cir. 1996). However, the notice-and-comment requirement does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C . § 553(b)(A). "Interpretive rules" do not "create rights, but instead clarify an existing statute or regulation." *Clarry*, 85 F.3d at 1048.

The President issued the Orders pursuant to section 7301, which allows the President to prescribe "regulations" concerning federal employee conduct. 5 U.S.C. § 7301. Courts have repeatedly confirmed that executive orders issued pursuant to this authority constitute formal regulations, and are "accorded the force and effect of a statute."[11] *Ass'n for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977); *see also Austin*, 418 U.S. at 273 n. 5 (executive orders issued pursuant to section 7301 may even nullify "inconsistent state laws through the Supremacy Clause"). SEIU does not contend that OPM's guidance will include substantive provisions beyond those found in the Orders, and thus the guidance SEIU contemplates will not "create rights," but only "clarify . . . existing . . . regulation[s]." *Clarry*, 85 F.3d at 1048. In response, SEIU argues that implementation of the Orders will "involve the imposition of new rules that change existing policy or practice." PI Mot., 16. Even if true, the *Orders* impose the new rules, not any ensuing OPM guidance.[12]

Finally, even this procedural argument may be brought before the FLRA. For example, SEIU can raise this argument if an agency claims that it need not negotiate over a particular topic because it

---

[11] SEIU concedes that the APA does not apply to the President. PI Mot., 13; *see also Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions . . . are not subject to [the APA's] requirements."). Thus, the Orders did not require notice-and-comment.

[12] Two Order provisions instruct OPM to amend pre-existing regulations to the extent they are inconsistent with certain requirements in the Orders. These specific provisions explicitly require that OPM use the notice-and-comment process. *See* OT Order § 4(c); Merit Order § 7(a).

is covered by a "Government-wide rule" within the Orders. SEIU can argue that the provision is inoperative due to an alleged procedural defect, and thus claim that the agency is not relieved of its duty, under the Statute, to bargain over the topic. Then, if necessary, SEIU may appeal any adverse FLRA decision to a federal court of appeals and again raise this argument.

**III.    SEIU has not established irreparable harm. It delayed seeking relief for over a year, and its alleged harms are neither actual and imminent, nor irreparable.**

"[T]he single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985). SEIU cannot meet this requirement. First, SEIU's delay in bringing this action suggests that there is no imminent, irreparable injury. Delay "may, standing alone . . . preclude the granting of preliminary injunctive relief . . . because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995). Here, the Orders were issued on May 25, 2018, and SEIU waited until August 13, 2019—over a *year* later—to file suit. SEIU's "[d]elay in seeking enforcement of [its] rights . . . tends to indicate" a "reduced need for" a preliminary injunction. *Citibank*, 756 F.2d at 276. Importantly, SEIU's stated reasons for challenging the Orders now applied equally in May of 2018 (when the Orders issued). According to one of its declarants, an SEIU unit was actively bargaining when the Orders were issued, and those negotiations continue today. *See* Phillips Decl. ¶ 56. Thus, SEIU cannot argue that its delay is justified due to any recent change in circumstance. Nor can SEIU rely on the district court's injunction in *AFGE* to excuse its delay. That injunction was entered on August 24, 2018, three months after the Orders were issued, and SEIU took no action during that time. Moreover, the Government promptly appealed that decision, and SEIU was aware that the injunction's longevity was uncertain. Yet again it took no action.

Second, "[t]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Here, SEIU does not identify a harm that *it* will imminently suffer. Although it claims that the Orders will promptly go into effect now that the D.C. Circuit issued its mandate in *AFGE*, *see* PI Mot., 23–24, SEIU does not specifically describe how the Orders will implicate any of its current or impending CBA negotiations. Although SEIU claims it has a unit currently before the Impasse Panel, it fails to explain how the Orders will affect these particular negotiations. For example, SEIU does not contend that the agency has tentatively agreed to grant official time for union representatives participating in third-party grievances—a position that would change once the Orders take effect.[13] Accordingly, SEIU's imprecise allegations are insufficient to satisfy its "burden of proof and persuasion" that a preliminary injunction is necessary. *Grand River*, 481 F.3d at 68.

Finally, SEIU's alleged harms are not irreparable. If, as SEIU fears, the Orders ultimately affect current CBA negotiations involving any of its member unions, those unions may secure adequate relief before the FLRA. If the FLRA agrees that an agency has violated the Statute by, say, refusing to negotiate over certain topics, it can order the agency to renegotiate the CBA. 5 U.S.C. § 7118(a)(7)(B). Likewise, if the FLRA agrees that an employee was improperly terminated without being provided an adequate opportunity to demonstrate improved performance, it can "requir[e] reinstatement of [the] employee with backpay." 5 U.S.C. § 7118(a)(7)(C). It can also issue any other remedy that is necessary

---

[13] SEIU also claims that its members will suffer imminent harm since they will immediately stop receiving official time when representing co-workers during grievance proceedings. PI Mot., 23. But this alleged harm hinges on the timing of their next CBA negotiations. If their current CBAs permit official time for this purpose, agencies must abide by those terms so long as they remain in effect. *See* OT Order §§ 4(c)(ii), 9(a).

and proper under the Statute. 5 U.S.C. § 7105(g)(3). Plaintiffs thus cannot show that their alleged harms rise to a level permitting the extraordinary relief sought here: an order blocking the President from exercising his long-recognized power to regulate the federal workforce.

## **CONCLUSION**

The Court should deny SEIU's motions for a temporary restraining order and a preliminary injunction.

Dated: September 30, 2019

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director, Federal Programs Branch*

*/s/* Kuntal Cholera
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
kuntal.cholera@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

<u>/s/ Kuntal Cholera</u>
Kuntal V. Cholera
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

*Attorney for Defendants*
