

UNITED STATES DISTRICT COURT
FILED
OCT 0 3 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 200UNITED and SERVICE
EMPLOYEES INTERNATIONAL UNION,

        Plaintiffs,

    v.

DONALD J. TRUMP, *President of the United States*, MARGARET WEICHERT, *Acting Director of the Office of Personnel Management*, and UNITED STATES OFFICE OF PERSONNEL MANAGEMENT,

        Defendants.

———————————————————————

**DECISION AND ORDER**

1:19-CV-01073 EAW

## **INTRODUCTION**

Plaintiffs Service Employees International Union Local 200United ("SEIU Local 200U") and Service Employees International Union ("SEIU") (collectively "Plaintiffs") bring this action seeking declaratory and injunctive relief related to three executive orders issued by defendant Donald J. Trump ("President Trump") and subject to implementation by defendant Margaret Weichert ("Director Weichert"), the Acting Director of defendant United States Office of Personnel Management ("OPM") (hereinafter referred to collectively with President Trump and Director Weichert as "Defendants"). (Dkt. 1). Plaintiffs assert that the challenged executive orders unlawfully "interfere with federal employees' statutory right to engage in collective bargaining." (*Id.* at ¶ 1). Currently

before the Court is Plaintiffs' motion for a temporary restraining order ("TRO"). (Dkt. 26). For the reasons discussed below, the Court denies the request for a TRO.

## BACKGROUND

### I. Statutory Scheme

In 1978, Congress enacted Title VII of the Civil Service Reform Act ("CSRA"), "the first statutory scheme governing labor relations between federal agencies and their employees." *Bureau of Alcohol, Tobacco and Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 91 (1983) [hereinafter "*ATF*"]. Before the enactment of Title VII, also known as the Federal Service Labor-Management Relations Statute ("FSLMRS"), "[p]residents used executive orders to grant federal employees 'limited rights to engage in concerted activity' through unions." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) [hereinafter "*AFL-CIO II*"] (quoting *ATF*, 464 U.S. at 91-92); *see* Employee-Management Cooperation in the Federal Service, 27 Fed. Reg. 551 (Jan. 17, 1962); Labor-Management Relations in the Federal Service, 34 Fed. Reg. 17,605 (Oct. 29, 1969).

The FSLMRS "grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters." *AFL-CIO II*, 929 F.3d at 752. The statute also provides that no provision of the FSLMRS "shall be construed to . . . limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before the [FSLMRS]'s effective date" unless "otherwise expressly provided." Pub. L. No. 95-454, § 904, 92 Stat. 1111, 1224 (codified at 5 U.S.C. § 1101 note).

Additionally, the FSLMRS established the Federal Labor Relations Authority ("FLRA"), "a three-member independent and bipartisan body within the Executive Branch" that "adjudicates negotiability disputes, unfair labor practice complaints, bargaining unit issues, arbitration exceptions, and conflicts over the conduct of representational elections." *ATF*, 464 U.S. at 92 (citing 5 U.S.C. § 7104). The FLRA can hold hearings, take testimony, and issue subpoenas, and if the FLRA finds an agency has violated the FSLMRS, it can require the agency "to cease and desist . . . and require it to take any remedial action it considers appropriate." 5 U.S.C. § 7105(g). "The FLRA's decisions in such disputes are subject to direct review in the courts of appeals." *AFL-CIO II*, 929 F.3d at 752 (citing 5 U.S.C. § 7123(a), (c)).

On May 25, 2018, President Trump issued the three challenged executive orders (the "Executive Orders") regarding federal labor-management relations. (Dkt. 20-1 at 12; Dkt. 29 at 10); *see* Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining, 83 Fed. Reg. 25329 (May 25, 2018) ("Collective Bargaining Procedures Order"); Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use, 83 Fed. Reg. 25335 (May 25, 2018) ("Official Time Order"); Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles, 83 Fed. Reg. 25343 (May 25, 2018) ("Removal Procedures Order"). The Collective Bargaining Procedures Order sets forth procedures for collective bargaining negotiations, 83 Fed. Reg. 25329; the Official Time Order prescribes parameters regarding the use of official time for union activities, 83 Fed. Reg. 25335; and

the Removal Procedures Order addresses performance appraisals and removal of employees, 83 Fed. Reg. 25343. The Executive Orders require agencies "to fulfill their obligation to bargain in good faith," 83 Fed. Reg. 25329, 25331; 83 Fed. Reg. 25335, 25336; 83 Fed. Reg. 25343, 25344, and state they are to be "implemented consistent with applicable law," 83 Fed. Reg. 25329, 25333; 83 Fed. Reg. 25335, 25340; 83 Fed. Reg. 25343, 25346.

In July 2018, the OPM issued three guidance documents (the "Guidances") regarding the rules and requirements set forth in the Executive Orders. Although OPM rescinded the Guidances after the United States District Court for the District of Columbia issued an injunction that prohibited OPM from implementing or giving effect to nine provisions of the Executive Orders, *see Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 440 (D.D.C. 2018) [hereinafter "*AFL-CIO I*"], *reversed and vacated, AFL-CIO II*, 929 F.3d 748, OPM intends to immediately implement the Executive Orders after the injunction is lifted (Dkt. 20-5 at ¶ 11).

## II.    **Prior Litigation**

In June 2018, seventeen federal employee unions, not including Plaintiffs, filed four lawsuits in the district court in D.C. challenging the legality of the Executive Orders. *AFL-CIO I*, 318 F. Supp. 3d at 391. The cases were consolidated into a single action, and the parties agreed to resolve the matters via summary judgment proceedings. *Id.* at 392. On August 25, 2018, the district court in D.C. issued a decision finding that it had subject matter jurisdiction and that the President has constitutional and statutory authority to issue

federal labor relations executive orders. *Id.* at 395-418. However, the D.C. district court concluded that nine provisions of the Executive Orders violated the FSLMRS. *Id.* at 418-37. The court enjoined "the President's subordinates from implementing or giving effect to" those nine provisions of the Executive Orders. *Id.* at 440. The government appealed the court's decision. *AFL-CIO II*, 929 F.3d at 754.

On July 16, 2019, the D.C. Circuit unanimously reversed the district court's ruling and vacated the judgment, holding that "the district court lacked subject matter jurisdiction." *Id.* The D.C. Circuit found Congress intended that the unions' challenges to the Executive Orders be reviewed by the FLRA, and accordingly that the district court lacked jurisdiction to hear those claims. *Id.* at 761. The unions petitioned for *en banc* review, which, in the absence of a request by any judge on the D.C. Circuit for a vote, the court denied on September 25, 2019. *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, No. 18-5289, Per Curiam Order (D.C. Cir. Sept. 25, 2019). The D.C. Circuit's mandate is set to issue on or about October 2, 2019, which will dissolve the district court's injunction. (Dkt. 26-1 at 5).[1]

### III.    The Unions and Their Claims

Plaintiffs are unions who represent federal workers. (Dkt. 20-1 at 18). SEIU is the certified representative for a nationwide unit of the Department of Veterans Affairs ("VA") employees whose facility-based contracts are negotiated by local units such as SEIU Local

---

[1]      As of the signing of this Decision and Order, the docket in the D.C. Circuit did not reflect issuance of the mandate.

200U. (*Id.* at 19). SEIU Local 200U represents federal employees who work at VA medical facilities in Buffalo, Canandaigua, Syracuse, and Albany, New York, and in Erie, Pennsylvania. (*Id.*). "These bargaining units include employees who provide pharmacy, rehabilitation, and prosthetic services; who provide specialized treatment such as psychological or speech/language therapy; and who serve as police officers and firefighters on VA campuses." (*Id.* at 18-19). SEIU Local 200U's members are covered by collective bargaining agreements negotiated between them—acting through SEIU Local 200U as their representative—and the VA facilities. (Dkt. 1 at ¶ 14). SEIU Local 200U maintains offices in Buffalo and Rochester to serve its members. (*Id.*). Plaintiffs allege that SEIU Local 200U "cannot function unless its employee representatives have time to perform the duties assigned to them by statute," and that "the union cannot fulfill its obligations without employee representatives." (Dkt. 20-1 at 19).

Plaintiffs assert various claims regarding the lawfulness of the content of the Executive Orders, including claims that the Executive Orders violate the Administrative Procedures Act (the "APA"), 5 U.S.C. § 500 *et seq*. (Dkt. 1 at 19-25). For their APA claims, Plaintiffs contend Defendants violated the APA in two different ways: (1) that "OPM is poised to implement rules that should be subject to notice and comment rule-making without complying with the APA's procedural requirements" (Dkt. 26-1 at 12); and (2) that OPM's implementation of the provisions of the Executive Orders will violate statutory provisions set forth in the CSRA and FSLMRS (*id.* at 14-16).

## IV.    Procedural History of the Instant Action

On August 13, 2019, Plaintiffs filed the instant action, which was initially assigned to another district judge. (Dkt. 1). On September 12, 2019, Plaintiffs filed a motion for a preliminary injunction (Dkt. 20), and the case was reassigned to the undersigned (Dkt. 21). On September 26, 2019, Plaintiffs filed the motion for a TRO presently before the Court (Dkt. 26) and a motion to expedite (Dkt. 27). The Court granted the motion to expedite (Dkt. 28), and Defendants filed their response to the motion for a TRO and motion for a preliminary injunction on September 30, 2019. (Dkt. 29). Oral argument was heard before the undersigned on October 1, 2019, and the Court reserved decision. (Dkt. 31).

## DISCUSSION

## I.    Legal Standard

"In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997). As the Second Circuit has explained:

> In general, district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quotations omitted). However, "[a] plaintiff cannot rely on the fair-ground-for-litigation alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Id.* In this context, the phrase "in the public

interest" does not call upon the Court to make a value judgment, *see Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (applying higher standard in lawsuit challenging the military's "Don't Ask, Don't Tell" policy after finding "it is inappropriate for this court to substitute its own determination of the public interest for that arrived at by the political branches, whether or not there may be doubt regarding the wisdom of their conclusion"), and the higher standard applies even if the party requesting a preliminary injunction or temporary restraining order "seeks to vindicate a sovereign or public interest." *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). Instead, the relevant inquiry is whether the governmental policy at issue was "implemented through legislation or regulations developed through presumptively reasoned democratic processes." *Able*, 44 F.3d at 131.

Plaintiffs argue that the governmental action at issue in this case is not entitled to any deference by the Court, because it results from "unilateral executive decision-making." (Dkt. 32 at 2). In support of this argument, Plaintiffs rely on *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *judgment vacated as moot sub nom. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993), and *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. 2019). (*See* Dkt. 32). However, neither of those decisions are factually analogous to the situation before the Court.

In *Haitian Centers*, the plaintiffs were challenging the government defendants' refusal to allow them to "have access to . . . Haitian migrants on board Coast Guard cutters

- 8 -

and at Guantánamo Bay for the purpose of providing them legal counsel, advocacy, and representation." 969 F.2d at 1332 (quotation omitted). The government defendants were unable to point to a specific statute that authorized their conduct, but instead rested on the broad grant of authority set forth in the Immigration and Naturalization Act. *Id.* at 1339. The Second Circuit concluded that under those circumstances, the district court had not erred in applying the lesser, fair-ground-for-litigation standard. *Id.* In *Otoe-Missouria Tribe*, the Second Circuit distinguished *Haitian Centers* specifically on the basis that it involved only an "informal policy" premised on "too general an authority to trigger the higher standard for a preliminary injunction." 769 F.3d at 111.

In *Christa McAuliffe*, the challenged governmental action related to changes the New York City Department of Education had made to admissions criteria for New York City schools. 364 F. Supp. 3d at 268. The district court found that the higher preliminary injunction standard did not apply, because the New York City Department of Education had acted unilaterally in adopting the changes, making them similar to the challenged policies in *Haitian Centers*. *Id.*[2]

This case is unlike *Haitian Centers* or *Christa McAuliffe* because, as discussed further in the Court's assessment of the merits of Plaintiffs' claims, the Executive Orders in this case were based specifically on 5 U.S.C. § 7301, wherein Congress granted to the President express statutory authority to "prescribe regulations for the conduct of employees

---

[2]     The *Christa McAuliffe* court ultimately denied the requested preliminary injunction. *See* 364 F. Supp. 3d at 284.

in the executive branch." *Id.* Moreover, the Executive Orders in question do not constitute a mere informal policy, but instead set forth detailed, specific procedures for federal labor relations. *See Assoc. for Women in Science v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977) (explaining that executive orders issued pursuant to § 7301 have the force of law). The Court further notes that in *Able*, much of the challenged governmental action was embodied in Department of Defense directives, which the Second Circuit nonetheless concluded fell "squarely within the confines" of the exception to the fair-ground-for-litigation standard. 44 F.3d at 131. Under these circumstances, the Court concludes that, in order to prevail on the instant motion, Plaintiffs bear the burden of showing a likelihood of success on the merits.

## II.    Subject Matter Jurisdiction

Plaintiffs contend that they are likely to succeed on the merits of their claims under the APA, which as noted above, have two aspects: first, Plaintiffs claim that Defendants have violated the APA's notice-and-comment rulemaking requirements; and second, Plaintiffs claim that the Executive Orders violate numerous provisions of the CSRA and FLSMRS and should accordingly be set aside under the APA as exceeding Defendants' lawful authority. However, before turning to the merits of Plaintiffs' claims, the Court must consider as a threshold matter Defendants' argument that the Court lacks jurisdiction over Plaintiffs' APA claims. In making this argument, Defendants rely largely on the decision in *AFL-CIO II*. Plaintiffs argue that *AFL-CIO II* is not outcome determinative, because it did not expressly consider claims under the APA. For the reasons that follow,

the Court finds that, to the extent Plaintiffs' APA claims challenge the content of the Executive Orders and related Guidances, they are not cognizable in this Court, but that the Court may have jurisdiction over the notice-and-comment rulemaking claim.

As the *AFL-CIO II* court explained, while district courts generally have jurisdiction over civil actions that arise under either the Constitution or the laws of the United States, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." 929 F.3d at 754. In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court established an analytical framework pursuant to which "courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. S.E.C.*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin*, 510 U.S. at 207, 212).

It is well-established that the FLSMRS establishes a review mechanism that is exclusive for claims falling within its scope, *see AFL-CIO II*, 929 F.3d at 755, and the parties do not dispute this fact here. Instead, Plaintiffs contend that their APA claims do not satisfy the second step of the *Thunder Basin* inquiry—that is, that they are not the type of claims that Congress intended to require the FLRA to hear.

To the extent that Plaintiffs' APA claims constitute challenges to the content of the Executive Orders and the related Guidances—in other words, with respect to Plaintiffs' claims that the Executive Orders and related Guidances run afoul of the APA because they

exceed President Trump and OPM's lawful authority—the Court finds that they are subject to the FLSMRS' statutory review scheme. The Court's conclusion in this regard is informed by the *AFL-CIO II* decision, wherein the D.C. Circuit analyzed in detail whether the content of the precise Executive Orders challenged here by Plaintiffs was subject to district court review. In the absence of any contrary authority from the Second Circuit, the Court finds it appropriate to adopt the D.C. Circuit's conclusion that claims to the lawfulness of the Executive Orders and associated Guidances "fall within the exclusive statutory scheme, which the unions may not bypass by filing suit in the district court." *AFL-CIO II*, 929 F.3d at 761.

This conclusion applies to Plaintiff's APA claims to the extent they challenge the substantive lawfulness of the Executive Orders and associated Guidances. It is well-established that the mere fact that a claim is styled as arising under the APA does not mean that it is "outside of the scope of the administrative review scheme." *Arch Coal, Inc. v. Hugler*, 242 F. Supp. 3d 13, 20 (D.D.C. 2017), *aff'd sub nom. Arch Coal, Inc. v. Acosta*, 888 F.3d 493 (D.C. Cir. 2018). Indeed, in *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), the D.C. Circuit, in a decision authored by now-Chief Justice Roberts, concluded that "the exclusivity of the remedial and review provisions of the CSRA" barred district court review of a "a collateral, systemwide challenge to OPM policy" based on the APA. *Id.* at 68-69; *see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 639 (D.C. Cir. 2013) ("[A] plaintiff's inability to use the APA to circumvent the CSRA's requirements

applies to a systemwide challenge to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case." (quotation omitted)).

At oral argument, Plaintiffs argued that the cases finding APA claims subject to the administrative review scheme are distinguishable because 5 U.S.C. §§ 1103, 1105, and 7134 make it clear that regulations promulgated by OPM must comply with the APA's requirements. The Court is not persuaded by this argument. As the *Fornaro* court noted, *see* 416 F.3d at 66, the text of the APA itself accounts for the possibility that agency action otherwise reviewable thereunder may instead be subject to an alternative remedy, *see* 5 U.S.C. §§ 702, 704. Nothing before the Court suggests that Plaintiffs would be unable to pursue the merits of their content-based APA challenges in litigation before the FLRA and ultimately the circuit court. Moreover, as discussed later in this Decision and Order, the provisions cited by Plaintiffs apply only to *regulations* issued by OPM, and the Guidances at issue here are not legislative rules subject to these provisions.

For all these reasons, the Court agrees with Defendants that it lacks jurisdiction over Plaintiffs' content-based APA claims. To be clear, the Court's determination in this regard is unrelated to any assessment of the merits of Plaintiffs' contention that the Executive Orders are in conflict with the CSRA and the FLSMRS. To the contrary, the Court finds the careful and thorough assessment of these issues in *AFL-CIO I* persuasive. However, as the D.C. Circuit explained in *AFL-CIO II*, the district court is not an available venue in which to assert such claims. Instead, Plaintiffs' content-based APA claims must be litigated before the FLRA in the context of concrete bargaining disputes.

However, the Court is not persuaded, on the instant record, that it lacks jurisdiction over Plaintiffs' procedural APA claims. The case law on this matter is far less clear. In *National Mining Association v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002), the D.C. Circuit noted that a court must "read very carefully legislative restrictions on district court review of <u>generic</u> challenges to agency action," and further noted that it would not be feasible to obtain review of the "rulemaking process" in "individual adjudications dealing with particular regulatory provisions." *Id.* at 856, 858 (emphasis added). Consistent with this distinction, the *Arch Coal* court noted that challenges to the procedural aspects of a rule can "fall outside the scope of the administrative process. . . ." 242 F. Supp. 3d at 19.

The Court notes that *National Mining Association* and *Arch Coal* involved the administrative review provisions of the Black Lung Benefits Act, and not the CSRA or FLSMRS. The parties have not cited, nor has the Court discovered in its own research, any cases that specifically address a district court's jurisdiction to review procedural APA challenges under the statutes relevant here. However, the Court finds it plausible that a purely procedural APA challenge—that is, a challenge to the process used to adopt a regulation, rather than the content thereof—is wholly collateral to the FLSMRS's administrative review scheme and outside the expertise of the FLRA, and therefore not excluded from district court review. The Court accordingly will consider the merits of Plaintiffs' request for a TRO solely with respect to its procedural APA challenge.

- 14 -

## III.   Likelihood of Success on the Merits

For the reasons previously discussed, the only claim that Plaintiffs assert on the instant motion for a TRO over which the Court arguably has jurisdiction is Plaintiffs' claim that Defendants have violated the APA's notice-and-comment rulemaking requirements. Accordingly, the Court now considers whether Plaintiffs have established a likelihood of success on the merits of this claim and concludes that they have not.

### A.   Applicability of the APA to Presidential Actions

Prior to discussing the merits of Plaintiff's procedural APA claim, a brief discussion of the applicability of the APA to presidential actions and, specifically, executive orders, is necessary.

The APA governs actions taken by agencies, which it defines as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with a number of exceptions, including Congress and the federal courts. 5 U.S.C. § 701(b)(1). In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court noted that "[t]he President is not explicitly excluded from the APA's purview, but he is not explicitly included," and concluded that "textual silence is not enough to subject the President to the provisions of the APA." *Id.* at 800-01. Accordingly, while a president's actions may be reviewable on other bases, such as constitutionality, they are not subject to the requirements of the APA. *Id.* at 801; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("[T]he President has never been thought to have to comply with APA rulemaking procedures when issuing executive orders.").

- 15 -

Notwithstanding the inapplicability of the APA to presidential actions, "agency actions implementing a presidential action may be reviewed under the APA, even when the agency action accomplishes a presidential directive." *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (explaining that while a court cannot review a presidential proclamation under the APA, it can review the validity of a rule that incorporates that proclamation). In this context, "courts that have conducted APA review of agency actions implementing a presidential directive are typically presented with a discrete agency rule or decision to review," and generally do not "conduct[] APA review [of a presidential directive] for compliance with substantive and procedural requirements without a defined final agency action." *Int'l Refugee Assistance Project*, 373 F. Supp. 3d at 665. In other words, an APA challenge to an agency's implementation of an executive order (or other presidential directive) is not permissible prior to some independent, concrete action by the agency. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (holding, in context of challenge to Secretary of Labor's issuance of regulations pursuant to executive order, that "[a]ppellants could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because, as the government correctly emphasizes, the President is not an 'agency' under that Act and appellants sued before the Secretary issued his regulations"); *cf. Hawaii v. Trump*, 878 F.3d 662, 680 (9th Cir. 2017) (finding APA review available where agencies had "consummated" their implementation of a

presidential proclamation), *rev'd and remanded on other grounds*, 138 S. Ct. 2392 (2018); *O.A. v. Trump*, No. CV 18-2718 (RDM), 2019 WL 3536334, at \*24 (D.D.C. Aug. 2, 2019) ("The Court, moreover, need not pause over the fact that presidential actions are not themselves subject to APA review, . . . because it is the Rule, and not the Proclamation, that has operative effect.").

## B.    Notice-and-Comment Rulemaking Claim

The Court turns now to Plaintiff's claim that the Executive Orders and OPM's related adoption of the Guidances violated the APA's notice-and-comment rulemaking requirements. "The APA establishes the procedures federal administrative agencies use for 'rule making,' defined as the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (quoting 5 U.S.C. § 551(5)). Under the APA "[i]n most instances, agency rules must be subjected to a notice and comment period before taking effect." *N.Y.S. Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001) (quotation and original alteration omitted). However, the APA's notice-and-comment rulemaking requirements do not apply to "rules that are merely interpretive." *Id.* An interpretive rule is one that does not create rights but merely clarifies an existing statute or regulation. *Id.*

The Court is not, on the instant record, persuaded that Plaintiffs have set forth a claim that is likely to succeed for violation of the APA's notice-and-comment rulemaking requirements because the Court is not persuaded that Defendants have taken any action to which such requirements apply. Initially, the Court finds that President Trump was not

- 17 -

required to engage in notice-and-comment rulemaking before issuing the Executive Orders. As the Court has previously explained, the President has express statutory authority to "prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301. This statutory authority is separate and distinct from the authority of the director of OPM to issue regulations, which is set forth in 5 U.S.C. §§ 1103 and 1105 and expressly subject to the requirements of the APA. The Supreme Court has held that § 7301 provides "express statutory authorization" for the President to issue executive orders governing federal labor practices that "may create rights." *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974) (enforcing executive order that "establish[ed] a labor-management relations system for federal employment"); *see also AFL-CIO I*, 318 F. Supp. 3d at 414-17 (discussing history of the president's authority to issue executive orders governing federal labor practices and concluding that neither the CSRA nor the FSLMRS "divested the President of his authority to act in the field of federal labor relations"). Moreover, and as discussed at length above, the President is not considered an agency under the APA and his actions are not subject to the requirements thereof.

There is simply no plausible basis for the Court to conclude that President Trump was required to engage in notice-and-comment rulemaking before issuing the Executive Orders pursuant to § 7301. Plaintiffs have conceded they are aware of no case law that would support such a conclusion, but instead argue that any finding to the contrary would permit an unlawful circumvention of the APA. However, the APA exists alongside

numerous federal statutes that modify or displace its terms, and the Court cannot ignore the fact that § 7301 expressly provides the President with an independent source of authority to issue executive orders of the type at issue here.

Nor are Plaintiffs' claims saved by their reference to the Guidances issued by OPM. The Guidances (which are, at this point, rescinded) do nothing more than summarize the content of the Executive Orders and advise the relevant heads of executive departments and agencies to consult with legal counsel regarding the implementation thereof. They do not go beyond the four corners of the Executive Orders,[3] nor do they purport to have the force of law. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (explaining that agency "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all . . . lack the force of law"); *cf. Nat'l Treasury Emps. Union v. Reagan*, 685 F. Supp. 1346, 1356-57 (E.D. La. 1988) (holding OPM's letter issued after the issuance of an executive order was a legislative rule, not a guideline, because "many provisions of the . . . Letter contain mandatory instructions above and beyond the mandatory instructions contained in the Order itself"). In other words, unlike the cases cited by Plaintiffs, this is not a matter in which, in response to an executive order or presidential directive, an agency has taken action that is then subject to the APA's notice-and-comment rulemaking requirements. Instead, the Executive Orders themselves have the force of law, *see Califano*, 566 F.2d at 344, and the Guidances issued by OPM merely interpret those

---

[3] Plaintiffs have not pointed to any portion of the Guidances that go above and beyond the provisions in the Executive Orders.

Executive Orders, *see Arch Coal*, 242 F. Supp. 3d at 21 ("While there might be some de facto rules that a court would treat as notice-and-comment rules . . . the [document] does not have the force of law or have a legally cognizable immediate effect[.]"). OPM has not yet issued any regulations or taken any other independent action in an effort to effectuate or implement the Executive Orders. *See Reich*, 74 F.3d at 1326 (explaining that parties cannot rely on the APA for a cause of action prior to "issuance of regulations implementing the Executive Order").

The Court notes that both the Executive Orders and the Guidances leave open the possibility for future notice-and-comment rulemaking, and expressly state that the Executive Orders should be implemented only "to the extent consistent with applicable law." *See* 83 Fed. Reg. 25329, 25333; 83 Fed. Reg. 25335, 25340; 83 Fed. Reg. 25343, 25346. In other words, on their own terms, the Executive Orders and associated Guidances anticipate that agencies will continue to comply with existing regulations, unless and until they are modified through the appropriate processes. There is nothing in the record before the Court to suggest that the affected agencies will not do so. Of course, any action by OPM to modify its existing regulations in response to the Executive Orders must fully comport with the requirements of the APA.

In sum, on the record currently before this Court, Plaintiffs cannot demonstrate that either the Executive Orders or the associated Guidances are subject to challenge for having failed to comply with the APA's notice-and-comment rulemaking requirements. Under these circumstances, Plaintiffs cannot demonstrate a likelihood of success on the merits (or

indeed even serious questions making the matter fair ground for litigation). The Court thus finds that issuance of a TRO is not warranted.

## III.   **Irreparable Harm**

In addition to arguing the merits of Plaintiffs' claims, the parties vigorously dispute whether Plaintiffs have established that they will experience irreparable harm absent a TRO. It is well-established that "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" or TRO. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). The Court has reservations as to the adequacy of Plaintiffs' showing in this regard. For instance, Plaintiffs ask the Court to restrain Defendants from implementing the Executive Orders in total, notwithstanding that portions of the Executive Orders were not enjoined by the *AFL-CIO I* decision and have been in effect since May of 2018. Similarly, the Court is hard-pressed to conclude that irreparable harm will inure pending the return date of Plaintiffs' motion for a preliminary injunction on October 21, 2019. In other words, the bureaucracy of the federal government is anything but fastmoving and the Court is hard-pressed to conclude that Plaintiffs' collective bargaining rights will be irreparably harmed immediately after the stay with respect to the Executive Orders is lifted.

However, because the Court has already concluded that Plaintiffs have not satisfied the requirement that they demonstrate a likelihood of success on the merits, the Court need not and does not reach this issue. *See Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 153 (2d Cir. 1999) ("[A]ny irreparable harm plaintiffs might

suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a TRO (Dkt. 26) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: October 3, 2019
       Rochester, New York