UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
DEC 1 0 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

---

SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 200UNITED and SERVICE
EMPLOYEES INTERNATIONAL UNION,

    Plaintiffs,

  v.

DONALD J. TRUMP, *President of the United
States*, DALE CABANISS, *Director of the
Office of Personnel Management[1]*, and UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT,

    Defendants.

**DECISION AND ORDER**

1:19-CV-01073 EAW

---

## INTRODUCTION

Plaintiffs Service Employees International Union Local 200United ("SEIU Local

200U") and Service Employees International Union ("SEIU") (collectively "Plaintiffs")

bring this action seeking declaratory and injunctive relief related to three executive orders

issued by defendant Donald J. Trump ("President Trump") and subject to implementation

by defendant Dale Cabaniss ("Director Cabaniss"), the Director of defendant United States

Office of Personnel Management ("OPM") (hereinafter referred to collectively with

---

[1] Dale Cabaniss was confirmed as Director of the Office of Personnel Management on September 11, 2019.  Pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted as a defendant in placed of former Acting Director Margaret Weichert.  The Clerk of Court is directed to amend the case caption accordingly.

- 1 -

President Trump and Director Cabaniss as "Defendants"). (Dkt. 1). Plaintiffs assert that the challenged executive orders unlawfully "interfere with federal employees' statutory right to engage in collective bargaining." (*Id.* at ¶ 1).

The Court denied Plaintiffs' request for a temporary restraining order ("TRO") barring implementation of the challenged executive orders by Decision and Order entered on October 3, 2019. (Dkt. 33) (hereinafter the "TRO Decision"). For the reasons set forth below, the Court now denies Plaintiffs' request for a preliminary injunction. (Dkt. 20).

## BACKGROUND

The factual background of this case is set forth in detail in the Court's TRO Decision, familiarity with which is assumed for purposes of this Decision and Order. The Court has summarized the key details below. Capitalized terms used herein and not otherwise defined will have the same definitions as in the TRO Decision.

On May 25, 2018, President Trump issued three Executive Orders regarding federal labor-management relations. (Dkt. 20-1 at 12; Dkt. 29 at 10); *see* Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining, 83 Fed. Reg. 25329 (May 25, 2018) ("Collective Bargaining Order"); Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use, 83 Fed. Reg. 25335 (May 25, 2018) ("Official Time Order"); Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles, 83 Fed. Reg. 25343 (May 25, 2018) ("Removal Procedures Order"). In July 2018, the OPM issued three Guidances regarding the rules and requirements set forth in the Executive Orders. OPM rescinded the

Guidances as a result of the United States District Court for the District of Columbia issuing an injunction that prohibited OPM from implementing or giving effect to nine provisions of the Executive Orders, as described below.

On August 25, 2018, the United States District Court for the District of Columbia issued a decision finding it had subject matter jurisdiction to hear a lawsuit challenging the legality of the Executive Orders and that the President has constitutional and statutory authority to issue federal labor relations executive orders. *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 395-418 (D.D.C. 2018) [hereinafter *"AFL-CIO I"*], *reversed and vacated, Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) [hereinafter *"AFL-CIO II"*]. However, the D.C. district court concluded that nine provisions of the Executive Orders violated Title VII of the Civil Service Reform Act ("CSRA"), also known as the Federal Service Labor-Management Relations Statute ("FSLMRS"). *Id.* at 418-37.

On July 16, 2019, the D.C. Circuit unanimously reversed the district court's ruling and vacated the judgment, holding that "the district court lacked subject matter jurisdiction." *AFL-CIO II*, 929 F.3d at 754. The unions petitioned for *en banc* review, which, in the absence of a request by any judge on the D.C. Circuit for a vote, the court denied on September 25, 2019. *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, No. 18-5289, Per Curiam Order (D.C. Cir. Sept. 25, 2019).

On August 13, 2019, Plaintiffs filed the instant action (Dkt. 1), and they filed a motion for a preliminary injunction on September 12, 2019 (Dkt. 20). On September 26,

2019, Plaintiffs filed a motion for a TRO (Dkt. 26), and Defendants responded to both the TRO and motion for preliminary injunction on September 30, 2019 (Dkt. 29). The Court denied the motion for a TRO on October 3, 2019. (Dkt. 33).

On October 4, 2019, the OPM re-issued the Guidances regarding the Executive Orders that it had previously rescinded when the AFL-CIO cases were pending. (Dkt. 36-1 at 5-25); *see AFL-CIO I*, 318 F. Supp. 2d at 440. On October 11, 2019, President Trump issued a presidential memorandum on the Executive Orders. Presidential Memorandum on Executive Orders 13836, 13837, and 13839 (Oct. 11, 2019) (hereinafter "Memorandum"). The Memorandum states in pertinent part:

> Provisions of the Executive Orders that had been subject to the District Court's injunction set presumptively reasonable goals that agencies must pursue during bargaining; directed agencies to refuse to bargain over permissive subjects of negotiation; and established Government-wide rules that displace agencies' duty to bargain with unions over contrary matters, regardless of whether the Federal Service Labor-Management Relations Statute would otherwise require bargaining absent those rules.

*Id.*

On October 14, 2019, Plaintiffs filed their reply to the motion for a preliminary injunction. (Dkt 36). The next day, Plaintiffs submitted a letter to the Court addressing the Memorandum (Dkt. 37), and the Court ordered the parties to provide supplemental briefing in light of the factual developments contained in Plaintiffs' letter (Dkt. 38). On October 22, 2019, Defendants filed a response to Plaintiffs' October 15, 2019, Letter (Dkt. 42), and they submitted a sur-reply to the motion for preliminary injunction on October 25, 2019 (Dkt. 43). Plaintiffs filed a sur-sur-reply on November 1, 2019. (Dkt. 44). Oral

argument was heard before the undersigned on November 8, 2019, and the Court reserved decision. (Dkt. 47).

On November 12, 2019, Plaintiffs filed a notice of supplemental authority bringing to the Court's attention a memorandum opinion issued by the United States District Court for the District of Columbia in *Federal Law Enforcement Officers Association. v. Cabaniss*, No. 9-cv-00735-CKK (D.D.C. Nov. 4, 2019).[2] (Dkt. 48; Dkt 49). Defendants filed a response to this notice on November 13, 2019. (Dkt. 50).

On November 18, 2019, Plaintiffs filed a letter setting forth factual developments regarding the Department of Veterans' Affairs implementation of the Executive Orders. (Dkt. 52). With the Court's permission (Dkt. 53), Defendants filed a response to this letter on November 20, 2019. (Dkt. 54). Plaintiffs then filed a reply regarding their letter on November 21, 2019. (Dkt. 55).

## DISCUSSION

### I.    Legal Standard

The standard for a preliminary injunction in the Second Circuit is as follows:

> In general, district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

---

[2]    The Court has reviewed this supplemental authority, but does not find it helpful regarding the determinative issues in this case, inasmuch as it is a denial of a motion to dismiss without prejudice, pending further briefing.

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quotations omitted). However, as discussed in detail in the TRO Decision, "[a] plaintiff cannot rely on the fair-ground-for-litigation alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Id.* (quotations omitted).

The Court previously determined, for reasons discussed in detail in the TRO Decision, that the fair-ground-for-litigation standard does not apply in this case, and that Plaintiffs bear the burden of showing a likelihood of success on the merits. (*See* TRO Decision at 7-10). Plaintiffs challenge that conclusion in their reply papers, arguing that "[t]he government action challenged here is taken unilaterally by the Executive Branch and is in fact contrary to the statutes enacted after a 'full play of the democratic process,'" and that "[w]here, as here, the Executive is alleged to have acted *contrary* to statute, the regular injunction standard governs." (Dkt. 36 at 8-9).

The Court is not persuaded that its prior conclusion that the fair-ground-for-litigation standard is inapplicable here should be revisited. First, the Court has already considered and rejected Plaintiffs' argument that "the governmental action at issue in this case is not entitled to any deference by the Court, because it results from unilateral executive decision-making." (TRO Decision at 8 (quotation omitted)). Plaintiffs have not cited any case law that the Court overlooked in considering this argument, and Plaintiffs' disagreement with the Court's analysis of the relevant case law does not warrant a change in the Court's determination as to the applicable standard. *Cf. R.F.M.A.S., Inc. v. So*, 640

F. Supp. 2d 506, 512 (S.D.N.Y. 2009) ("A party's fundamental disagreement with a court's legal analysis and conclusions as to a matter fully considered does not serve as sufficient ground to warrant reconsideration of the court's decision.").

The Court is further unpersuaded by Plaintiffs' new argument that the fair-ground-for-litigation standard applies in this case because the Executive Orders allegedly conflict with the CSRA and FSLMRS. Accepting this argument would require the Court to put the proverbial cart before the horse by making a merits determination before ascertaining the applicable preliminary injunction standard. This is inconsistent with the relevant case law. For instance, in *Oneida Nation of New York v. Cuomo*, 645 F.3d 154 (2d Cir. 2011), the Second Circuit found the fair-ground-for-litigation standard inapplicable notwithstanding the plaintiff's allegation that the state's actions conflicted with various federal statutes. *See id.* at 163-64. In other words, an allegation that the challenged governmental action is unlawful is not sufficient to invoke the fair-ground-for-litigation standard. Instead, as the Court explained in the TRO Decision, the relevant question is whether the challenged governmental action was implemented through regulations developed via presumptively reasoned democratic processes. (TRO Decision at 8). Here, as the Court discusses further below (and explained in detail in the TRO Decision), the challenged Executive Orders are regulations issued by the President through his express statutory authority to set standards for federal labor relations, and they are accordingly entitled to deference by this Court. *See Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("As long as the action to be enjoined

is taken pursuant to a statutory or regulatory scheme, even government action with respect to one litigant requires application of the 'likelihood of success' standard.").

In any event, the Court ultimately concluded in the TRO Decision that Plaintiffs had failed to satisfy even the less-stringent fair-ground-for-litigation standard. (TRO Decision at 20-21). The same is true here, for the reasons discussed below. As such, the Court would deny Plaintiffs' request for a preliminary injunction even if it agreed with Plaintiffs regarding the applicable standard.

## II.    Likelihood of Success on the Merits

Much of the TRO Decision assessed the likelihood that Plaintiffs would ultimately succeed on the merits of their claims that Defendants violated (or were poised to violate) the Administrative Procedures Act ("APA").[3] (TRO Decision at 10-21). The Court will not repeat its prior analysis here. Instead, the Court sets forth below the new arguments raised by Plaintiffs in support of their request for a preliminary injunction, and explains why they do not change the Court's prior conclusion that Plaintiffs are not likely to succeed on their APA claims (and have further not even shown that they constitute fair ground for litigation). These new arguments implicate the following key issues, each of which the Court addresses below: (1) whether the challenged Executive Orders have the force and effect of legally binding regulations; (2) whether the APA's notice-and-comment

---

[3]     As the Court explained in the TRO Decision, while Plaintiffs have asserted a number of challenges to the Executive Orders, in seeking a preliminary injunction they have relied on their claimed likelihood of success on their APA claims. (*See* TRO Decision at 10).

rulemaking requirements applied to the issuance of the OPM Guidances summarizing the Executive Orders' provisions; and (3) whether the Court has jurisdiction to consider Plaintiffs' substantive challenges to the Executive Orders' provisions.[4]

### A.     Legal Force of the Challenged Executive Orders

Plaintiffs argue that the OPM Guidances summarizing the Executive Orders' requirements cannot be considered "interpretive" because the Executive Orders do not constitute "binding legal authority." (Dkt. 44 at 14). The Court found to the contrary in the TRO Decision, explaining that 5 U.S.C. § 7301 provides the President with express statutory authority to issue binding regulations governing federal labor relations. (TRO Decision at 17-18); *see also* 5 U.S.C. § 7301 ("The President may prescribe regulations for the conduct of employees in the executive branch."). Plaintiffs have not made any argument causing the Court to call this conclusion into question.

Plaintiffs' arguments in this regard rely in significant part on their apparent contention that when § 7301 uses the word "regulation," it means something different and with less force and effect than regulations issued by federal agencies. (*See* Dkt. 44 at 14 ("Defendants take advantage of the word 'regulation' in § 7301 to claim that the President's actions must have the force of law for purposes of the APA.")). However, Plaintiffs have cited to no case holding that regulations issued by the President under § 7301 are different

---

[4]     In the TRO Decision, the Court found that it was plausible that it had jurisdiction over Plaintiffs' procedural APA claims. Defendants argue in their sur-reply that the Court does not have such jurisdiction, relying on *Heckler v. Ringer*, 466 U.S. 602 (1984). (*See* Dkt. 43 at 27-28). The Court disagrees that *Heckler*, which considered a different statutory scheme, is determinative here, and accordingly declines to revisit this issue at this time.

or have a lesser legal status than regulations issued by OPM itself. And, as the Court explained in the TRO Decision, the only Supreme Court case to have considered the issue "held that § 7301 provides 'express statutory authorization' for the President to issue executive orders governing federal labor practices that 'may create rights.'" (TRO Decision at 18 (quoting *Old Dominion Branch No. 496 Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974)); *see also AFL-CIO I*, 318 F. Supp. 3d at 413 ("*Old Dominion* can only be read to support the conclusion that the President of the United States possesses the authority to issue executive orders regarding federal labor-management relationships, at least in the pre-FSLMRS world.").

Plaintiffs argue that *Old Dominion* was decided prior to the enactment of the FSLMRS in 1978, and that the FSLMRS "expressly modified" the President's authority under § 7301. (Dkt. 44 at 14). Specifically, Plaintiffs contend that 5 U.S.C. § 1103 directs that rules and regulations established by the President "be subject to the APA rulemaking procedures." (*Id.*). This argument is flatly contracted by the plain language of § 1103. In particular, § 1103(a)(5)(A) states that the Director of OPM is responsible for "executing, administering, and enforcing . . . the civil service rules and regulations <u>of the President and the Office</u> and the laws governing the civil service." 5 U.S.C. § 1103(a)(5)(A) (emphasis added). This statutory provision acknowledges that there are two kinds of relevant "civil service rules and regulations"—those issued by the President, and those issued by OPM. The text of § 1103 goes on to state that with respect to "any rule or regulation <u>which is proposed by the Office</u>," the Director is required to publish general notice in the Federal

Register and comply with the APA's notice-and-comment rulemaking requirements. 5 U.S.C. § 1103(b)(1) (emphasis added). However, this subsection of § 1103 is silent regarding rules and regulations issued by the President. In other words, despite clearly knowing that both the President and OPM may issue "civil service rules and regulations," in drafting § 1103(b)(1), Congress chose only to require that rules and regulations "proposed by the Office" be subject to the APA's notice-and-comment rulemaking requirements. Regulations issued by the President pursuant to § 7301 are not "proposed by" OPM, and so do not fall within the express statutory language of § 1103(b)(1).

Plaintiffs also rely on 5 U.S.C. § 1105 to contend that regulations issued by the President under § 7301 are subject to the APA's notice-and-comment rulemaking requirements. (See Dkt. 44 at 14-15). It is true that § 1105 provides that the Director of OPM is generally required to comply with the provisions of the APA in carrying out her civil service functions and responsibilities. However, § 1105 states that it is "[s]ubject to section 1103(b)," and, as explained above, § 1103(b) only requires the Director to engage in notice-and-comment rulemaking where a rule or regulation originates with OPM, and not where it originates with the President.

The omission of rules and regulations issued by the President from § 1103(b)(1) is particularly important because no provision of the FSLMRS "shall be construed to . . . limit, curtail, abolish, or terminate any function of, or authority available to, the President which the President had immediately before the [FSLMRS]'s effective date" unless "otherwise expressly provided." Pub. L. No. 95-454, § 904, 92 Stat. 1111, 1224 (codified

at 5 U.S.C. § 1101 note). In light of the Supreme Court's decision in *Old Dominion*, there can be no dispute that prior to the FSLMRS's effective date, civil service regulations issued by the President pursuant to § 7301 were not required to proceed through notice-and-comment rulemaking to have legal effect, and the text of § 1103 does not expressly limit this presidential authority.

Plaintiffs also cite to the Second Circuit's decision in *Clarry v. United States*, 85 F.3d 1041 (2d Cir. 1996), to argue that presidential directives do not have the force of law. (Dkt. 33 at 12). However, the decision in *Clarry* does not support Plaintiffs' arguments. There, the plaintiffs were challenging an OPM policy that "barred air traffic controllers who had participated in a strike against the federal government from employment with the Federal Aviation Administration ('FAA'), and from employment with private entities under contract with the FAA." *Id.* at 1043. In particular, the plaintiffs argued that OPM had misinterpreted a memorandum issued by then-President Reagan regarding their eligibility for employment by the FAA and, that in any event, the OPM's policy deprived them of a protected property interest without due process and was contrary to its own regulations. *Id.* at 1046-49.

In rejecting the plaintiffs' claims in *Clarry*, the Second Circuit reached the following conclusions, among others: (1) OPM had not violated its own regulations because, even if 5 C.F.R. § 731.303, upon which the plaintiffs relied, was interpreted as inconsistent with OPM's policy, "[t]he President has broad authority pursuant to 5 U.S.C. §§ 3301 and 7301 to regulate employment matters, and President Reagan exercised this authority . . . by

issuing his directive," such that "President Reagan's directive . . . overrode § 731.303 in this particular situation"; and (2) OPM had not violated the APA's notice-and-comment rulemaking procedures when it implemented President Reagan's directive, because the policy was "based on an interpretation of its own regulations." *Id.* at 1047-49 (footnote omitted). Thus, far from supporting Plaintiffs' contentions, *Clarry* establishes that § 7301 authorizes the President to issue regulations that have the force of law, such that they can override already existing regulations, and that OPM may then interpret its regulations in this context. Moreover, the OPM policy in *Clarry* was not, like the Guidances in this case, a mere summary of the President's directive. Instead, President Reagan's directive was ambiguous, and OPM had interpreted it "as barring the strikers for an indefinite period from reemployment with the FAA and private entities under contract with the FAA," and had further issued a bulletin setting forth that interpretation and stating that "all strikers shall be determined not to be suitable for reinstatement or appointment in any position in the Federal Aviation Administration, because it would be detrimental to the efficiency of that agency by interfering with or preventing its effective performance of its duties and responsibilities." *Id.* at 1044 (quotation omitted).

*Clarry* also forecloses Plaintiffs' argument that the Executive Orders cannot be considered legally binding because "the President does not possess any independent legislative power." (Dkt. 44 at 12). While it is obviously true that the President cannot rewrite or alter duly-enacted statutes, he has "has broad authority pursuant to 5 U.S.C. §§ 3301 and 7301 to regulate employment matters," and when exercising such authority,

he may override existing regulations. *Clarry*, 85 F.3d at 1047 (footnote omitted); *see also Dehainaut v. Pena*, 32 F.3d 1066, 1074 (7th Cir. 1994) ("[I]f an existing regulation . . . applies a more lenient policy than that allowed by statute, the President, acting under his statutory authority to regulate federal employment, may issue a directive overriding that regulation." (citation and footnote omitted)). This is not an impermissible exercise of legislative power, but a function of the President's role as head of the executive branch and his associated broad statutory authority to regulate executive branch employment policies.

The Court is further not persuaded by Plaintiffs' argument that the Collective Bargaining Order was not issued pursuant to § 7301. (*See* Dkt. 36 at 12). It is true that, unlike the Official Time Order and the Removal Procedures Order, the Collective Bargaining Order does not expressly state that it was issued under § 7301. Instead, the Collective Bargaining Order states more generally that it is issued pursuant to "the authority vested in [the President] . . . by the Constitution and the laws of the United States of America." (*See* Dkt. 1-1 at 1; *compare with* Dkt. 1-2 at 1 (Official Time Order stating that it is issued pursuant to "the authority vested in [the President] . . . by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and section 7301 of title 5, United States Code")). It cannot be disputed that the phrase "the laws of the United States of America" includes § 7301, a duly-enacted federal statute. Plaintiffs have not cited, nor has the Court discovered in its own research, any authority for the proposition that an Executive Order is required to identify the specific provisions of law pursuant to which it is issued. Moreover, the content of the Collective

Bargaining Agreement falls within the President's § 7301 authority. Under these circumstances, the Court rejects the contention that the failure to specifically cite to § 7301 in the Collective Bargaining Order renders it legally non-binding.

Plaintiffs have further argued that the Executive Orders are not binding because they each state that they do not create individually enforceable rights. (*See, e.g.*, Dkt. 20-1 at 40 (Collective Bargaining Order stating that "[t]his order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person")). Plaintiffs contend the President is attempting to "have it both ways," and that if the Executive Orders are legally binding, they must be subject to private enforcement by aggrieved individuals. (*See* Dkt. 44 at 15). The Court finds this argument without merit. It is well-established that the APA permits judicial review of agency action only if the plaintiff is "within the zone of interests sought to be protected" by the statue or regulation that was allegedly violated. *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 (1991). In other words, in the hypothetical scenario where a federal employee wanted to sue his or her employing agency because it allegedly violated one of the Executive Orders, that employee would have to demonstrate as a threshold matter that he or she was within the zone of interests that the Executive Orders sought to protect. The language that Plaintiffs point to in the Executive Orders serves the purpose of foreclosing this argument, making it clear that the Executive Orders are not meant to expand the rights or entitlements of any individual

federal employee (or union). The inclusion of this clarifying language does not render the Executive Orders without legal effect, but instead makes plain who can and cannot qualify as a party aggrieved by agency action allegedly taken in contravention of the Executive Orders.

Finally, while Plaintiffs are correct that § 7301 does not give the President the authority to take action that "either repeals or amend parts of duly enacted statutes" (Dkt. 36 at 14 n.7 (quoting *Clinton v. City of New York*, 524 U.S. 417, 439 (1998)), the question of the substantive validity of the Executive Orders (that is, whether their contents are within the President's authority) is distinct from the question of their procedural validity (that is, whether they were enacted in such a fashion as to constitute legally binding authority). In other words, just as a statute does not cease to be a statute simply because it is challenged as unconstitutional, a regulation does not cease to be a regulation simply because it is challenged as inconsistent with a statute. This argument by Plaintiffs is essentially a substantive one and, as the Court discussed in detail in the TRO Decision (and reaffirms below), the Court lacks jurisdiction over Plaintiffs' substantive challenges to the Executive Orders.[5]

---

[5] The Court notes in this regard that while Plaintiffs claim the Memorandum "alludes to conflicts between the Executive Orders . . . and the governing congressionally enacted statutes, and clearly expresses the view . . . that agencies are required to implement the President's EOs even when the terms are contrary to statute" (*see* Dkt. 37 at 1), this is not a fair reading of the Memorandum. The FSLMRS, in discussing the duty to bargain in good faith, expressly states that such duty "extend[s] to matters which are the subject of any rule or regulation <u>only if the rule or regulation is not a Government-wide rule or regulation</u>." 5 U.S.C. § 7117(a)(1) (emphasis added). In other words, the FSLMRS acknowledges that the issuance of a Government-wide rule or regulation can remove

- 16 -

For all these reasons, the Court continues to find, as it did in the TRO Decision, that pursuant to the President's express statutory authority to issue regulations under § 7301, the challenged Executive Orders are presumptively legally binding. *See AFL-CIO I*, 318 F. Supp. 3d at 417 (acknowledging that "the President can issue executive orders that carry the force of law in the field of federal labor-management relations").

**B.      Applicability of APA Notice-and-Comment Rulemaking Procedures to the OPM Guidances**

Having found for all the reasons previously discussed that the Executive Orders constitute presidentially-issued, legally effective regulations, the Court turns next to the issue of whether OPM was required to engage in notice-and-comment rulemaking before it issued (and subsequently reissued) the Guidances. In the TRO Decision, the Court found that "the Executive Orders themselves have the force of law, and the Guidances issued by OPM merely interpret those Executive Orders." (TRO Decision at 19-20 (citation omitted)). None of the new arguments raised by Plaintiffs cause the Court to question that conclusion.

Plaintiffs spend much of their reply papers arguing that the APA applies to issuance of the Guidances. (*See* Dkt. 36 at 10-17). This argument misses the point. The issue is

---

particular topics from the collective bargaining process and abrogate the duty to bargain in good faith as to those topics. The Memorandum's statement that the Executive Orders "established Government-wide rules that displace agencies' duty to bargain with unions over contrary matters, regardless of whether the Federal Service Labor-Management Relations Statute would otherwise require bargaining absent those rules" (Dkt. 37 at 5 (emphasis added)) is a clear reference to this statutory provision, not an instruction to ignore the FSLMRS' requirements, as Plaintiffs suggest.

not whether the APA generally applies to actions taken by OPM to implement the Executive Orders—the answer to that question is yes, as the Court held in the TRO Decision. (*See* TRO Decision at 16 ("[A]gency actions implementing a presidential action may be reviewed under the APA, even when the agency action accomplishes a presidential directive." (quotation omitted))). Instead, the issue is whether the Guidances were required to go through notice-and-comment rulemaking. They were not, because they did nothing more than summarize the legally binding Executive Orders. (*See* TRO Decision at 17-20 (explaining that the Guidances are merely interpretive and that interpretive rules are not subject to the requirements of notice-and-comment rulemaking)); *cf. Diamond Shamrock Corp. v. Edwards*, 510 F. Supp. 1376, 1387 (D. Del. 1981) (finding Department of Energy ruling interpretive and not subject to notice-and-comment rulemaking because it was "merely an interpretation of the effects of [an] Executive Order").

Plaintiffs contend that the Guidances "impose legislative rules subject to the APA's notice-and-comment requirements" (Dkt. 36 at 17), but then support that argument solely by arguing that a finding to the contrary would mean that "the President could promulgate detailed EOs about almost anything—even outside the scope of discretion delegated to him by Congress—and claim that agency action implementing such Orders is merely 'interpretive' and therefore immune from APA notice-and-comment requirements" (*id.* at 18). This argument by Plaintiffs ignores the key fact in this case that § 7301 expressly grants the President authority to issue regulations governing the subject matter of the challenged Executive Orders. In areas where no such statutory authority exists, the

President's Executive Orders do not constitute regulations and do not have the force and effect of regulations. Accordingly, Plaintiffs' concerns about opening the floodgates to presidentially-issued regulations that circumvent the requirements of the APA are misplaced. The Court's analysis of the reach of the APA is limited to the narrow context presented here—regulation of employment in the executive branch of the federal government.

Plaintiffs also claim that *Clarry* establishes that "presidential directives are not considered 'law' for APA purposes such that subsequent implementing action can be said to be 'interpreting' existing 'law.'" (Dkt. 36 at 18). The Court has already explained why *Clarry* does not support Plaintiffs' arguments. As set forth above, *Clarry* did not involve agency action that merely summarized the requirements of a presidential directive, but the adoption of an agency policy. *See* 85 F.3d at 1049 ("OPM's policy implementing President Reagan's Directive is derived from 5 U.S.C. § 7311 and OPM's own regulations. . . . OPM adopted the interpretation provided in President Reagan's Directive. . . ."). In other words, *Clarry* involved agency action that went beyond the four corners of the presidential directive at issue. Moreover, the *Clarry* court, as discussed above, expressly held that President Reagan's directive was legally binding such that it overrode an existing contrary regulation. *Id.* at 1047-49. The *Clarry* court also concluded that the OPM policy at issue was "an interpretive rule that is exempt from the APA's notice and comment procedures," *id.* at 1049, much as the Court has concluded with respect to the Guidances at issue in this case.

Finally, the Court notes that Plaintiffs have made a cursory argument that the Guidances "*do* go further than the President's Orders, *i.e.*, by ordering immediate implementation of provisions upon expiration of any bargaining agreement (whereas the EOs purport to respect the contract terms, which often include provisions stating that the agreements will roll-over and continue in effect during bargaining of the next contract)." (Dkt. 36 at 17). The Court agrees with Defendants that this is a misinterpretation of the Guidances. While the Guidances state that the provisions of the Executive Orders "are effective on the date the CBA expires or rolls over" (*see* Dkt. 20-8 at 3), the provisions of the Executive Orders themselves contain an express instruction to abide by the terms of all currently existing collective bargaining agreements (*see* Dkt. 1-1 at 5 ("Nothing in this order shall abrogate any CBA in effect on the date of this order.")). In other words, the Guidances do not conflict with or go beyond the Executive Orders, because they incorporate by reference all the Executive Orders' provisions. The Guidances further recognize that agencies may not simply "implement the provisions of the EO that conflict with an existing and currently effective CBA," and encourage agencies to "consult with legal counsel and offices of labor relations on questions relating to appropriate implementation of the EO." (Dkt. 20-8 at 3). The Court disagrees with Plaintiffs that the Guidances instruct agencies to ignore the clear language in the Executive Orders indicating that the terms of all currently existing collective bargaining agreements must continue to be applied.

In sum, Plaintiffs' additional submissions and arguments have not changed the Court's assessment of Plaintiffs' likelihood of prevailing on their procedural APA claims. The Court continues to find that Plaintiffs are not likely to succeed on such claims, nor have they met the lower fair-ground-for-litigation standard.

## C.      Subject Matter Jurisdiction over Substantive APA Claims

Finally, the Court turns to the matter of its jurisdiction over Plaintiffs' substantive APA claims. In the TRO Decision, the Court concluded—relying in significant part on the D.C. Circuit's decision in *AFL-CIO II*—that these claims were subject to mandatory litigation before the FLRA in the context of concrete bargaining disputes. (*See* TRO Decision at 10-13).

In their reply papers, Plaintiffs argue that the Second Circuit assesses the factors set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), differently than the D.C. Circuit, and so the analysis set forth in *AFL-CIO II* does not apply here. The Court has considered each aspect of Plaintiffs' *Thunder Basin* argument, and is not persuaded that its prior determination regarding subject matter jurisdiction should be disturbed.

With respect to the issue of whether meaningful judicial review would be foreclosed by requiring substantive APA challenges to the Executive Orders to first be raised before the FLRA, Plaintiffs argue that the Second Circuit's decision in *Tilton v. SEC*, 824 F.3d 276 (2d Cir. 2016) establishes that, in this Circuit, "judicial review is not 'meaningful' if part of plaintiffs' claims or their resulting harm will escape review." (Dkt. 36 at 22). This is an overly broad reading of *Tilton*. Of particular importance, *Tilton* did not consider

whether the availability of particular kinds of relief rendered judicial review meaningless. Instead, the issue in *Tilton* was whether "judicial review of an Article II challenge to an administrative tribunal is not meaningful if conducted after the tribunal's proceeding concludes, because of the inherent remedial limitations of post-proceeding review." 824 F.3d at 284. *Tilton* simply does not, as Plaintiffs claim, stand for the proposition that judicial review must offer a full and complete remedy to be meaningful.

Moreover, Plaintiffs' argument that judicial review in this case would not be meaningful because "[n]o remedy after years of administrative process can completely make whole employees who have been out of work for years, lost time that can never be regained, or been forced to bargain under illegal rules" (Dkt. 36 at 22-23), is wholly inconsistent with the *Tilton* court's holding that "post-proceeding relief, although imperfect, suffices to vindicate [a] litigant's constitutional claim." *Tilton,* 824 F.3d at 285 (rejecting argument that meaningful judicial review did not exist because "[s]ubsequent judicial review cannot restore" the "financial and emotional resources to complete a proceeding that may ultimately prove constitutionally infirm" (footnote omitted)). In addition, the Supreme Court explained in *Thunder Basin* that even where an administrative review body lacked authority to address particular claims, such claims could subsequently be "meaningfully addressed in the Court of Appeals." *Thunder Basin*, 510 U.S. at 215; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 16-18 (explaining that under the CSRA, the appellate court's "authority to decide particular legal questions" is not limited by the authority of the administrative review body).

Plaintiffs also argue that the FLRA currently lacks a General Counsel, which renders it unable to issue any complaints, and that parties may thus find themselves "before the Federal Service Impasse Panel (FSIP), which can impose contract terms in a nonreviewable decision." (Dkt. 36 at 23 (emphasis omitted)). However, the Court agrees with Defendants that nothing in *Thunder Basin* or its progeny suggests that the Court should look beyond the statutory scheme itself in assessing the availability of meaningful judicial review. *See Thunder Basin*, 510 U.S. at 207 ("Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." (citation omitted)); *Elgin*, 567 U.S. at 10 (explaining that the relevant question is what is "fairly discernible in the statutory scheme"). The Court is not persuaded the vacancy in the FLRA's General Counsel position (which presumably will be filled at some point) calls into question the validity of the statutory review scheme.[6] Certainly the D.C. Circuit did not reach such a conclusion in *AFL-CIO II*.

In addition, Plaintiffs argue that certain aspects of the Executive Orders may ultimately escape review entirely, because "[f]or example, if an employee loses the opportunity to grieve a performance review or any disciplinary or performance matter

---

[6] Indeed, the Court notes that the D.C. Circuit recently issued a decision reversing a determination by the FLRA and requiring United States Customs and Border Protection to bargain over a union's proposal regarding reimbursement for work-related travel. *See Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, No. 18-1250, __ F.3d. __, 2019 WL 6222446, at *4 (D.C. Cir. Nov. 22, 2019). The statutory review scheme therefore cannot be said to be wholly non-functioning, as Plaintiffs seem to suggest.

because she no longer has access to a union representative on official time, there will be no agency order to review; the grievance will simply never take place." (Dkt. 36 at 23). Plaintiffs have not explained why this speculative hypothetical scenario is relevant to the assessment of whether their statutory challenges to the Executive Orders could be pursued via the FLRA. Again, nothing in *Thunder Basin* or its progeny suggests that the Court should assess the individual circumstances of potential future litigants in assessing the intent of the statutory review scheme.

Plaintiffs next argue that its claims are wholly collateral to the administrative review provisions, because they are not "intertwined with an administrative proceeding." (Dkt. 44 at 19). Again, Plaintiffs rely on an overly broad reading of *Tilton* to support their arguments. In *Tilton*, the Second Circuit distinguished between two approaches to the "wholly collateral" factor identified in *Thunder Basin*: (1) an approach in which "a claim is *not* wholly collateral to an administrative proceeding only if it is substantively intertwined with the merits dispute that the proceeding was commenced to resolve"; and (2) an approach in which "a claim is not wholly collateral if it has been raised in response to, and so is procedurally intertwined with, an administrative proceeding—regardless of the claim's substantive connection to the initial merits dispute in the proceeding." *Tilton*, 824 F.3d at 287. The *Tilton* court concluded that "[a]bsent further guidance from the Supreme Court," it was "inclined" to adopt the latter approach. *Id.* at 288.

Plaintiffs claim that *Tilton* means that their claims are wholly collateral to the administrative review provisions, because they "seek affirmatively to challenge the illegality of federal agency action, via claims that are not cognizable in the administrative process and that are not asserted as a defense in an enforcement proceeding." (Dkt. 36 at 24). However, nothing in *Tilton* suggests that only defensive claims (and not affirmative claims) may be channeled through an administrative review process. Indeed, such a holding would be directly in conflict with *Thunder Basin*, where the Court held that the review process in question did "not distinguish between preenforcement and postenforcement challenges." *Thunder Basin*, 510 U.S. at 208. Instead, the *Tilton* court acknowledged that the key inquiry was whether the claim at issue was a "vehicle by which" the plaintiffs sought the relief they ultimately desired. *Tilton*, 824 F.3d at 288 (quoting *Elgin*, 567 U.S. at 22). This standard is satisfied here. Plaintiffs' substantive APA challenges to the Executive Orders and Guidances are one of the vehicles they have chosen to pursue their ultimate goal of prohibiting agencies from complying with the Executive Orders' provisions.

Turning to the final *Thunder Basin* factor of agency expertise, Plaintiffs argue that "the agency has no greater claim on statutory interpretation than do the federal courts." (Dkt. 36 at 24). The *AFL-CIO II* court squarely rejected this argument, explaining that "claims . . . that the executive orders direct agencies to violate the [FSLMRS] by refusing to bargain over mandatory subjects or by taking actions that are inconsistent with the duty to bargain in good faith. . . . lie at the core of the FLRA's specialized expertise in the field

of federal labor relations." 929 F.3d at 760 (quotation omitted). The Court continues to be persuaded by the D.C. Circuit's assessment of this third *Thunder Basin* factor.

All other arguments Plaintiffs make in support of their motion for a preliminary injunction were considered and rejected by the Court in the TRO Decision. Plaintiffs have not demonstrated that the Court should disturb its prior determination that it lacks subject matter jurisdiction over Plaintiffs' substantive APA challenges to the Executive Orders. Accordingly, the Court cannot find on the instant record that Plaintiffs are likely to succeed (or even that there is fair ground for litigation) with respect to these claims.

## III.    Irreparable Harm

The parties continue, as they did on Plaintiffs' motion for a TRO, to vigorously dispute whether Plaintiffs have established that they will experience irreparable harm absent court intervention. Because the Court does not find that Plaintiffs have demonstrated a likelihood of success on the merits (or, in any event, serious questions making the matter fair ground for litigation), the Court need not and does not reach this issue. *See Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("[A]ny irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (Dkt. 20) is denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: December 10, 2019
        Rochester, New York